**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| PAUL TARASHUK, PERSONAL REPRESENTATIVE OF THE ESTATE OF PAUL DAVID TARASHUK, DECEASED,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>ORANGEBURG COUNTY; et al.,<br><br>　　　　　　　　Defendants. | C.A. NO.: 5:2019-cv-02495-JMC<br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS LEROY RAVENELL, THE ORANGEBURG COUNTY SHERIFF'S OFFICE, AND CLIFFORD DOROSKI** |

　　　Plaintiff submits this Memorandum in Opposition to the Motion for Summary Judgment of Defendants Leroy Ravenell, the Orangeburg County Sheriff's Office ("OCSO") and OCSO Deputy Clifford A. Doroski (collectively, the "OCSO Defendants").

　　　Before the Court are several summary judgment motions to determine whether the senseless death of Paul Tarashuk was caused by the conscience-shocking, deliberate indifference of the employees of OCEMS, the Orangeburg County Sheriff's Office and Deputy Doroski, the Town of Santee Police Department and Officers Smith and Cline, and the South Carolina Department of Public Safety (Highway Patrol) and Patrolman Rice, whether there was a failure to hire, train and/or supervise these state and county employees, and whether the conduct at issue violated the Americans with Disabilities Act and Tort Claims Act.

　　　The OCSO Defendants provide the Court with a very brief recitation of the facts, omitting critical information relevant to Deputy Doroski's knowledge of events, criticism of the other officers, and decision-making process, as well as the OCSO policies and practices in handling

1

mentally ill subjects. All of that information is relevant to their Section 1983 arguments, as well as the *Monell* and ADA claims. Plaintiff will set forth in detail the factual basis that creates genuine issues of material fact for the immunity issue and other claims. Some of this information is duplicative; most of what follows is told from the perspective of Deputy Doroski. In addition, this chronology helps explain the lack of understanding between the law enforcement agencies concerning which agency was in charge of the investigation and which ones were assisting.

## I.    STATEMENT OF FACTS

### A.  FACTUAL RECORD

The Plaintiff's Complaint sets forth in detail the factual allegations in this case, the majorityof which are not contested by the OCSO Defendants in their motion. Dr. Frierson's expert report (Exh. 1) details Paul Tarashuk's previous diagnosis of schizoaffective disorder. In his opinion, Paul was suffering from a manic event related to his illness on the night in question. His report also states that the Orangeburg County Coroner's Office found no drugs in Paul's system after he died. This is not contested.

Mr. Kuczynski's expert report (Exh. 2) details the damage to Paul's truck, indicating that Paul had been run off the road prior to the incident in question, and that someone had taken a crowbar or other heavy object and hit the truck in various places. The OCSO Defendants do not contest his conclusions.

In addition, the Plaintiff has produced the expert report of Frank Murphy, who has served in law enforcement for over fifty years. Mr. Murphy's report contains an extremely detailed "chronology of events," with citations to the deposition testimony, bodycam videos, dashcam videos, dispatch reports, interviews, and various documentary evidence. His report is incorporated herein. (Exh. 3.) Once again, most of the factual record cited by Mr. Murphy is not

contested, but the OCSO Defendants omit a significant amount of factual detail related to their actions and inactions in this case.

## B.    FACTUAL SUMMARY RELATED TO OCSO MOTION

Harold Potter called to a SCDPS ("Highway Patrol") dispatcher several times on the evening of September 9, 2018 starting at 11:02 p.m. Compl. ¶¶51-56. He said that a naked man had approached his tractor-trailer on an entrance ramp to I-95 South, and that he thought the man had jumped onto the catwalk as he took off down I-95. He updated the dispatcher with his location as he traveled down I-95 southbound "doing 60" driving south (starting at mile marker 95, and then passing, 94, 93, and exit 90). (Exh. 4, Highway Patrol dispatch call.) A few minutes later, Potter called the dispatcher back and told him that he thought the naked man had pulled or cut his "air lines " to his brakes, and that he had pulled over at the I- 95/I-26 interchange at mile marker 86. (Exh. 5, Highway Patrol second dispatch call.)

The dispatcher noted the "Location of Occurrence" in the Highway Patrol Call History Record as the entrance ramp from Route 301 onto I-95. (Exh. 6, Cline Depo. Exh. 5, Call History Record.) This was exit 97.

Highway Patrol Dispatch called Trooper Rice (call sign: G55) to respond. This initial call between Dispatch and Rice has not been produced. Rice later told SLED that he received a dispatch call indicating that there was a truck driver stating that he had a naked man riding on the catwalk between his truck and his trailer, who was "unplugging the air-lines and electrical lines back there." (Exh. 7, SLED interview of Rice (May 30, 2019) 3:15- 45.) Rice asked for his dispatch to make contact with a closer agency that "*could possibly detain the guy or at least get there and keep him from getting in the roadway or causing any further harm to himself or to any others*." (Exh. 7, SLED interview of Rice 3:45-4:22.)

3

From this point the dispatch information provided to law enforcement agencies is clear, but the actual assignments are not. Highway Patrol Dispatch called the OC Dispatch at 11:16 p.m. for "help" on an incident in which a tractor trailer driver had reported that a "Hispanic naked male has jumped on his catwalk on his truck and cut his brake lines and now he's down at [mile marker] 86 southbound [on I-95], and he's pulled over with his flashers on, and he doesn't know what this male is doing. He was banging on his truck. He believes he has cut his air lines. He has no brakes anymore." The OC dispatcher asked if Highway Patrol was sending someone. The Highway Patrol dispatcher said that they did not have anyone available at the moment to respond. The OC dispatcher said she would send someone over there. (Exh. 8, OC Dispatch record at 11:16.)

OC Dispatch called the Santee police, reported the information concerning the naked Hispanic male and said that Highway Patrol had no one to send at that time. (Exh. 9, OC dispatch record at 11:17.) Officers Smith and Cline responded to the call.

Meanwhile, Mr. Potter continued to report to Highway Patrol dispatch what the naked man was doing after he had stopped the tractor-trailer: "naked male is now crawling under the truck," "subj[ect] is under truck 'messing with truck'," "subject may have [sic] jumping up and [d]own on catwalk," "now on top of truck," "sliding down the windshield," "messing with wipers," "now at passenger door trying to get driver to let him in," "now at passenger door trying to get driver to let him in, "on catwalk waving at passing vehs [vehicles],""pounding on truck," "now he is on the road and almost got hit by a TT [tractor trailer]," "he's walking in front of cars," "now he's crawled back underneath truck."[1] (Exh. 5.) *See also* Compl. ¶¶56-59.

---

[1] Potter took photographs of Paul sliding down the windshield. (Exh. 10, Cline Depo. Exh. 6.) He later showed one of those photographs to Trooper Rice (Exh. 11, Cline bodycam 22:15-17). After that, he told *Doroski* that he took a photograph: "And … he's … jumping all over my truck, my top, I've got a picture from my phone hanging - [to Smith] did you see that picture? I mean, he's in my windshield, looking at me, banging. And he's getting on the side, just banging all around my truck. Climbing all over my truck." Doroski did not ask to see the photograph. (Exh. 12, Doroski bodycam2 at 5:05.)

A motorist and a tractor-trailer driver called 911 and both said that they had almost hit a naked man on I-95 at the I-26 interchange. Compl. ¶58. The motorist reported to Highway Patrol Dispatch that "there's a man in the middle of the road, naked, like flagging people down. We came within inches of hitting him." (Exh. 13, Highway Patrol Dispatch record of call from Bob Stacey.) Mr. Potter later told many of these same details to the three different law enforcement agencies that responded to the scene, as recorded on the bodycam videos. None of the law enforcement officers called Highway Patrol Dispatch to confirm Mr. Potter's story.

SCDPS produced a string of recorded calls from Trooper Rice and his supervisor that do not have time stamps. In the first of these, Rice told his supervisor that he was on the way out to the scene and that he had received "several calls on a Hispanic Mike [male] supposedly naked and standing in front of an 18 wheeler right now trying to jump on it or something like that…I'm still unclear whether he's blocking traffic or not, but I'm on the way out there. I've got Orangeburg making some [?] with the County as well." The next recorded call in this string has Rice requesting OC Dispatch to ask EMS to have an ambulance go to the scene because "they will have sheets and blankets and stuff we could probably use to cover that subject up with." Apparently, OC Dispatch did not ask EMS to come out at that time. Rather, in the next communication, and while Rice is still on the way, the dispatcher tells Rice that the County is 10-23 [on scene]." (Exh. 14, G55 Naked Pedestrian I95SB 86mm Orangeburg County, 0:00-1:14.)

When the Santee officers arrived, Officer Smith's told OCSO dispatch that "I can confirm he's on the truck. No clothes." (Exh. 15, OC Dispatch record at 11:23.) In their initial interaction, the officers asked the man[2] to come down from the cab. Officer Smith asked him what was going on. Paul responded, "I'm fixing my truck." Officer Cline asked, "Naked?" On the bodycam video,

---

[2] The following day the man was identified as the decedent, Paul Tarashuk. He is referred to herein as "Paul" or "Mr. Tarashuk."

Paul does not seem to know that he is naked. Officer Smith points that out to him: "You got no clothes on. You're in your birthday suit... You don't have no clothes on. You taking something?" Paul looked surprised and turned away. (Exh. 11, Cline bodycam 0:53-1:59.)

The officers then talked to Mr. Potter briefly, who said that he did not know the man, and that "I was back there, a couple of exits back, and he comes running up on me. I took off. Freaked me out. *Look how he is*." After two minutes on the scene, Officer Smith called OC Dispatch to "send me a [Orangeburg County] deputy out here." Again, the report was for a Hispanic male, no clothes. Officer Smith said he did not know where he came from, and suggested that he came from the northbound side of I-95. (Exh. 16, Smith bodycam1 0:00-2:16.)

At 11:31 p.m., OC Dispatch called Deputy Doroski (call sign: 118). Dispatch asked him "*to assist Santee*" on I-95 at mile marker 86, "in reference to *Highway Patrol passed on* a Hispanic male that was *on top of a tractor trailer and he's naked*. He's out with him and he needs for someone to speak with him because he came across I-26 northbound." Doroski acknowledged the call and would head to the scene. (Exh. 17, OC Dispatch Record 11:33 p.m.)

At the scene, Officer Cline then handcuffed Paul, and Smith reported to OC Dispatch that he had detained Paul at 11:33 p.m. (Exh. 11, Cline bodycam 4:29; Exh. 17, OC Dispatch Record 11:33 p.m.) Paul was in police custody within minutes of Santee Police's arrival, which is what Trooper Rice told SLED that he had requested.

From the communication records to this point, when Trooper Rice was notified, he asked his dispatcher to ask for another agency *to assist* and detain the naked male to prevent him from harming himself or others. Highway Patrol asked OC Dispatch for "help" because no trooper was available. OC Dispatch then called Santee Police to see if they could "hit I-95 Southbound at the 86" because they did not have anyone to send. Once at the scene, Santee Officer Smith called OC

6

Dispatch to "send a deputy." OC Dispatch then called Deputy Doroski *to assist Santee* because Highway Patrol had "passed" the call to them. The record thus indicates that Doroski was called to assist Santee, which was in charge of the investigation, but at the same time Highway Patrol was also coming to the scene. The confusion as to which agency was in charge, and which was assisting, persisted during the entire interaction. It also led to Doroski's extreme frustration that is evident from his own comments on his bodycam.

At this point, early on at the scene, Cline's interview of Paul demonstrated that Paul was confused and nonsensical. He indicated that he was the driver of the truck, and had been in the truck. Officer Smith looked in the truck, and entered from the driver said. He did not see any evidence that Paul had clothes in the truck. Paul said that he was trying to plug the truck in so could get a ride and "get me there on time." He said that he lived down the road in "Charles China Town." Then Paul said this:

> Charles China, boomchuckle, uh, sheshock, motherfucking, China, bomb, police chuckling. You know what, let me walk my vegetation back to the woods, and then, trying to do ... bombzilla, bombdoopa, karate, dildo, fez-dispensing, um ... so you guy's had astarbombing, bombfuckening, cliffsiding, redirecting.

Cline said, "OK. Just stay right there." (Exh. 11, Cline bodycam 5:52-6:54.)  Compl. ¶¶63-74.

Trooper Rice appeared on the scene at approximately 11:37 p.m. Cline reported to Rice that they found Paul naked on top of the cab, and that "*he's not coherent*" and "*definitely a mental subject of some sort*." (Exh. 11, Cline bodycam 11:41-13:25.) He also said that he had Paul in handcuffs because he kept trying to wander away. Rice did not ask Officer Cline any questions about why he thought Paul was a mental subject. He was more concerned with getting Paul some clothes. Mr. Potter threw some red shorts out the passenger window, and Officer Cline helped Paul put them on (Exh. 11, Cline Bodycam 11:41-13:25.)

Deputy Doroski arrived shortly thereafter, at 11:41 p.m., and advised OC Dispatch that

7

there were multiple units on the scene, including Highway Patrol. (Exh. 18, OCSO Dispatch Record 11:41:59 p.m.) He next advised OC dispatch that "it looks like they have one detained." (Exh. 19, OCSO Dispatch Record 11:42 p.m.) When he turned his body-camera on, he said: "Looks like I will be setting out with *an agency assist here with Santee and Highway Patrol…Supposed to be a naked man on the roof of a tractor trailer*." (Exh. 20, Doroski bodycam1 0:01-05.) OCSO Deputy Howell arrived shortly thereafter.[3]

At that point, Officer Rice was talking to Paul in front of a Santee patrol car. Doroski walked up within a few feet and listened to Trooper Rice interview Paul. *Doroski heard the following conversation*:

| | |
|---|---|
| Rice: | "Basically what I want to know why are we on the side of the road and you're naked right now? And on top of the cab of the truck? |
| Paul: | "You know what? It was an accident. We just…" |
| Rice: | "What do you mean it was an accident? What happened?" |
| Paul: | "You know, basically what happened was: I work with him, and he kicked me out of the truck. I took a piss. I tried to plug the truck back up and he just wants me to get back in the truck." |
| Rice: | "What do you mean I tried to plug the truck back up. Why was it unplugged to start with?" |
| Paul: | "I have no clue. I think we must have hit a bump and it pulled..." |
| Rice: | "So you got out of the truck, naked." |
| Paul: | "Yeah. No, I mean I got out. I tried to um ...... " |
| Rice: | "Why are you naked? Where is your clothes at?" |
| Paul: | "You know what? Just drive me back to uh…" |

---

[3] By 11:45 p.m. there were six different law enforcement officers from three different agencies on the scene: Officers Smith and Cline from Santee; Troopers Rice and Richardson from Highway Patrol; and Deputies Doroski and Howell from OCSO.

Rice:           "The only place you're going right now is to jail…"

Paul:          "OK."

Rice:           "…for public and disorderly conduct. So go ahead and come clean with me about what's going on tonight."

Paul:          "Basically the man just said, 'throw me in the back of the truck or something.'"

Rice:           "Huh?"

Paul:          "Just throw me in the back of the truck."

Rice:           "What? Throw what in the back of the truck?"

Paul:          "Get me in the back of my truck and let me drive back to...I just got drunk and I need to just drive back. …And I just took a piss and that's it."

Rice:           "So what happened to your clothes? Where are your clothes at?"

Paul:          [no response; looking around]….

(Exh. 20, Doroski bodycam1 0:01-2:53.) Paul then said he operated the truck, and he also said that his identification was in the truck and on the manifest.

At that point, less than three minutes after arriving on scene, Doroski said to Deputy Howell, *"Time to ask for a DRE* [drug recognition expert]." (Exh. 20, Doroski bodycam1 2:51-2:54.)

Paul said he would walk over to the truck, and Rice told him "you are detained at this moment, OK?" Doroski told Deputy Howell, in a side conversation, that if he told him he's going to jail for disorderly conduct, he is under arrest; he is not detained. Then Doroski asked Howell: "*when's he gonna start running?*" (Exh. 20, Doroski bodycam1 at 3:14-29.)

Rice said that he would go look for Paul's ID in the truck. (Exh. 11, Cline bodycam 17:00-04.) He tried one more time to get coherent information from Paul. He was unsuccessful:

Rice:           "And your name is David what?"

Paul:        "You know I just drive the truck."

Rice:        "What's your last name?"

Paul:        "I just drive the truck; I'm hired to…"

Smith:        "What's your last name?[4]

Rice:        "Your first name is David?"

        Paul sighs.

Rice:        "Sir?"

Paul:        "Yes."

Rice:        "Your first name is David?"

Paul:        "David; yes."

Rice:        "What's your last name?"

Paul:        "Can I just jump back in my truck and drive it back…?"

Rice:        "No. You can't."

Paul:        "Why?"

Rice:        "Because."

Paul:        "Because why?"

Rice:        "You're being detained right now."

Paul:        "All right. So what do you want me to do?"

Rice:        "I want you to tell me what your last name is."

Paul:        "There's nothing to tell you."

Rice:        "You don't have a last name?"

Paul:        "No. I literally just drive the truck."

---

[4] Doroski is heard snorting or laughing at this exchange. (Exh. 20, Doroski bodycam1 4:07-4:08.)

Rice:            "That's not what I'm asking you, now."

Paul:            "Just.... hook...just hook the truck back up."

Rice:            "Look at me. What is your last name? David what?"

Paul then just knelt down in the grass.

Rice:             "Where are you from?"

Paul:             "I drive that truck."

Rice:             "Where are you from?"

[Paul sits down on the grass and says nothing from that point on]

Smith:          "He told me he's trying to get back to Florida."

Cline:          "He told me he just came out of the woods and he's from jinka-bonga."

At this, Doroski continues his commentary on how Highway Patrol and Santee are conducting the investigation. He commented to Howell: "Secure him inside of a vehicle. Let's start there." (Exh. 20, Doroski bodycam 5:02-04.) When Trooper Richardson asked Paul where he was coming from, Doroski commented to Howell, sarcastically: "On the cab of his truck, naked." (Exh. 20, Doroski bodycam1 5:08-10.)

Paul then scooted backwards on the grass, and then just laid down. Doroski commented: "*Time to call a DRE on that boy. That's what you call 'under the influence.*'" (Exh. 20, Doroski bodycam1 5:34-41.)

Paul then continued to scoot backwards, and as Smith and Richardson moved to grab Paul, Doroski commented: "Secure him somewhere." Doroski turned away from the officers, and commented to the camera: "*Jesus, watch him run all over the damn interstate.*" Smith and Richardson sat Paul down in front of the patrol car. When Howell came over to Doroski, Doroski said, "*Now we're gonna put him in the road. He gonna run out into traffic, and I ain't part of it.*

*Secure that man inside of a vehicle*." (Exh. 20, Doroski bodycam1 5:42-6:02.)

Doroski then continued to mock Trooper Richardson. Richardson asked Paul, "You upset or something?" Doroski turned to Howell: "'*You upset?' No, he's under the influence. Nobody can see that? Am I the only one who can see that? I'm pretty sure you can*." (Exh. 20, Doroski bodycam1 6:18-6:26.)

As Officer Smith explained to Trooper Richardson that Paul was riding on the back of the tractor trailer and had pulled the air-lines, Doroski said to Howell: "Get some more of this on film." He walked closer to Paul, Smith and Richardson. (Exh. 20, Doroski bodycam1 6:50-7:04.) As Doroski stood next to the hood of the patrol car, Richardson said to Smith: "He had no clothes on?" Smith: "Buck naked. Like the day he was born." He described Paul sitting on top of the cab of the tractor trailer, relaxing." Smith tried to engage Doroski in conversation, but Doroski said nothing. Then he turned back towards Howell. (Exh. 20, Doroski bodycam1 7:07-8:38.)

Doroski joked with Howell about drivers backing up on the interstate, noting that it could be worse - *if the driver was naked on his cab*. (Exh. 20, Doroski bodycam1 8:45-9:45.)

All during this time, Rice was searching the cab of the tractor trailer. Doroski told Howell that it should not have taken that long to search for the man's identification in the cab. Consent to search for an ID was not, in his mind, consent to search the vehicle. "Looks like an illegal search and seizure to me." (Exh. 20, Doroski bodycam1 10:00-10:44.)

As Smith was explaining that the driver had stopped a few exits back and Paul had jumped on the cab, Doroski commented: "*He's not making any sense when he talks. He's under the influence of something*." (Exh. 20, Doroski bodycam1 11:09-11:13.)

Rice, Cline and Potter started walking back from the truck at the 16.42 second mark on Doroski's bodycam. Howell suggested it might be time to "disappear." Doroski said, "I'm about

to." (Exh. 20, Doroski bodycam1 17:15-19.)

Trooper Rice then went to call his supervisor.

Officer Cline then came over to Doroski and said, "You know who he is? He told me he's from 'Jinga Bonga %#$@$*.' I said, 'What the heck is that?' He said, 'Well it's from China.'" Doroski chuckled. Cline: "I said, 'What?' I said, "Don't even say no more.' Made searching easy." Doroski then commented: "Looks like a John Doe to me." (Exh. 20, Doroski bodycam1: 17:59-18:02.)

Doroski then turned and walked away to leave the scene with Howell.[5]

After Rice finished his conversation with his supervisor, he came back to the Santee officers and said, "The Sheriff's office done took off? Can one of y'all call him and tell to come *back*?" (Exh. 11, Cline bodycam 36:14ff.)

Smith called Doroski over the radio. Doroski asked, "They advise what they need?" Rice, who was kneeling down trying to get Paul to talk, heard the question but said nothing. Smith then said to Rice, "*Need transport?*" Rice stood up and said, "*Want to see if it's possibly something they're going to handle. If not*…" He shrugged. Smith then said over the radio to Doroski, "They need you to come back in reference to the, uhh, situation. Orangeburg…happened in the County." Doroski then said, "*Just detain him and advise him he's going to be under arrest for disorderly conduct*…Want us to come back. Is that correct?" The dispatcher said, "Affirmative." Rice said nothing. Smith said to Cline that Doroski was just trying to be clear with what's going on (Exh. 16, Smith bodycam 37:49-38:08.)

It was not clear. Officer Smith was suggesting Rice to ask OCSO to transport Paul to the

---

[5] At no point did Doroski ask other agencies whether he could leave, or tell them that he was leaving. On his Incident Report, he stated that a Highway Patrolman had told Howell that they could leave. (Exh. 21, OCSO Incident Report.) That did not happen. It is not on the bodycam, and Richardson denied saying it. (Exh. 22, Richardson Tr. 17-18.)

hospital. Trooper Rice equivocated, saying he wanted to see if OCSO could "handle" it. Doroski said to detain Paul and tell him that he was under arrest.

As instructed by Doroski, Officer Cline then told Paul that he was about to go to jail as an unidentified "John Doe" and that he would not be released until he was identified. Smith and Cline both asked Paul if he knew where he was. Paul gave no response. (Exh. 11, Cline bodycam 38:42-39:24.)

Officer Cline told Rice that when they arrived, Paul was naked but thought he had his clothes on. They discussed what kind of drugs might cause Paul's behavior. Rice, who is a certified drug recognition expert, said that there were a couple of categories that "he was looking at," including a hallucinogen or a stimulant. Officer Smith noted that it was "*lucky he didn't get run over*." (Exh. 11, Cline bodycam 41:02-41:53.)

Smith then went to get some information on the tractor trailer. Doroski called over dispatch and asked Smith to call him back on his cell phone. Smith went to his patrol car and called Doroski from his flip-phone. Smith's end of the conversation is recorded, with some of what Doroski said audible. What is clear is that Doroski was not at all happy, commenting about this "stupid shit." Doroski later testified that he did not see any need for OCSO to come back to the scene to handle anything. (Exh. 23, Doroski Tr. 37.) Smith said that they were trying to figure out where Paul came out of the woods "buck naked," and that Paul had said he had a truck parked somewhere. Smith said that they were trying to figure out "where his stuff's at, or a responsible party; he's not giving a name or anything, *so he's out on Cloud 9*." (Exh. 16, Smith bodycam 46:11-48:20.)

After Smith finished his call to Doroski, he explained to Rice and Cline that Doroski was "trying to figure out what we're going to do with him, and if he's got a vehicle parked somewhere

with his clothes in it. What I explained to him, maybe they can look to see if they can find the vehicle." Rice responded: "Well, like I said, if he can … come and help us out with it, we can go down there and check." (Exh. 16, Smith bodycam 49:27-52.) But Rice never checked the entrance ramp off Route 301 to 95 south (at mile marker 97), nor did Richardson, Smith, Cline, Doroski, or Howell. That is where they would have found Paul's Sierra pickup truck in a ditch off the entrance ramp, with his driver's license and one of his two dogs.[6]

When Doroski arrived back on the scene, there was some conversation between Rice, Deputy Howell, and Doroski. Some of that conversation was recorded. (Exh. 12, Doroski bodycam2 0:00-1:10.). Rice presented two scenarios: 1) that Potter was telling the truth, and that a naked man had just jumped onto the catwalk; or 2) Potter and Paul had something going on and Potter had kicked him out, based on the fact that Rice had found some sex toys in Potter's cab. Doroski speculated that could have happened at a sex store off of Exit 97. Doroski said he would talk to the trucker and "get the story."

Rice then told Howell that if Highway Patrol had to deal with Paul, he would take him to jail for public and disorderly conduct for jumping on the truck, being naked in public, and being a pedestrian on the interstate. Rice also said that the driver knows nothing about Paul, and he had no way of proving that he did. Howell indicated that they did not want to arrest Paul. (Exh. 26, Rice dashcam (from SLED disc 2) 13:58-15:15.

When SLED interviewed Rice later about the decision on what to do with Paul, Rice said

---

[6] Several hours after Paul died, the same troopers that were on the scene of Paul's death found Paul's pickup truck about one mile from where Paul died on the entrance ramp at mile marker 97. They found Paul's driver's license. Inexplicably, they did not make the connection between the dead man (who Smith had told them was "out in left field" and who had jumped into traffic that morning), with the abandoned and damaged truck a mile away. They did not bother to ask Trooper Rice and show him the driver's license photo. That was unfortunate because Rice had immediately made the connection between the naked male he interacted with and the report of a naked male killed on the highway (when he talked with Corporal Burris early that morning). Animal Control *did* make the connection, and on September 12, 2018 called Paul's parents to tell them. (Exh. 24, Cindy Tarashuk Tr. 38-39; 159; 167-168; Exh. 25, Burris Tr. 37-55; 76-78.)

that Doroski indicated that they were going to leave Paul there:

> That's when I stopped him and I said, '**No. No. No. No. He will not get left here…I said, 'If y'all leave him there, I'm not going to leave him on the side of the road like this. You know good and well we cannot leave anyone on the side of the interstate, especially on the interstate.**' In South Carolina, it's against the law to be on the side of an interstate…I said, '**To start with, you got a guy here who we have not positively identified, he is basically shutting down on us. I don't know whether he's on some type of medication, whether he's on a drug, *or does he have a mental illness*.' I don't know. But I told the deputy straight out, I said, 'If you leave him here, here's what's going to happen. I'm going to take him to jail for being a pedestrian on an interstate, or take him to the hospital to hopefully get an assessment on him, or possibly both. If I take him to the hospital, and they can't do anything with him, then I will escort him to the jail**. At least he'll get inside, he'll be fingerprinted until we can determine who he is and where he came from.'"

(Exh. 27, SLED interview 24:50 – 25:49.) Doroski testified that he did not remember this conversation. (Exh. 23, Doroski Tr. 71-73.)

Doroski then walked towards the trucker. On the way, he commented to himself, "*These darn municipalities that do these assists, they don't know what the heck they're doing. They don't understand the word, 'assist.' They're going to detain somebody, they want us to clean the mess up*." (Exh. 12, Doroski bodycam2 :1:17-1:32.) The "mess" was Paul Tarashuk. Doroski understood that OCSO was called to assist by Santee, Santee or Highway Patrol had detained Paul, Highway Patrol had told Paul he was under arrest, those agencies were the witnesses to Paul's conduct on the interstate, and yet he had to take care of it. Those agencies had arresting power, so he did not know why he was called back. He never figured that out. He maintained at deposition, however, that he was not agitated or frustrated – despite what the bodycam shows. (Exh. 23, Doroski Tr. 41-43.) OCSO Captain Culler, however, disagreed: Doroski was irritated. (Exh. 28, Culler Tr. 42.)

Doroski walked past Cline and Trooper Richardson to interview the trucker.

Doroski walked past Cline and Richardson, and said gruffly to Potter: "You the truck

driver? Come talk to me." (Exh. 12, Doroski bodycam2 1:38-1:46.) Officer Cline commented, "I don't think he's happy." (Exh. 11, Cline bodycam 53:00-12.)

Doroski then aggressively interviewed Mr. Potter. He said that "he's getting a whole lot of mixed stories here, and I've got too many parties involved. First off, let me say: Do not lie to me. I'm a human lie detector. If you're going to lie, I'm going to pinch it." (Exh. 12, Doroski bodycam2 1:50-2:09.). Potter once again reiterated what had happened, consistent with what he had told the Highway Patrol dispatcher, Officers Smith and Cline, and Trooper Rice. Potter said that the man had never been in the cab (Exh. 12, Doroski bodycam2 2:10-4:25.) Doroski asked Officer Smith whose shorts the man had on, and Potter said that they were his shorts. Officer Smith told Doroski that after Paul said he had been in the cab, that he (Smith) had looked and saw nothing, and Highway Patrol went in and looked and also saw nothing. So Doroski had no evidence that Paul was ever in the cab. (Exh. 12, Doroski bodycam2 4:25-4:45.)

Potter then continued telling Doroski what happened. After he had been forced to stop, the man was:

> jumping all over my truck, getting on top, I got a picture on my phone with him hanging – (to Smith) did you see that picture? – I mean he's in my windshield looking at me, banging. And he's getting on my side, just banging all around my truck. Climbing all over my truck. ***Gets out on the highway, out on the highway, almost gets hit by a semi, then another car, like he's trying to get hit. And I thought that I was going to see him get run over.*** I'm talking to the 911 operator the whole time. I mean, can't you listen to that 911 call…to verify what I'm saying?"

(Exh. 12, Doroski bodycam2 4:46-5:51.) Doroski declined: "I'm talking to you right now. You're talking to Highway Patrol. I'm not highway Patrol. So let's start there. And I'm asking you what's going on." (Exh. 12, Doroski bodycam2 5:52-6:03.) Potter then reiterated that the man had never been in his cab, that he did not work for his company, and that he had just come running up to his headlights. "That's the truth. I don't know that man. I've never seen that man before, until

he jumped on my truck." (Exh. 12, Doroski bodycam2 6:04-6:21.)

Doroski just turned and walked away back to the patrol cars.

While Doroski was interviewing Potter, Deputy Howell had tried to interview Paul, who was sitting with his back to the patrol car, still in handcuffs. He implied that Paul had something going on with the trucker. Paul remained silent. (Exh. 11, Cline bodycam 54:48-57:57). During this interview, Rice again told Paul that if he did not provide information, they would have no choice but to take him and "you'll be booked into jail as a John Doe. And you'll have to sit there until they can figure out who you are."

Doroski asked Howell what he found out. Howell said that Paul was just playing sleepy.[7] Doroski then summarized what Potter said to him. Doroski said, "I ain't buying it. If you jump on the catwalk on the back of that damn tractor, why the hell you taking off? Let me start there. I ain't believing this bullshit story." (Exh. 12, Doroski bodycam2 :6:39-7:28.)

At this point all the law enforcement officers talked about what happened. Cline told Doroski that Paul had apparently abandoned another truck at another exit. The officers talked about which exit that could have been. Then Doroski said that "my whole point is that he [Potter] says he sees him get on the catwalk, but this jackal takes the hell off. What moron does that?  One and one doesn't … only equal two. I'm way too damn smart to buy that bullshit, I'll tell you that. I ain't buying it. Now we just gotta figure out who this fellow is." (Exh. 12, Doroski bodycam2 7:30-8:32).

In fact, that is not all that Doroski had to do. He could have, and should have, investigated whether Potter's story was true. He did not call Potter's dispatch or Highway Patrol's dispatch to validate the story. He did not do anything at all to investigate. (Exh. 23, Doroski Tr. 124; 161-

---

[7] At deposition, Doroski admitted that he did not know why Paul had shut down. (Exh. 23, Doroski Tr. 71-74.)

162.) He admitted that if someone jumped out into traffic on I-95, as it was reported to him by

Potter, such a person would be acting in an unsafe and unreasonable manner. (Exh. 23, Doroski

Tr. 68-69.) After watching the video of his interview of Potter, Doroski admitted that Potter's

story made sense. (Exh. 23, Doroski Tr. 155-160.) Doroski also admitted at deposition the

following:

> Q:    And, if that story was true, then Paul should have gone to the hospital. Isn't that
>       right?
> A:    Or be placed under arrest for public disorderly conduct.
> Q:    And, if either one of those things had happened, Paul would not have been killed
>       on I-95 that morning.
>                     …
> A:    It – it's highly likely.
> Q:    Because he wouldn't have been there?
> A:    Correct.

(Exh. 23, Doroski Tr. 162-163.) Yet Doroski was adamant that he would not change anything

that happened that night because he followed OCSO procedures. (Exh. 23, Doroski Tr. 135-

136.)

The officers talked with each other. Officer Smith suggested getting EMS. (Exh. 16,

Smith bodycam 59:57-59.) Doroski tried to get Paul to talk. He poked Paul a few times. Paul said

nothing and made no reaction. Then Doroski stood up and said to get EMS out, get the handcuffs

off of Paul, move him to a vehicle, because he did not want Paul on the road. (Exh. 12, Doroski

bodycam2 9:45-9:52.) Smith called EMS. Doroski told Cline that Paul "appears to be under the

influence of something." Cline agreed. (Exh. 12, Doroskibodycam2 10:22-10:25.) Smith told OC

Dispatch that Paul was not communicating, and that when you asked him a question, he "just

gave a blank stare."(Exh. 15 Smith 1:01:24-1:02:35.)

Then they took the handcuffs off Paul and put him in the back of Doroski's patrol car. At

12:32 a.m., Smith told the Orangeburg dispatcher that "he's not communicating, and when you ask

him a question, just get a blank stare." (Exh. 16, Smith bodycam 1:01:28.) Doroski radioed dispatch: "*Orangeburg, he just appears to be under the influence of something.*" (Exh. 12, Doroski bodycam2 11:11-11:17.) Doroski testified at deposition that he never thought that Paul was under the influence or had a mental illness. (Exh. 23, Doroski Tr. 44-45.) This is directly contradicted by the bodycam videos. He said numerous times that he thought Paul was under the influence. He told  Howell, Cline, and the OC dispatcher that Paul was under the influence. He witnessed Paul's incoherent answers and shut down. He was told that Paul was naked on top of the tractor. Mr. Potter told him of Paul's bizarre behavior and that he had jumped out into traffic and almost got hit. He himself asked Paul if he was on drugs. Finally, he told EMS that he thought Paul was on drugs. At deposition Doroski had almost no memory of the details of the incident (see, e.g., Exh. 23, Doroski Tr. 65-67), even though this was the *only* case in which he had been called for a naked pedestrian on the interstate, the *only* case where someone he was investigating died (*Id*. at 58-59.), and even though he was counseled by his superiors and interviewed in SLED's criminal investigation.

Cline took the handcuffs off of Paul, and Doroski had Paul sit in his patrol car. In the words of Doroski, Paul was now in his "custody." (Exh. 31, SLED interview tape2 19:58ff.)

The handcuffs had been on for an hour, but Paul was still not free to leave.

The Santee officers then walked over to Smith's patrol car to give Doroski the underlying information on the trucker. Doroski was still upset. He leaned into the window of Smith's patrol car, and told Officers Smith and Cline:

| | |
|---|---|
| Doroski: | "Last I checked, this is called the 'highway.' Am I wrong?" |
| Cline: | "Right." |
| Doroski: | "OK. I don't know why highway patrolmen can't do his job or her job on the highway. Call me silly." |
| Cline: | "I mean we came out as an agency assist till they're available... But we weren't gonna run it till, once they showed up that should be theirs." |

Doroski:     "**Oh, I know whose it should be. I'm getting passed this thing down. He ain't going to jail, I promise you that. He ain't my fish. I ain't cleaningit. I get him some medical help. All I'm doing. That's not acceptable**."

(Exh. 11, Cline bodycam 1:04:12ff; Exh 12, Doroski bodycam2 12:51-13:28.) Neither Smith nor Cline asked what getting "some medical help" meant.

Cline then went back to Santee. Doroski asked Smith if he was doing a report, and asked him to include the names of the troopers – inferring that Highway Patrol was somehow responsible for this situation. (Exh. 12, Doroski bodycam2 14:20-33.) At that point, Potter came up to the patrol car and asked, "if you'll need the exact place where I stopped, I can call my dispatch [and] they can look it for me." Smith and Doroski declined. They both said, "*No, we don't need it*." (Exh. 12, Doroski bodycam2 at 14:33-39.)

Both Doroski and Smith thereby missed a golden opportunity to find Paul's truck. At his deposition, Doroski could not explain why he did not follow up on this. (Exh. 23, Doroski Tr. 37-40; 185.) Officer Smith testified that he would have wanted to know that information (as indeed the Santee officers had been trying to figure out the location of the entrance ramp for an hour.) (Exh. 30, Smith Tr. 44-47.) OCSO Captain Culler testified that to do a proper investigation Doroski *should* have investigated which entrance ramp Potter was talking about and whether Paul had a truck there. In fact, Captain Culler agreed that Doroski did *not* do a proper investigation.[8] (Exh. 28, Culler Tr. 32-38.) Doroski admitted that he did not conduct a thorough preliminary

---

[8] For example, Doroski did not contact Highway Patrol dispatch to confirm if what Potter was saying to him matched what he told the dispatcher. Nor did he ask Smith, Cline, or Rice (each of whom had interviewed Potter earlier) whether Potter's story was consistent. Nor did he get Potter to ask his own dispatcher for the location. Nor did he look at Potter's GPS on his tractor trailer. Nor did he ask any officer to check the entrance ramps between his location and Santee (even though both Smith and Rice had mentioned that they would or could do that). Nor did he take into consideration that neither Smith nor Rice had found *any* evidence that Paul had been in the cab. Nor did he bother to look at the photographs that Potter took of Paul hanging upside down looking into his cab. Nor did he check for a missing person. Plaintiff's expert, Mr. Murphy, concluded that Doroski did not conduct a preliminary investigation to include the basics of the "*who, what, when, where, how and why*" of this incident. An adequate investigation would have revealed the location where Paul was picked up, and police would have discovered Paul's truck with Paul's identification, and Paul's death that morning would not have happened. (Exh. 3, expert report at 30-32; 34.)

investigation of this incident (but still maintained he would not do anything differently). (Exh. 23, Doroski Tr. 79-80; 134-136; 160-162.) Doroski also admitted to SLED that it is not a normal occurrence to have a call for someone nude, and at least it would be a "red flag" to do an investigation. (Exh. 31, SLED interview tape 2, 10:40-12:05.) The jury could easily infer that Doroski was not interested in doing *any* investigation because he was irritated by being there at all. Paul was not his "fish" and he was not going to "clean it."[9]

On the way back to his patrol car, Doroski passed some troopers, and commented to himself, "*Highway patrolmen not doing their job as usual*." (Exh. 12, Doroski bodycam2 at 15:14-17).

Doroski tried to talk to Paul one more time. Paul had his head down. He did not respond. Doroski said he wanted EMS to check him to see if he was OK. He asked if he "*had taken anything tonight, any prescription medication or any drugs or anything?*" (Exh. 12, Doroski bodycam2 16:48-17:48.) Again, no response. Doroski then turned off his bodycam.

The troopers and the deputies then sat on the highway for another forty minutes before EMS arrived at 1:17 a.m. Apparently, they did not talk to each other. Trooper Rice testified that he knew Doroski was upset. But he did not ask Deputy Doroski what exactly he planned to do, nor whether Doroski was going to take Paul to jail. (Exh. 23, Doroski Tr. 114-116; Exh. 32, Rice Tr. 27-28; 48.) Doroski testified at deposition that did not volunteer that information, even to Deputy Howell. (Exh. 23, Doroski Tr. 111-112.) In talking with SLED, however, he said that he *did* tell the other agencies that he was going to take Paul and drop Paul off in Santee, but he did not remember specifics. (Exh. 33, SLED interview 25:09-25:30.)

---

[9] At deposition, Doroski testified that he did not view this situation as involving a homosexual relationship (again contradicting the bodycam video), and that there was no reason he knew of that he was asked to investigate the incident at all. He admitted that all that he did to investigate was to talk to Mr. Potter and the other officers, and that "I wouldn't have done anything different than I had during this particular incident." (Exh. 23, Doroski Tr. 77-80.)

According to the Santee Defendants' summary judgment brief, Smith and Cline suspected that Paul "was on something, off his meds, or mentally ill," and that they passed on that to concern to the "agencies having jurisdiction," which would include Doroski of OCSO. (Santee Brief at p. 16.)." Indeed, Cline told Doroski that Paul said he was from "jinga-bonga*&@$%@." (Exh. 20, Doroski bodycam1 at 17:59ff.)

The EMS crew met with Deputy Doroski, and Harmon asked him about the situation. Givens said the officer was "perturbed" and "aggravated" when they got there. Doroski told the EMS crew that there were several different stories about Paul. (Exh. 34, DHEC interview of Givens, 15:00-15:15.) In particular, Doroski stated that Paul was running or walking down the interstate naked, or hitchhiking naked. (*Id*. at 15:33-43.) Harmon's Incident Report indicates that Doroski said "he had a male pt riding on tractor trailers on the interstate and a few other things." (Exh. 35, OBFOIA000174.) According to Trainee Scurry, Doroski told them that Paul had been "riding nude on the back of tractor trailers." (Exh. 36, Incident Report of OCEMS Trainee Scurry, 10566-E-0001.) Doroski did not tell them what other possible scenarios there were, and they did not ask. (Exh. 37, Givens Tr. 30.) Deputy Doroski does not remember what he said to the EMS crew. (Exh. 23, Doroski Tr. 115.) Givens acknowledged that being naked and walking on the interstate was *not* normal behavior, which is indeed obvious. (Exh. 38, DHEC interview of Harmon, 15:54ff.)

A summary of what happened when Paul was on the ambulance is set forth at pages 5-9 of Plaintiff's Memorandum in Opposition to the OCEMS Defendants' Motion for Summary Judgment. Doroski recorded the interaction with OCEMS. (Exh. 39, Doroski bodycam3.) In regard to the instant motion, there are several important facts from this video:

First, when Paramedic Harmon jammed the ammonia capsule up Paul's nose, Paul did not flinch or move. He did not try to take it out. Given the strong smell of ammonia, that is abnormal and Doroski witnessed that.[10]

Second, Doroski told the OCEMS crew that he thought Paul was on some sort of drugs. In other words, he admitted that Paul was not acting normal. And, in his own words, he said that Paul "*ought to get treatment for it*."[11]

Third, the only version of prior events that Doroski provided to EMS on the video (in addition to what the EMS crew identified, *supra*) was that "supposedly [Paul] was naked on top of the cab of a tractor." (*Id*.) This information alone was sufficient to warrant a trip to the hospital under the circumstances for EMS, according to DHEC. Although the EMS crew did not ask any follow up questions on that information, notably Doroski did *not* provide any of the information that Potter had told him about Paul's behavior, including that Paul jumped on the driver's catwalk naked, that he traveled miles down the interstate on the catwalk, that he pulled the air-lines, that he hung upside down looking inside the cab, or that he had jumped out into traffic on I-95.

Fourth, it is evident on the bodycam video that Doroski became irritated that Paul would not respond to the OCEMS crew. So much so, in fact, that Harmon told Doroski to "shut up." (Exh. 39, Doroski bodycam3 8:48-9:24.)

Fifth, the OCSO Defendants claim that Paul's vital signs were normal. They were not. His blood pressure was 160/82 and his pulse was 124.

---

[10] Captain Culler agreed that Paul's failure to react to the ammonia was a signal to anyone – including EMS and Doroski – that "there's something not quite right here." (Exh. 28, Culler Tr. 22; 43.)

[11] Doroski said: "If it's an act, it's a pretty good act. Because I see the same thing when I see a variety of drugs being used. Now if you've been taking something, we are not here to judge you….Ought to get treatment if you've taken anything we gonna get treatment for it." (Exh. 39, Doroski bodycam3 6:04ff.)

Finally, under OCEMS policy, Paul was in an altered mental state, did not have the capacity to refuse transportation to the hospital, and should have been transported to the hospital. He should not have been given a "choice" to go to the hospital or go to jail because he did not have the mental capacity at that point to make any choice concerning treatment. All that OCEMS had to do, under its own policies, was to shut the ambulance doors and transport their patient to the hospital for a medical and mental evaluation. If that had happened, Paul would not have died the next morning. Two things prevented that from happening, however: 1) Doroski's *command* to Paul to leave the ambulance; and 2) OCEMS's failure to do anything to stop Doroski from taking their patient. Doroski is the one who decided that Paul was going to get off the ambulance. He commanded Paul: "Then come on. I'm gonna give you a ride. You don't want to go to the hospital, so let's go." (Exh. 39, Doroski bodycam3 10:53-11:00.) Doroski told SLED that he was the one who made the decision for Paul to come with him, and he did not recall if EMS ever affirmatively said that they were not taking Paul. (Exh. 29, SLED interview tape 2, 15:33-16:50.)

What happened next has been briefed. Doroski had two law enforcement options under the circumstances: transport Paul to jail for disorderly conduct, or transport him to the hospital for evaluation. Those are the two options identified by Officer Cline, Trooper Rice, Trooper Richardson, and Santee Police Chief Serrano.[12] Officer Smith testified that it was obvious that Paul had to go to the hospital. (Exh. 30, Smith Tr. 50-52.) Even Doroski admitted, after seeing video of the initial interactions between Paul and the Santee police, that Paul was a candidate for Emergency Protective Custody and that he did not have the ability and means to take care of himself. (Exh. 23, Doroski Tr. 178-184.)

---

[12] Exh. 40, Cline Tr. 37-40; 64-65; Exh. 32, Rice Tr. 45-47; Exh. 22, Richardson Tr. 23-24; Exh. 41, Serrano 30(b)(6) Tr. 23-24 (jail or Emergency Protective Custody).

Instead, Doroski gave Paul a ride to Santee and dropped him off at a gas station at 1:56 a.m., near the OCSO substation and about a mile from I-95. Doroski does not recall the basis for his decision. (Exh. 23, Doroski Tr. 103-105; 111.) He did testify that he considered the gas station area was a "safe environment" because various businesses were open and Paul could get something to eat and contact someone. To Doroski, this was "compassionate." This is nonsense: Paul had no wallet, no money, no cell phone, no shirt, and no shoes. Paul had no idea where he was. Doroski testified that perhaps Paul lived nearby. Of course, Doroski had to admit that he had no idea where Paul lived, much less who he was, whether he knew anyone in Santee, who he could contact, where his truck was, how he could buy anything without money, whether he was a missing person, or wanted by the police. (Exh. 23, Doroski Tr. 116-127.)

Paul had been in the custody of law enforcement and of OCEMS from 11:30 p.m. on September 9, 2018 to 1:56 a.m. on September 10, 2018.

At 5:43 a.m., Paul Tarashuk was once again naked, and once again back on I-95, this time running down the center line near mile marker 97, a mile from his abandoned truck. Several drivers called 911 after nearly hitting Paul. One caller said, "he's definitely mentally ill." The next caller said that she thought she had just hit a man. Paul was dead.

The same OCEMS crew responded to scene of Paul's death, along with Santee Officer Smith. Harmon told Smith talked about what had happened the night before. She said that "something was wrong with [Paul] and he would not talk to us," that "he had been riding on the back of an 18-wheeler naked." She also said that they would have taken Paul "to the hospital" if they had known that Doroski was just going to drop Paul off. (Exh. 42, Smith Bodycam2 1:17-1:20; 7:15-17; 7:30ff.) Officer Smith agreed, saying that "he needed to go." (Exh. 42, Smith Bodycam2 6:30-7:39; Exh. 30, Smith Tr. 50.)

Officer Smith told various Highway Patrolmen on the scene that when he saw Paul the night before, that Paul had not been "acting right," he was "out in left field," it was "like he was turned off," that he had a "blank stare," that he had a "potential mental illness or drugs or someone had slipped him something." He thought that Paul might have had a mental illness. He later testified that if it was up to him, he would have taken Paul straight to the hospital because "it was obvious he needed to go." (Exh. 30, Smith Tr. 50-52.)

Trainee Scurry told DHEC that she too thought that Paul should have been take to the hospital because from the reports they had gotten his behavior was not normal and he was not safe. (Exh. 43, DHEC Interview of Scurry at 10:42-11:27.)

Within a week of the incident, OCSO Captain Culler reviewed just Doroski's three bodycam videos (not the Santee videos which start before Doroski arrived). He and OCSO Chief Kinsey met with Doroski on September 17, 2018. Captain Culler told Doroski that he should not have taken "possession" of Paul because Highway Patrol had said he was under arrest. (Culler did not know that in the somewhat confusing "handoff" call that Doroski had told the officers on the scene to advise Paul he was under arrest. [Exh. 38, Culler Tr. 38-41].) More importantly, Culler's consultation report says this:

> Furthermore, the subject appeared to have some type mental issue or he was under the influence of something. The subject would not talk to him, and he would not identify himself to verify that he was not wanted, missing, etc. Deputy Doroski was advised that he did the right thing by calling Ems, ***but the subject should have been made to go to the Hospital for evaluation before he could be released because he was obviously a danger to himself when I observed his actions on video***. I explained that *Doroski should have never dropped this subject off at a gas station with only shorts on, no ID, and no money, especially the way he was acting at that time and prior to his arrival.*

(emphasis added) (Exh. 44, Consultation report, Culler Dep. Exh. 1.) Despite this "consultation," OCSO did not discipline Doroski. Further, testified that he has received no instruction or training, and knows of no OCSO policy or practice, that would lead him to do anything differently. (Exh.

23, Doroski Tr. 82-83; 134-136.).

When Santee Officer Cline found out that Paul had just been dropped off in Santee and then killed on the Interstate, he was livid. He testified that he was "infuriated" at this decision; "it was completely and totally wrong"; "that guy should never have been released without knowing who he was and what his problem was." (Exh. 40, Cline Tr. 55-57.) Shortly after the incident, in a recorded telephone call to Officer Fichi, a Tarashuk family member, Cline said that Paul had been "totally unintelligible;" that he was not sure if "he was on something or if he was off his meds;" that Paul should "never have been released without knowing who he was and what his problem was;" that "I took it he was off his meds [and] something was wrong with him medically;" that this "was completely and total[ly] unnecessary loss;" that Paul's death was "senseless, needless; a shear and total loss of life for no reason," and that Paul was acting "weird" and there should have been a "mental evaluation." (Exh. 45, Phone call from Fichi to Cline.)

All of this evidence indicates that Paul was mentally ill, that he was a danger to himself, and that it was obvious. It was certainly obvious to Officers Smith and Cline.

### C. OCSO TRAINING CONCERNING INDIVIDUALS WITH MENTAL ILLNESS

Given Doroski's decision to just drop Paul off in Santee, it is not surprising that he did not recall any specific training on how to deal with persons suffering from mental illness or concerning the Americans with Disabilities Act. Nor could he specifically recall any OCSO training or policy on the subject. (Exh. 23, Doroski Tr. 50-55.) He did not recall viewing the several hour training session put out by the South Carolina Criminal Justice Academy. (Exh. 23, Doroski Tr. 172-176.) He did not remember any specific thing to look for concerning signs and symptoms of mental illness. (Exh. 23,Doroski Tr. 173-174.)

OCSO provides training for its deputies, in part to ensure compliance with OCSO policies

and procedures. There is no one at OCSO specifically certified to train concerning mental illnesses. OCSO provided some training on the mentally ill persons in September 2014, but the Training Officer for OCSO could not remember its contents. Doroski began employment at OCSO in 2016, so he did not get training from OCSO on this topic. (Exh. 46, OCSO 30(b)(6) Tr. 14-20; 24-25.)[13] The Training Officer testified that the only the OCSO policy concerning mentally ill people is actually followed by OCSO deputies is if supervisors or department heads bring it to his attention. No one has ever brought it to his attention that deputies are not following the procedures, and the Training Officer had no way of knowing whether any training related to mental illness is effective. (*Id*., Tr. 32-33; 37-40.)

OCSO Policy 303 relates to Responding to Emotionally Disturbed Persons. (Exh. 47, OCSO 30(b)(6) Depo. Exh. 4.) The policy covers Emergency Protective Custody ("EPC"). An EPC is defined as a process in which an officer takes a person into custody for protection "when there exists a likelihood of serious harm to the person or others." OCSO's Training Officer, testifying on behalf of OCSO, testified that under Policy 303 someone riding naked on the back of a tractor-trailer on I-95 may need an EPC, and that jumping out into traffic on I-95 fit the definition for an EPC. (Exh. 46, OCSO 30(b)(6) Tr. 46-48). Further, as a matter of "common sense," the OCSO designated representative testified that someone riding naked on the back of a tractor-trailer on I-95, jumping into traffic, climbing on the cab, hanging upside-down, and looking into the cab is "abnormal behavior" that fits the definition in Policy 303 of mental illness. (*Id*. 49-50.) Such a person is a danger to himself and should be EPC'd. (*Id*. 50-51.) In assessing these situations, under the OCSO policy the 911 calls should be taken into consideration. (*Id*. at

---

[13] Policy 303 dealing with the mentally ill indicates that new deputies will receive training on mentally ill and emotionally disturbed persons. The "training" consists of new hires being told to review the 500 page OCSO policy manual. (Exh. 46, OCSO 30(b)(6) Tr. 55-56.)

53-54.) Under the facts outlined, the OCSO designee acknowledged that the written policy is superfluous because it is obvious a person in that condition needed to be EPC'd, which would involve transport to a hospital by EMS or directly by OCSO (*Id*. 49- 57.)

The OCSO deponent later testified that such a person described above may either be mentally ill, or on drugs. (*Id*. at 62-63.) In such a situation, based on the officer's investigation, the ultimate disposition of such a person would either be the hospital or jail (or to a family member's home). There are no written policies that identifies any discretionary factor that would allow a deputy to drop such a person off at a gas station. (*Id*. at 62-68.)

## II.  ARGUMANT

### A.    SUMMARY JUDGMENT STANDARD

Plaintiff reiterates the common summary judgment principles set forth in his Memorandum in Opposition to the OCSO Defendants, and in particular refers to *Brown v. Elliott*, 876 F.3d 637, 641-42 (4th Cir. 2017) ("[W]hen resolving the issue of qualified immunity at summary judgment, a court must ascertain the circumstances of the case by crediting the plaintiff's evidenceand drawing all reasonable inferences in the plaintiff's favor.")

### B. CONSTITUTIONAL CLAIMS

#### 1.  STATE CREATED DANGER

Plaintiff's Third Cause of Action raises a 42 U.S.C. §1983 against Deputy Doroski based on the "state created danger" exception to *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 196 (1989). *See* Compl. ¶¶186-223.There, the Supreme Court decided that, in general, a state actor's mere failure to act does not give rise to liability for a due process violation. The Court noted two exceptions to this rule. "The first arises when the individual and the state have a "special relationship," *such as a custodial relationship*, that gives rise to an

affirmative duty to protect." *Turner v. Thomas*, 930 F.3d 640, 645 (4th Cir. 2019), *cert. denied*, 140 S.Ct. 905 (2020) (emphasis added). Thus, the *DeShaney* Court announced that "when the state takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* This includes a duty to provide medical care. *Id.*, citing *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285 (1976). This duty was extended beyond incarcerated prisoners under the Eighth Amendment to involuntarily committed mental patients in *Youngblood v. Romeo*, 457 U.S. 307, 314-325, 102 S.Ct. 2452, 2457-2463 (1982); see also *Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983 (1983) (holding that the Due Process Clause requires the responsible government or governmental agency to provide medical care to suspects in police custody who have been injured while being apprehended by the police). This duty is based on the state's restraint of an individual's liberty to act, which triggers the protection of the Due Process Clause. This exception is more generally discussed in the caselaw as "deliberate indifference to serious medical needs," and is discussed in more detail below (the OCSO Defendants argue this issue under both the "State Created Danger" claim and the "Deliberate Indifference" claim).

The second exception noted in *DeShaney* is known as the "state-created danger" doctrine. "Under this doctrine, a state actor may be held liable for harm resulting from "affirmative actions" that created or enhanced the dangerous conditions that produced the plaintiff's injury." *Turner*, 930 F.3d at 645. "[T]o establish § 1983 liability based on a state-created danger theory, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omissions." *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015). "Put another way, 'state actors may not disclaim liability when they themselves throw others to the lions,' but that does not 'entitle persons who rely on promises of

aid to some greater degree of protection from lions at large.'" *Id.* (quoting *Pinder v. Johnson*, 54 F.3d 1169, 1177 (4th Cir. 1995)).

The OCSO Defendants argue that Doroski did not increase Paul's risk of danger by giving him a ride from the side of I-95 to a gas station in Santee. (Brief at p. 13.) That fact, however, is not the basis for the state created danger claim, but merely the end point of Doroski's actions. Under the facts set forth above, Paul was not in danger when sitting on the ambulance. Rather, he was poised to get the medical attention that he needed at the hospital. It was *Doroski* who made the *affirmative decision* to take Paul from the EMS crew and off the ambulance, and then drop him off in Santee in a parking lot in the middle of the night. This decision and that action was not "inaction" by a state actor. On the contrary, Doroski took EMS's patient away, from a safe place, and threw him into the lion's den.[14] If he had done nothing and just stood by while EMS did its job, he would not have created or increased the danger to Paul.

There is no genuine issue of material fact on this point: Doroski commanded Paul to get off the ambulance and leave. SLED asked Doroski:

SLED:       "Who made the decision that he [Paul] came with you?"
Doroski:    "Me."

(Exh. 29, SLED interview tape 2, 16:08-16:14.) At a minimum, Doroski "increased the risk of private danger" by this affirmative command, which in turn led to his inexplicable decision to drop Paul off in Santee. Therefore, the state created danger exception to *DeShaney* applies to the facts of this case, and the OCSO Motion for Summary Judgement should be denied on this claim.

---

[14] Captain Culler's analysis describes the lion's den: "…but the subject should have been made to go to the Hospital for evaluation before he could be released because he was obviously a danger to himself when I observed his actions on video. I explained that *Doroski should have never dropped this subject off at a gas station with only shorts on, no ID, and no money, especially the way he was acting at that time and prior to his arrival*." (Exh. 44.)

## 2.  DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

Plaintiff claims that Deputy Doroski was deliberately indifferent to his medical needs within the meaning of *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). *See also Martin v. Gentile,* 849 F.2d 863, 871 (4th Cir.1988) (applying *Estelle* to pretrial detainees). (Compl. ¶¶224-257.) State actors must treat detainees "at least as well as prisoners, and often they must treat detainees better" because they have not been convicted and therefore must not be punished." *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209 n.5 (4th Cir. 2017). In order to establish a deliberate indifference claim, a detainee must show that:  (1) that the deprivation of a basic human need was objectively sufficiently serious, and (2) that subjectively the officials acted with a sufficiently culpable state of mind. *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008); *De'lonta v. Johnson,* 708 F.3d 520, 525 (4th Cir.2013); *see also King v. Rubenstein*, 825 F.3d 206 218 (4th Cir. 2016) (Eighth Amendment case involving forced and unnecessary medical treatment).

### a.  CUSTODY

As a starting point, the OCSO Defendants argue that the long line of "deliberate indifference" cases are inapposite because Paul was not in custody when he was killed. (OCSO Brief at 10-12, under the "special relationship" exception to *DeShaney*.) Again, their factual analysis misses the mark.

The OCSO Defendants note that "some type of confinement of the injured party" is "needed to trigger the affirmative duty" of providing medical care. *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir. 1995). They then note that it is "doubtful" that Paul was in custody while waiting to be evaluated by EMS, since Paul's handcuffs had been removed, Doroski put Paul in the back of his patrol car for his comfort, and Paul was not under arrest. (Brief at 11.) At best, these are disputed facts. Paul had been in handcuffs for an hour, which is indisputably "custody."

He had been told by Highway Patrol he would be under arrest. Doroski himself complained that he did not know why he had to come back to the scene because he understood that Paul was under arrest. And Doroski himself told Officer Smith over the radio to advise Paul that he was under arrest. Paul was at various points told he was under arrest. While Doroski was waiting for EMS to arrive, Paul clearly was not free to leave, much less free to exit Doroski's patrol car.

These facts demonstrate the "physical control" to establish "custody" as identified in the main case cited by the OCSO Defendants. *See Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005). There, EMTs watched the decedent die in the back of an ambulance without providing any medical care. There were no law enforcement officers involved. No policemen were in the ambulance, or apparently on the scene. There was no "restraint of physical liberty" of the unconscious patient on a stretcher in an ambulance. The EMTs did nothing to restrain the decedent. *Id*. at 590-591.[15] Here, however, Paul was in the custody of law enforcement, and was not free to leave Doroski's patrol car. Doroski stood on the top step of the ambulance to ensure Paul did not leave. At most, there is a genuine issue of material fact on this issue.

The OCSO Defendants further argue that even if Paul was in custody while in Doroski's cruiser, or in the ambulance, or on the ride to Santee, he was *not* in custody when he died. (Brief at p. 12.) Any "special relationship" ended at the Horizon Gas Station, according to the OCSO Defendants. That argument also misses the point: while Paul was in custody, he was denied medical care in a deliberately indifferent manner.

Doroski's deliberate indifference started with a wholly inadequate investigation of events, driven by Doroski's irritation for being called back to handle an incident that in his mind should

---

[15] Likewise, the other case cited by the OCSO Defendants, *Markis v. Grosse Point Park*, 180 Mich. App. 545, 556, 448 N.W.2d 352, 357 (1989), is factually dissimilar. The police had stopped a driver who exhibited impaired sensory and motor skills. But the officer "did not detain" the driver, who a few hours later struck and killed another motorist. There was no arrest, and the driver was not physically restrained in any way. Obviously, that is not the case here.

have been handled by Highway Patrol. He gave zero weight to what Potter had told the Highway Patrol dispatcher, to Officer Smith, to Officer Cline, and to Trooper Rice ("I ain't believing this bullshit story."). He ignored Potter's photographs of Paul hanging upside down looking into the cab. He ignored the lack of evidence that Paul was ever in the cab. He ignored Cline's statement that Paul had said he was from "jinga bonga." He ignored the fact that Paul had jumped out into the highway and was almost killed. He did not call the dispatcher to confirm that. He even ignored (or forgot) his own statements that Paul was under the influence and needed a drug recognition expert. He refused to gather information as to where Paul was picked up in the first place – or to assign that job to one of the assisting agencies - thus missing the chance to identify Paul. In his words, this was "not my fish; I ain't cleaning it." *See, e.g.*, *Benter v. Peck*, 825 F.Supp. 1411 (S.D. Iowa 1993) (prison official's refusal to investigate seriousness of an inmates' need for eyeglasses prevented necessary treatment and constituted deliberate indifference to his serious medical needs).

The deliberate indifference continued when Doroski decided that Paul would not go to the hospital for a medical evaluation. It was not his decision to make.

Further, and directly contrary to the Defendant's argument, Doroski's duty was not extinguished by his awful choice. If that were so, police could let anyone out of jail with impunity.

In *Paine v. Cason*, 678 F.3d 500 (7th Cir. 2012), Chicago police arrested a woman ("Eilman") outside Midway airport who was in a manic phase cause by her bipolar disorder. She did not tell the police about her mental health background, and was uncooperative after her arrest, including providing false or nonresponsive answers to questions, and sometimes not responding to questions at all. Some officers thought Eilman was just being difficult, and some thought she was on drugs. Police held her for a few hours, and then released her on her own recognizance in a

high crime neighborhood in downtown Chicago. She had no idea where she was. Five hours later, she ended up on the seventh floor of an abandoned apartment, was raped, and fell or was thrown out of the building. She suffered permanent brain damage. *Id*. at 503-506.

The Court determined that there were three possible legal theories: 1) the right to medical care while in custody; 2) the right to be kept in custody longer to facilitate medical care; and 3) the right not to be released in a dangerous place when she was in a mental state unable to protect herself. As to the first issue, the Court noted that the right for police to provide care for the serious medical conditions of persons in custody is clearly established. The factual issue of whether the police understood that Eilman had a serious condition was not before the court on an interlocutory appeal. *Id*. at 506.

As to the second issue, the Court held that there is no right to be detained for medical care (a claim that Plaintiff is not making in the instant case).

As to the third issue, the Court reasoned that the question was whether the state enhanced the risk of danger to Eilman under the facts. The Court cited several decisions that "hold that people propelled into danger by public employees have a good claim under the Constitution." *Id*. at 510.[16] The Court held that it is clearly established that the "police may not create a danger,

---

[16] The Court cited *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) (police arrested driver of car for drag racing, but left three minor occupants to fend for themselves on a limited access highway in Chicago; "drag racing is dangerous, but the situation of the children deteriorated when the police took away the drive and left them stranded."); *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993) (police violated due process by arresting a driver and leaving the keys with an intoxicated adult, resulting in the inevitable crash); *Wood v. Osrander*, 879 F.2d 583 (9th Cir. 1989) (police arrested driver and impounded car, leaving passenger in high crime area). *See also Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir.1996) (police officers detained an intoxicated woman one third of a block from her home on a cold night and then released her to walk home alone after sending her husband home, and the plaintiff suffered from hypothermia); *Lum v. County of San Joaquin*, 2012 WL 1027667 (E.D.Cal., March 23, 2012) (an arrestee with bipolar disorder was not provided any medical care and was found dead three days after he was release. The plaintiffs alleged "that by failing to administer a medical or psychological evaluation at the time of arrest and detention, and by releasing Lum six miles from home without money, shoes, a phone, or a means of transportation, the defendants placed Lum in a situation that was more dangerous than the one they found him in." *Id*. at *6. The Court found, apart from the "special relationship" and "state created danger" exceptions to *DeShaney*, there was a triable issue as to whether defendants deprived Lum of his right medical care while in the custody of the county. *Id*. at *8.).

without justification, by arresting someone in a safe place and releasing her in a hazardous one, and it is also clearly established that police must arrange for medical treatment of serious conditions while custody continues." *Id*. at 511.

As applied to the instant case, the *Paine* case confirms that there is a clearly established right to medical care while in custody, even custody for a short duration. It further establishes that the police may not enhance danger to an arrestee by unjustifiably releasing him or her in a hazardous place. As in *Paine*, Paul suffered a manic event from bipolar disorder, was in custody, was not provided medical treatment, and then was unjustifiably left in an unknown area with no resources at all to get help. Unlike *Paine*, Paul was actually on the cusp of getting the medical help that he needed, but unjustifiably denied a trip to the hospital for that treatment.

### b. DEPRIVATION OF OBJECTIVELY SERIOUS MEDICAL NEEDS

A medical need is serious when it "has been diagnosed by a physician as mandating treatment or ... is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). The OCSO Defendants argue that Plaintiff have failed to show an objectively serious medical need because "the need related to him possibly being under the influence" and "there is no evidence of deliberate indifference because Doroski responded appropriately to the need by contacting EMS and ensuring Tarashuk was evaluated prior to taking him to Santee." (Brief at 17.)

This argument grossly understates the record while conflating the objective and subjective prongs of a deliberate indifference claim. There is no real argument by OCSO that Paul had an objectively serious medical need. He had diagnosed schizoaffective disorder, and was suffering a manic event. Cline's interviews of Paul demonstrates that Paul was in an altered mental state, and even Doroski admitted, after viewing Cline's interviews, that Paul needed to be EPC'd.

### c.  SUBJECTIVE DELIBERATE INDIFFERENCE

Next, OCSO argues that "there is no evidence Doroski had actual subjective knowledge of both the serious medical condition and the excessive risk posed by his action or inaction." (Brief at p. 17.)[17] A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3e 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970).

Although Doroski did not know Paul's particular medical diagnosis, he clearly knew Paul's medical need. The evidence of that knowledge is overwhelming in this case.

Within minutes of arriving on the scene, Doroski knew that Paul needed a drug evaluation. He knew Paul needed to be secured because he might "run all over the interstate." Shortly thereafter, he commented that "he's going to run out into traffic." Next he said that Paul was "not making any sense when he talks. He's under the influence of something." He knew that Paul had just shut down. Potter told him that Paul had jumped out into traffic like he wanted to get hit. Again, Doroski stated that "he appears to be under the influence of something." He told the OC dispatcher that he was under the influence. He told the OCEMS crew that Paul was reportedly naked, riding on the back of a tractor-trailer. He asked Paul what drugs he was taking, and told the

---

[17] As noted in earlier briefs, the "subjective" element is in the process of being revised by Circuit Courts. Further, because Paul was neither a prisoner nor technically a pretrial detainee, the Seventh Circuit has held that neither the Eighth Amendment nor the Fourteenth Amendment apply. Rather, the "objective reasonableness" standard of the Fourth Amendment would apply. *Ortiz v. Chicago*, 656 F.3d 523 (7th Cir. 2011). Under that lesser standard, the Court's determination of whether an officer's response to the plaintiff's medical needs was objectively unreasonable is based on 1) whether the officer had notice of the medical needs; 2) the seriousness of the medical need; 3) the scope of the requested treatment; and 4) the weight of various police interests. Here, Doroski knew Paul was under the influence of something and needed medical intervention; Paul had exhibited bizarrely dangerous behavior; all he needed was transport to the hospital (which in this case effectively consisted of just shutting the ambulance doors and driving to Orangeburg); and 4) there is no countervailing police interest since this level of intervention is already the policy of OCSO.

EMS crew that he acted like he was on drugs. (Exh. 23, Doroski Tr. 94-96.) All of this, from Doroski's own mouth, does not require an inference from circumstantial evidence. It is direct evidence of Doroski's subjective knowledge and his assessment of the risk that later materialized (running out into traffic).

Inferentially, however, what was obvious to Captain Culler, Officer Cline, and Officer Smith, was in fact obvious to Doroski: Paul needed to go to the hospital, not just to have his vital signs checked. What clouded Doroski's judgment was that he did not think he should have to handle this "stupid shit" in the first place.

### 3.    Qualified Immunity

The OCSO Defendants argue that Ravenell and Doroski are entitled to qualified immunity. (Brief at 23.) Contrary to Defendants' argument, to meet the "clearly established law" standard, the Plaintiff does not have to produce a case with the exact same fact pattern. The absence of controlling authority does not guarantee qualified immunity. "We must consider not only 'specifically adjudicated rights,' but also 'those manifestly included within more general applications of the core constitutional principles invoked.'" *Dean v. McKinney*, 976 F.3d 407, 417 (4th Cir. 2020), quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017). As noted above, the *Paine* decision recognized that police must provide care for the serious medical conditions of persons in their custody, and "[t]hat right is clearly established." 678 F.3d at 506.

The facts in this case are outrageous, but not novel. Police have denied medical care in many contexts. Perhaps an older Supreme Court decision sets a more apt standard for this case: qualified immunity protects all but the "plainly incompetent." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Such a standard fits this case, and fits Doroski's actions that night.

### C.     STATE TORT CLAIMS ACT IMMUNITY

The OCSO Defendants argue that this is a "failure to protect" case that is covered by governmental immunity under the South Carolina Tort Claims Act. (Brief at 4-8.) In particular, the Defendants argue that a recent South Carolina Appeals Court decision is dispositive. *See Shelley v. S.C. Highway Patrol*, 432 S.C. 335, 852 S.E.2d 220 (Ct.App. 2020). There, a trooper stopped to assist a disabled motorist, who appeared to be under the influence of drugs or alcohol. The interaction lasted 14 minutes. The motorist was not detained, not handcuffed, and not arrested. He was not provided with emergency services. The trooper left the scene, and 42 minutes later the motorist was struck and killed on the highway. The Court held that the Highway Patrol had immunity under the Tort Claims Act for "civil disobedience, riot, insurrection, or rebellion, or the failure to provide or the method of providing police or fire protection." S.C. Code §15-78-60(6).

Although this Court is not bound to follow South Carolina Court of Appeals decisions,[18] the conduct in question cannot simply be brushed off as a "failure to protect" case. Doroski did not leave Paul to his own devices, as in *Shelley*. Rather, Doroski had Paul in custody, and affirmatively intervened with the EMS crew by *commanding Paul to get off the ambulance*. This led directly to Paul's death several hours later. Doroski had no authority to make this decision or this command. It not only contravened OCSO Policy 303, it was also "not within the scope of his official duties." *Shelley* notes that such conduct is not entitled to immunity under the Tort Claims Act. There is therefore a genuine issue of material fact on this issue, and summary judgment on the tort claim is not appropriate.

---

[18] District courts are not bound by decisions of state intermediate courts. *Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986). It would seem that under OCSO's view of Shelley, for example, there would be automatic immunity in any jailhouse suicide case in South Carolina. That reads the immunity provision too broadly.

### D.     AMERICANS WITH DISABILITIES ACT

The OCSO Defendants argue that the ADA because Doroski did not know that Paul suffered from a mental limitation due to a qualifying disability. They do not argue that Paul had a disability, just that Doroski did not know it. Plaintiff adopts the arguments on this issue set forth in his opposition to the OCEMS and SCDPS Defendants' Motions for Summary Judgment.

### E.     NEGLIGENT SUPERVISION/TRAINING

The next argument is that Ravenell and OCSO are not "persons" under Section 1983. (Brief at pp. 20-22). This is an Eleventh Amendment immunity argument, which bars damages actions against the state in federal court. This case, however, was brought in state court. The defendants removed it, and therefore waived its Eleventh Amendment immunity. *Wingate v. Byrd*, 2017 WL 10518177 (D.S.C. Jan. 20, 2017); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 481 (4th Cir. 2005) ([T]he Court has consistently held that a State's voluntary appearance in federal court effects a waiver of Eleventh Amendment immunity.")

As to Sheriff Ravenell, Chief Kinsey testified that it is ultimately Sheriff Ravenell's responsibility that the deputies follow the policies of the sheriff's office. (Exh. 46, OCSO 30(b)(6) Tr. 203.) He signed every policy in the OCSO Manual, including Policy 303 which Doroski violated.

As to the *Monell* claim, discovery has revealed that although OCSO has a policy to deal with mentally ill subjects, and actually requires training every third year, Doroski was not trained in the policy and did not even know the policy. As with SCDPS, OCSO does nothing to ensure that Policy 303 is actually followed in practice. For example, Doroski's "consultation" letter does not even mention the any applicable policy. (Doroski testified he just disagreed with

Captain Culler, and did not even acknowledge the accuracy of the "consultation" since he did not sign it. Thus, there has been no meaningful discipline concerning this incident under OCSO 303, and certainly no meaningful training. See Exh. 3, Report of Frank Murphy at 42-47; 49-58.). Mr. Murphy's specific and detailed opinions as to OCSO's failures to train, supervise, and discipline are set forth at pages 56-57 (defective policy for investigating violations of department policy; gross deviations from their own policy for evaluating deputies; gross deviation from their own policies concerning handling mentally ill subjects; gross deviations from following their own disciplinary policy; deliberately indifferent deviation from their own policy intended to protect at risk citizens; failure to provide adequate or reasonable discipline and/or retraining). OCSO did not identify any expert to rebut any of Mr. Murphy's opinions in these areas, nor did OCSO even brief these issues.

These facts are sufficient to withstand summary judgment under *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001). The lack of policy implementation is pervasive. Chief Kinsey's slow motion, three year hold on reviewing what happened was so inadequate as to show deliberate indifference. Doroski's lack of knowledge of Policy 303 (which required that he at least obtain Emergency Protective Custody of Paul) directly caused Paul's death. Chief Ravenell, in charge of OCSO, is therefore properly the named Defendant in the *Monell* claim.

## CONCLUSION

Based on the foregoing, the OCSO Defendants' Motion for Summary Judgment should be denied.

s/Russell T. Burke
Russell T. Burke (Fed. Id. No. 1604)
Chad McGowan (Fed. Id. No. 6620)
McGowan, Hood & Felder, LLC
1517 Hampton Street
Columbia, South Carolina 29201
(803) 779-0100
rburke@mcgowanhood.com

Steven D. Farsiou
Trinity & Farsiou, LLC
47 Maple Avenue, Suite 7
Flemington, NJ 08822

June 30, 2021