# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# ORANGEBURG DIVISION

| | |
|---|---|
| Paul Tarashuk, *Personal Representative of the Estate of Paul David Tarashuk*,<br><br>Plaintiff,<br><br>v.<br><br>Orangeburg County; Orangeburg County Emergency Medical Services; Danny Rivers, *Individually and in his Official Capacity as the Director of Orangeburg County Emergency Medical Services*; Orangeburg County Sheriff's Office; Leroy Ravenell, *Individually and in his Official Capacity as the Sheriff of the Orangeburg County Sheriff's Office*; South Carolina Department of Public Safety; Leroy Smith, *Individually and in his Official Capacity as the Agency Director of the South Carolina Department of Public Safety*; Town of Santee; Joseph Serrano; *Individually and in his Official Capacity as the Chief of Police of the Town of Santee*; Jamie D. Givens; Alison K.B. Harmon; Clifford A. Doroski; Fred D. Rice; Buist M. Smith; and Keith A. Cline,<br><br>Defendants. | Civil Action No.: 5:19-cv-02495-JMC<br><br><br><br><br><br><br><br>**ORDER AND OPINION**<br>**(SECTION 1983 CLAIMS AGAINST ALISON K.B. HARMON AND JAMIE D. GIVENS)** |

      Before the court are two Motions for Summary Judgment: one filed by Defendant Alison K.B. Harmon (ECF No. 82), and the second filed by Defendants Orangeburg County EMS ("OCEMS"), Orangeburg County, Danny Rivers, and Jamie D. Givens (ECF No. 79), which seek, *inter alia*, summary judgment on Plaintiff's 42 U.S.C. § 1983 claims against Harmon and Givens for deliberate indifference to a serious medical need.[1] (ECF No. 1-5 at 52-57.)

---

[1] Citations to deposition testimony refer to pagination generated by ECF.

After careful consideration, the court **DENIES** Harmon's Motion for Summary Judgment (ECF No. 82), and **DENIES IN PART** and otherwise **DEFERS RULING** on the Motion for Summary Judgment filed by OCEMS, Orangeburg County, Rivers, and Givens (ECF No. 79).[2] In particular, the court denies summary judgment as to Plaintiff's claims under section 1983 for deliberate indifference to a serious medical need against Givens and Harmon.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

A little before 6:00 a.m. on September 10, 2018, a vehicle hit and killed Paul David Tarashuk ("Tarashuk") while he was a pedestrian on I-95. (ECF No. 1-5 at 29 ¶¶ 152-53.) The night before, near 11:00 p.m., a truck driver called 911 to report that a man, later identified as Tarashuk, had climbed naked onto the trucker's tractor trailer at an on-ramp; rode on the catwalk while the truck traveled on I-95; detached "air lines" to the truck's brakes, forcing the truck to stop; and repeatedly attempted to enter the cab while the truck sat parked on the highway's shoulder.[3] (*See* ECF Nos. 80-1 at 2-3; 94 at 3-4; 94-6 at 1-3.) Officers from three law enforcement agencies eventually responded, questioned Tarashuk, and received incoherent, bizarre, and/or inconsistent responses.[4] (ECF No. 81-2 at 2.) EMS was requested, which later arrived at the scene and began evaluating Tarashuk. (ECF No. 1-5 at 13 ¶ 65, 15 ¶ 76, 22 ¶ 119.) Around 2:00 a.m. the next morning, a deputy dropped Tarashuk off at a gas station with no money, cell phone, or

---

[2] The court defers ruling on the remainder of the issues within the instant Motion given the pending Motion to Amend Complaint (ECF No. 113) and upcoming hearing set for July 22, 2021 (ECF No. 114). ). However, the proposed Amended Complaint does not appear to impact the deliberate indifference claims brought against Harmon and Givens, and the court otherwise determines a hearing is not necessary to resolve these particular issues.
[3] The Complaint alleges Tarashuk was suffering from a schizophrenic event while traveling down I-95 and was run off the road between 9:00 p.m. and 11:00 p.m. (ECF No. 1-5 at 10 ¶ 44-47.)
[4] Law enforcement and OCEMS were unaware of Tarashuk's identity throughout their interactions as he refused or was unable to state his full name and carried no identification.

identification, while wearing nothing but red shorts provided by the trucker. (*See* ECF No. 96-16 at 4.) Tarashuk found his way back to I-95 and died later that morning.

The above-captioned Defendants have filed five Motions for Summary Judgment. (*See* ECF Nos. 79 through 83.) The following facts are relevant to the Motions for Summary Judgment filed on behalf of Harmon and Givens. (*See* ECF Nos. 79, 82.)

Givens, an emergency medical technician, arrived on the scene at 1:17 a.m. with Harmon (the crew chief and a paramedic) and another trainee. (ECF No. 1-5 at 24 ¶ 128.) They were responding to a Code 46—which Harmon recognized as a call for "altered mental status," and Givens knew was either a psychiatric call or an altered mental status call. (ECF Nos. 105-4 at 71:9-11; 91-7 at 15:1-2.) Harmon spoke with Defendant Clifford A. Doroski, an Orangeburg County Sheriff's Office ("OCSO") Deputy, upon arrival. (ECF No. 105-4 at 73:7-13.) According to Harmon, Doroski mentioned that Tarashuk was not talking and had been found riding naked on a tractor. (*Id.*) The paramedics then took Tarashuk to their ambulance for examination, and Doroski's bodycam recorded the rest of the interaction. (ECF No. 91 at 6.) Tarashuk initially sat in the back of the ambulance with his head down, unresponsive to questions, and Harmon eventually pushed an ammonia inhalant up his nose as a stimulant.[5] (ECF No. 105-4 at 90:7-9.) Harmon left the stimulant in Tarashuk's nose for six minutes in a purported effort to increase his alertness, although he had no physical reaction to the inhalant. (*Id.* at 194:18-25.) Givens and Harmon repeatedly asked Tarashuk for his name and other information, but he did not respond.

---

[5] Before inserting the stimulant into Tarashuk's nose—an act Harmon timidly concedes "may not have been sanctioned by OCEMS policy" (ECF No. 82-1 at 9)—it appears Givens asked Harmon if Harmon wanted "to have the pleasure" of administering the stimulant (ECF No. 91-15 (Doroski bodycam at time mark 1:55-2:00)). And while apparently administering the stimulant below Tarashuk's nose, Harmon told Tarashuk "talk to me, talk to me, you don't want it up your nose then talk to me, stop acting stupid you're a grown man[.]" (*Id.*) (Doroski bodycam at time mark 2:20-2:35).)

3

(ECF No. 1-5 at 25 ¶¶ 133-34.) While questioning him, the paramedics checked Tarashuk's vitals multiple times and found them to be normal.[6] (*Id.* at 25 ¶ 133, 26 ¶ 138.)

Defendant Harmon later testified she did not believe Tarashuk posed a threat to himself or others during the interaction and did not believe he had a serious medical need. (ECF No. 79-3 at 8:16-19; 10:16-19.) Defendant Givens asserted she believed Tarashuk was "getting comfortable" with the paramedics throughout the evaluation and was able to follow their interactions, pointing out he would "respond, smile at what we said"; "his eyes were still following us"; "he shook his head no" in response to one question; and he verbalized a response once by stating "no" when asked if he wanted to go to jail. (ECF No. 79-2 at 11:23-12:22.) However, bodycam footage of the encounter captures no instance in which Tarashuk offered a verbal response to the paramedics' questioning throughout the nearly twelve minute encounter. (*See* ECF No. 91-15 (Doroski bodycam).) Tarashuk also did not react to an attempt to communicate with him through writing. (ECF No. 79-2 at 12:4-10.)

After the OCEMS team repeatedly checked his vitals and unsuccessfully questioned Tarashuk, the other OCSO deputy in the ambulance exclaimed to Tarashuk, "what are you looking at me for? You're full of shit bro," to which Harmon responded, "yeah, he is." (ECF No. 91-15 (Doroski bodycam at time mark 10:20-10:30).) Givens and Harmon then again offered Tarashuk the choice of either going to jail or going to the hospital. (ECF Nos. 105-4 at 96:13-17; 79-2 at 12:13-18.) When Tarashuk shook his head no to those options, Deputy Doroski remarked: "Then come on. I'm gonna give you a ride. You don't want to go to the hospital, either, so let's go. His

---

[6] The Complaint refers to Tarashuk's vitals as normal (ECF No. 1-5 at 25 ¶ 133); Plaintiff's response to the instant Motion asserts the South Carolina Department of Health and Environmental Control ("DHEC") pointed out that Tarashuk's blood pressure of 160/82 and pulse of 124 were not within normal limits during their post-incident interview with Defendant Harmon (ECF No. 91 at 7).

vitals are good ladies?"[7] (ECF No. 91-16 at 5.) Givens and Harmon made no attempt to stop Doroski from taking Tarashuk, and Harmon told them to "have a nice day" as they departed the ambulance. (ECF Nos. 105-16 at 5; 105-4 at 134:14-20.) Givens testified she believed Doroski was taking Tarashuk to jail, and Harmon believed Doroski was taking Tarashuk either to jail or a hospital. (ECF Nos. 79-3 at 10:1-3; 79-2 at 13:4-9.) Yet outside near the rear of the ambulance, as the OCSO deputies and Tarashuk were walking away, Doroski told Tarashuk: "You are not under arrest. I'm gonna give you a ride . . . . You're not going to jail, you're not under arrest, I'm going to give you a ride . . . . I'll figure out where you live. I'll give you a ride to a safe environment. That's all I want." (ECF No. 91-15 (Doroski bodycam at time mark 11:00-11:37).) Doroski then told the other on-scene OCSO deputy that he was taking Tarashuk to Santee, and ultimately dropped Tarashuk off at a closed gas station. (*Id.* (Doroski bodycam at time mark 11:50-11:54); ECF No. 1-5 at 28-29 ¶¶ 150-52.)

Tarashuk eventually wandered back to I-95 and was struck by oncoming traffic and killed a few hours later on the morning of September 10, 2018. (ECF No. 1-5 at 29 ¶¶ 152-53.) Givens filled out a Prehospital Care Report after Doroski left with Tarashuk, classifying the interaction as a mental health call, and marking Tarashuk's acuity as lower. (ECF No. 105-7 at 1.)

Subsequently, Plaintiff Paul Tarashuk, the personal representative of the Estate of Paul David Tarashuk, filed suit against the above-captioned Defendants. (*See* ECF No. 1-5.) Defendants removed the matter to federal court in September 2019. (*See* ECF No. 1.) Givens filed her Motion for Summary Judgment on June 9, 2021, requesting summary judgment as to the 42 U.S.C. § 1983 claim against her or a finding that she is entitled to qualified immunity. (ECF

---

[7] A couple minutes before these remarks, Doroski informed Plaintiff that if he did not "want to go to the hospital, you can go with me." (ECF No. 91-15 (Doroski bodycam at time mark 8:55-9:05).)

No. 79.) Plaintiff filed a Response in Opposition (ECF No. 91), to which Givens replied (ECF No. 106). Likewise, Harmon filed her Motion for Summary Judgment on June 18, 2021, also requesting that either summary judgment be entered in her favor or a finding that she is entitled to qualified immunity. (ECF No. 82-1 at 20.) Plaintiff filed a Response in Opposition (ECF No. 105), to which Harmon replied (ECF No. 111). Currently at issue are the claims under section 1983 for deliberate indifference to a serious medical need against Harmon and Givens, which the court examines below.

## II.    LEGAL STANDARDS

### A. Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

When considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In qualified immunity cases, this usually means accepting the plaintiff's version of the facts unless "blatantly contradicted by the record" or an unchallenged videotape. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). However, "[o]nly disputes over facts that might affect the outcome of the suit under governable law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Further, to show that a genuine issue of material fact

exists, the non-moving party must set forth facts beyond "[t]he mere existence of a scintilla of evidence." *Id.* at 252. The non-moving party must present evidence sufficient to demonstrate that a reasonable jury could return a verdict for the non-moving party in order to avoid summary judgment. *See id.* at 248.

        B. <u>Section 1983 Claim and Fourteenth Amendment Deliberate Indifference</u>

Section 1983 allows a citizen, or other person within the jurisdiction of the United States, to bring suit against any person acting under the color of law, whether state or federal, for depriving him of rights secured by the United States Constitution. *See* 42 U.S.C. § 1983. Section 1983 does not confer a substantive right, rather it provides a "method for vindicating federal rights elsewhere conferred." *Albright v. Oliver,* 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n.3 (1979)).

The first step in analyzing a section 1983 claim is to identify the federal right that has allegedly been infringed. *Id.* If a complaint asserts a section 1983 claim that fails to allege a violation of a cognizable federal right, it is subject to dismissal under Rule 12(b)(6). *See Stack v. Greenville Cnty. Detention Ctr.*, No. 4:08-1756-HFF-TER, 2008 WL 2368086, at *4 (D.S.C. June 10, 2008). Plaintiff alleges that Harmon and Givens violated Tarashuk's rights under the Fourteenth Amendment through indifference to his serious medical needs, because Tarashuk was never transported to a hospital for treatment.

A government official who is deliberately indifferent to a plaintiff's serious medical needs is a violation of the due process clause of the Fourteenth Amendment. *See Krell v. Braightmeyer*, 828 F. App'x 155, 158-59 (4th Cir. 2020) (citations omitted); *Young v. City of Mount Ranier*, 238 F.3d 567, 575 (4th Cir. 2001). To prove a medical deliberate indifference claim,

> the plaintiff must first demonstrate that he had a serious medical condition—i.e., a condition that "has been diagnosed by a physician as mandating treatment or is so

> obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (internal quotation marks omitted). Second, the plaintiff must establish that the defendants acted with deliberate indifference—i.e., that they "had actual knowledge of the plaintiff's serious medical needs and the related risks, but nevertheless disregarded them." *Id.* at 357 (brackets and internal quotation marks omitted).

*Krell*, 828 F. App'x at 158-59.

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citation omitted). Deliberate indifference may be shown by "governmental conduct that 'shocks the conscience.'" *Young*, 238 F.3d at 574; *cf. Grayson*, 195 F.3d at 696 (explaining that "deliberate indifference requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

Such indifference can be manifested by medical personnel in their response to a subject's needs or by officers or guards intentionally denying or delaying access to medical care. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The United States Court of Appeals for the Fourth Circuit has noted "it is not enough that the officers *should have* recognized [the risk]; they actually must have perceived the risk." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004) (emphasis in original) (citing *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)). Additionally, an official "actually *must have* recognized that [their] actions were insufficient" in light of the circumstances. *Id.* at 303 (emphasis in original). Knowledge of these elements can be inferred from circumstantial evidence—if the risk of injury or the medical need is so obvious that the officer "could not have failed to know of it," then knowledge can be inferred. *Id.* (quoting *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995)). Similarly, an official's response can be "so patently inadequate as to justify an inference that the official actually recognized that [their] response to the risk was inappropriate." *Id.*

C. Qualified Immunity

Qualified immunity offers complete protection "from liability for civil damages" for government officials sued in their individual capacities as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). For qualified immunity to attach to a defendant, either the facts viewed in the light most favorable to the plaintiff fail to demonstrate the violation of a protected constitutional right and/or the right was not clearly established at the time of the violation. *Tolan v. Cotton*, 134 S. Ct. 1861, 1865-66 (2014).

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Id.* "The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]'" *Id.* (citation omitted). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 1866 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). For the second prong, "'the salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged conduct was unconstitutional.'" *Id.* (quoting *Hope*, 536 U.S. at 741). "Courts have discretion to decide the order in which to engage these two prongs." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

When examining whether a right was clearly established when violated,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful; but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

### III.   ANALYSIS

A.   Section 1983 Claims

Harmon and Givens insist no evidence has established they were deliberately indifferent to Tarashuk's medical needs, and both bring similar contentions in their respective briefs. (ECF Nos. 82-1 at 6; 79-1 at 6.) They argue that any alleged violations of OCEMS protocols or unprofessional conduct on their part would not rise to the level of a violation of constitutional rights or deliberate indifference. (*Id.*) Both assert that deliberate indifference claims cannot be based on any alleged violation of policy, because a section 1983 action may not be solely based on a violation of state law or a state tort. (ECF Nos. 82-1 at 9; 79-1 at 7.) Both stress that Tarashuk's vital signs were within normal ranges and he indicated he did not want to be taken to a hospital or jail. (ECF Nos. 82-1 at 12; 79-1 at 8.) Both proclaim that taking Tarashuk to the hospital against his will may have given rise to a claim of false imprisonment. (ECF Nos. 82-1 at 13; 79-1 at 8.) Both testified they believed Tarashuk was being taken to jail or the hospital when he left the scene. (ECF Nos. 82-1 at 13; 79-1 at 8-9.) At most, Harmon and Givens contend Plaintiff has alleged unprofessional or negligent behavior against them, and that none of their alleged actions would constitute a deliberate indifference to Tarashuk's serious medical needs. (ECF Nos. 82-1 at 15; 79-1 at 9.) Additionally, Harmon and Givens insist the section 1983 claims against them must focus on each of their actions alone, and not the perceptions or statements of others around them. (*See* ECF Nos. 111 at 3; 106 at 3.)

Harmon adds that her use of the ammonia stick may have been improper, but asserts it does not rise to the level required for deliberate indifference. (ECF No. 82-1 at 9.) Harmon points out that she knew nothing about Tarashuk's medical history or any medications he should have been taking. (*Id.* at 11.) She also specifically notes she had no knowledge that Tarashuk had been

10

reported to have run into traffic before she arrived, or that law enforcement felt he posed a danger to himself or others. (*Id.*)

In response, Plaintiff agrees that any violation of OCEMS protocols alone may not lead to section 1983 liability.[8] (ECF No. 105 at 22.) However, Plaintiff argues the protocols are relevant in assessing the knowledge Harmon and Givens may have had concerning Tarashuk's medical needs. (*Id.*) Plaintiff asserts the OCEMS protocols inform that Tarashuk's behavior indicated an altered mental state and contributes to the inference that he was in danger. (*Id.*) Plaintiff stresses that Tarashuk did not have the capacity to refuse treatment, per OCEMS policies. (ECF Nos. 105 at 24; 91 at 26-27.) Further, Plaintiff asserts there is no basis for any assumption that Doroski was transporting Tarashuk to a hospital or prison facility. (ECF No. 91 at 27.) In sum, Plaintiff emphasizes that, in the light most favorable to Plaintiff, Harmon and Givens knew Tarashuk was in an altered mental state, had no capacity to refuse treatment, and needed medical attention. (ECF Nos. 105 at 25; 91 at 27-28.) Plaintiff contends that allowing Tarashuk to leave with Doroski was not merely unprofessional or negligent but instead rises to the level of conscious-shocking deliberate indifference to his serious medical needs. (*Id.*)

As an initial matter, the court finds Plaintiff has put forth sufficient evidence to demonstrate Tarashuk suffered from a serious medical condition—meaning it had "been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (quoting *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016)). Plaintiff has offered the expert

---

[8] As noted above, Plaintiff alleges Harmon and Givens violated Tarashuk's Fourteenth Amendment rights, while acting under the color of state law with OCEMS, by being deliberately indifferent to his serious medical needs and failing to transport him to a hospital for medical treatment. (ECF No. 1-5 at 55 ¶ 280.)

testimony of Richard L. Frierson, M.D., D.F.A.P.A., who concludes "[t]here is abundant evidence from police cam videos that [Tarashuk] was in the midst of an acute psychotic break at the time of his death," including, *inter alia*, his apparent confusion and distracted manner, nonverbal and catatonic behavior, and history of riding naked on a tractor, all of which were known to Harmon and Givens based on their interactions with Plaintiff. (*See* ECF No. 91-1 at 10.)

Here, the court concludes a reasonable jury could find that Harmon and Givens were deliberately indifferent to Tarashuk's serious medical needs. The court begins with an examination of Harmon's actions. Based on the evidence, a jury could plausibly find that Harmon specifically recognized Tarashuk's serious medical needs. The EMS call was a Code 46—which Harmon recognized as a call for an "altered mental status" in her deposition. (ECF No. 105-4 at 71:9-11.) Though she testified that Tarashuk did not present like a mentally ill patient to her and it was possible he was "playing" them, she also agreed it was possible he had an altered mental status. (*Id.* at 128:19-23.) Her testimony notwithstanding, Harmon knew the call that night was for an "altered mental status," heard from Doroski that Tarashuk had rode naked on top of a trailer hours earlier, experienced Tarashuk's inability or unwillingness to answer their questions, witnessed his lack of any physical or verbal reaction to the ammonia stick, and observed that Tarashuk was being nonverbal. Harmon also agreed Tarashuk was not "alert and oriented times four" and did not know where he was. (ECF No. 105-4 at 121:24-25, 122:1.) Indeed, when responding to the scene of Tarashuk's death later that morning, Harmon remarked "something was wrong with him[,]" and that she would have taken Tarashuk to the hospital had she known where Doroski was dropping him. (ECF No. 105-19.)

Moreover, while it is true a failure to follow protocols alone does not support section 1983 liability, it could be relevant in determining whether Harmon knew she failed to adequately

12

respond to Tarashuk's medical needs. OCEMS protocols make clear that, based on the behavior Harmon witnessed, Tarashuk needed to be transported to a hospital and did not have the capacity to refuse treatment, whether he was under the influence of drugs or suffering from a mental illness.[9] (*See* ECF No. 105-18 at 5.)

Further, the court finds a genuine dispute of fact as to whether Harmon was deliberately indifferent, as it is contested whether she believed Doroski was transporting Tarashuk to a hospital or to jail. Despite observing Tarashuk's erratic behavior, when Doroski left the ambulance with Tarashuk, Harmon simply told them to "have a nice day" and did not attempt to stop them. (*See* ECF Nos. 105-16 at 5; 105-4 at 134:14-20.) Harmon did not ask Doroski what he meant by taking Tarashuk for a "ride"; nor did she testify as to previously hearing Doroski state (or otherwise indicate) that he intended to transport Tarashuk to a prison facility or hospital. (ECF No. 91-16 at 5.) After seeing Tarashuk shake his head "no" to going to jail or the hospital, Doroski stated: "Then come on. I'm gonna give you a ride. You don't want to go to the hospital, either, so let's go. His vitals are good ladies?" (ECF No. 91-16 at 5.) These comments alone do not establish whether Harmon believed Doroski intended to transport Tarashuk to jail, which could have provided adequate medical care, or simply take Tarashuk for "a ride" to an unidentified location where medical treatment would not be available.[10] Indeed, immediately after exiting the

---

[9] OCEMS protocol GP-12 states: "A patient, who is evaluated and found to have **any one** of the following conditions, shall be considered incapable of making medical decisions regarding care and/or transport, and should be transported to the closest appropriate medical facility under implied consent: (1) Altered mental status; (2) Evidence of threat to self or others; (3) Unable to verbalize an understanding of the illness and/or risks of refusing care; (4) Unable to verbalize rational reasons for refusing care despite the risks; (5) No legal guardian available to determine transport decisions. (ECF No. 105-18 at 5 (emphasis added).)

[10] The Fourth Circuit has found an officer taking a subject to jail, rather than a hospital, after observing irrational behavior and slurred speech did not amount to deliberate indifference to the subject's medical needs. *See Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999).

ambulance (and mere feet from the ambulance's entrance), Doroski declared to Plaintiff that he would not be taken to jail. (ECF No. 91-15 (Doroski bodycam at time mark 11:00-11:37).)

Taken in the light most favorable to Plaintiff, a genuine dispute exists whether Harmon believed Doroski was transporting Tarashuk to a prison facility or hospital—where his medical needs could be addressed—based on Doroski's statements and behavior throughout the encounter and while exiting the ambulance. Thus, a jury could credibly find Tarashuk's medical issues were "so obvious that the fact-finder could conclude that [Harmon] did know of it because [s]he could not have failed to know of it," and her response was "so patently inadequate as to justify an inference that [she] actually recognized that [her] response to the risk was inappropriate." *Brice*, 58 F.3d at 105.

The court likewise concludes a jury could determine Givens was deliberately indifferent to Tarashuk's serious medical needs for substantially similar reasons. She observed the same behavior from Tarashuk as Harmon. Givens recognized Code 46 as either an altered mental status call or a psychiatric call. (ECF No. 91-7 at 15:1-2.) She witnessed and was surprised by Tarashuk's lack of reaction to the ammonia stick. (*Id.* at 10:4-19.) Like Harmon, Givens knew that Tarashuk was not "conscious and alert times four." (*Id.* at 16:18-20.) Givens never heard Tarashuk say a word and, when she tried to communicate by writing questions down for him, he looked at the paper but did nothing else. (ECF No. 79-2 at 11:15-25.) Further, Givens filled out the required Prehospital Care Report that night—classifying the call as a mental health call and marking Tarashuk's acuity as lower.[11] (ECF No. 105-7 at 1.) Relatedly, Givens testified that she

---

[11] Givens' Prehospital Care Report also states that Tarashuk "refused to sign our paper copy," apparently referring to a medical release form. (ECF No. 105-7 at 2.) Yet bodycam footage of the entire incident reveals no instance in which OCEMS personnel presented Tarashuk with any type of paperwork to sign. (*See* ECF No. 91-15 (Doroski bodycam).)

and Harmon believed Tarashuk was going to jail, and that they would have taken him to the hospital had they known where Doroski was dropping him. (ECF No. 82-7 at 9:4-12.) Yet for the reasons previously discussed regarding Harmon, a jury could plausibly find that Givens knew of Tarashuk's medical needs and knew she responded inadequately. A jury could likewise find that allowing Tarashuk to leave with Doroski was such an inadequate response that she had knowledge of its inadequacy.

In short, Tarashuk had a serious medical need, and a jury could reasonably find Harmon and Givens specifically knew of that need and responded inadequately.[12] Crucial to the latter inquiry is an underlying factual dispute whether Harmon and Givens believed Doroski intended to transport Tarashuk to a jail or hospital (where medical care was available), or not. Given these factual disputes, the court finds Harmon and Givens are not entitled to summary judgment on Plaintiff's claims for deliberate indifference to a serious medical need under section 1983.

B. Qualified Immunity

As discussed above, to resolve the qualified immunity question, the court must determine (1) whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional right, and (2) whether the right was clearly established at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. Although the question of qualified immunity is resolved at the summary judgment stage whenever possible, when a dispute of material fact "precludes a conclusive ruling on qualified immunity . . . the [court] should

---

[12] The court also observes Plaintiff has produced the expert report of Joe Lord, a paramedic since 1980, who determined that Harmon and Givens must have known Tarashuk was in an altered mental state because, despite not knowing the full factual background of Tarashuk's behavior that night, they "knew that being naked on the interstate, either walking along the road or on top of the cab of a tractor, or riding naked on a tractor, was abnormal and bizarre behavior indicative of an altered mental state and/or behavioral emergency." (ECF No. 91-48 at 16.)

submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury." *Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005).

First, the court determines that, in the light most favorable to Plaintiff, a jury could find Harmon and Givens violated Tarashuk's Fourteenth Amendment right to be free from an official's deliberate indifference to his medical needs. In particular (and as discussed *supra*), an underlying material dispute of fact exists regarding whether Harmon and Givens believed Doroski intended to take Tarashuk to a hospital or jail, and, crucially for qualified immunity, whether a reasonable basis existed for that belief. Though a jury may ultimately conclude Harmon and Givens reasonably held such a belief, at this stage the court is simply barred from resolving any genuine dispute of material fact. The court thus cannot now determine whether Harmon and Givens are entitled to qualified immunity. *See also Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016).

Second, the court must consider whether this right was clearly established at the time of the alleged misconduct. *See Pearson*, 555 U.S. at 232. The second prong is a purely legal question and "is always capable of decision at the summary judgment stage." *Willingham*, 412 F.3d at 559 (quoting *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992)). The asserted right must be defined with particularity and not in a general sense. *Williams v. Ozmint*, 716 F.3d 801, 806 (4th Cir. 2013) (citing *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)). In this case, Tarashuk alleges his substantive due process rights under the Fourteenth Amendment were violated, specifically because Defendants Harmon and Givens were deliberately indifferent to his serious medical needs by failing to transport him to a hospital and allowing Doroski to take him from the ambulance.

The Supreme Court has held that "a pretrial detainee has a right to be free from any form of punishment under the Due Process Clause of the Fourteenth Amendment." *Belcher v. Oliver*,

16

898 F.2d 32, 34 (4th Cir. 1990) (citing *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)). This right "requires that government officials not be deliberately indifferent to any serious medical needs of the detainee." *Id.* (citing *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988)). It is beyond debate that deliberate indifference toward the serious medical needs of prisoners constitutes a violation of the Eighth Amendment, and that pretrial detainees are entitled to "at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment."[13]  *See Estelle*, 429 U.S. at 104; *Young*, 238 F.3d at 575.  For the purposes of a deliberate indifference qualified immunity analysis, the Fourth Circuit has previously found "the right of prisoners to receive adequate medical care and to be free from officials' deliberate indifference to their known medical needs" to be sufficiently specific. *See Scinto*, 841 F.3d at 236. "A prisoner's right to adequate medical care and freedom from deliberate indifference to their medical needs has been clearly established by the Supreme Court and this Circuit since at least 1976." *Id.* "The Fourth Circuit has repeatedly "recognized this clearly established right of pretrial detainees[,]" and thus the court finds here that Tarashuk's right to freedom from deliberate indifference to his medical needs was clearly established at the time of this incident.  *See Knouse v. Primecare Medical of West Virginia*, 333 F. Supp. 3d 584, 590 (S.D.W. Va. 2018).

Therefore, based on an underlying factual dispute, the court finds Harmon and Givens are not entitled to summary judgment on the basis of qualified immunity at this stage in the case. *See Willingham*, 412 F.3d at 560.  To be clear, the underlying dispute of material fact at issue is whether Harmon and Givens in fact believed Doroski intended to take Tarashuk to a hospital or jail, where

---

[13] As the court recognized in *Young*, Tarashuk may not be a typical pretrial detainee because he was not under arrest or going to be arrested.  *See* 238 F.3d at 575 n.5.  However, he was held without consent by the various agencies and handcuffed for at least part of his interactions with them, and the court finds they owed him the same duty of care as a typical pretrial detainee.  *See id.*

medical care was available, and whether a reasonable basis existed for that belief.

## IV.     CONCLUSION

Accordingly, the court **DENIES** Defendant Alison K.B. Harmon's Motion for Summary Judgment (ECF No. 82), and **DENIES IN PART** and otherwise **DEFERS RULING** on the Motion for Summary Judgment filed by Defendants Orangeburg County EMS, Orangeburg County, Danny Rivers, and Jamie D. Givens (ECF No. 79). In particular, the court denies summary judgment as to Plaintiff's claims for deliberate indifference to a serious medical need under section 1983 against Givens and Harmon.

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

July 21, 2021
Columbia, South Carolina