# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# ORANGEBURG DIVISION

| | |
|---|---|
| Paul Tarashuk, *Personal Representative of the Estate of Paul David Tarashuk*, | Civil Action No.: 5:19-cv-02495-JMC |
| Plaintiff, | |
| v. | |
| Orangeburg County, Orangeburg County Emergency Medical Services, Danny Rivers, *Individually and in his Official Capacity as the Director of Orangeburg County Emergency Medical Services*, Orangeburg County Sheriff's Office, Leroy Ravenell, *Individually and in his Official Capacity as the Sheriff of the Orangeburg County Sheriff's Office*, South Carolina Department of Public Safety, Leroy Smith, *Individually and in his Official Capacity as the Agency Director of the South Carolina Dept. of Public Safety*, Town of Santee, Joseph Serrano, *Individually and in his Official Capacity as the Chief of Police of the Town of Santee*, Jamie D. Givens, Alison K.B. Harmon, Clifford A. Doroski, Buist M. Smith, and Keith A. Cline, | **ORDER AND OPINION** |
| Defendants. | |

    Before the court is a Motion for Summary Judgment filed by Defendants South Carolina Department of Public Safety ("DPS"), DPS Director Leroy Smith, and Patrolman Freddie Rice (collectively "DPS Defendants"). (ECF No. 80.) At issue are the remaining claims addressed in the Motion: (1) Plaintiff's claim against DPS under 42 U.S.C. § 12101 ("ADA claim"), where Plaintiff contends Tarashuk had a covered mental disability which DPS employee Patrolman Rice knew or should have known and failed to reasonably accommodate as required by Title II of the Americans with Disabilities Act ("ADA"), (ECF No. 1-5 at 68), and (2) Plaintiff's claim for

negligence under the South Carolina Tort Claims Act ("SCTCA") against DPS for Patrolman Rice's alleged negligence.[1]

In previous orders, the court granted summary judgment as to Plaintiff's eleventh cause of action under 42 U.S.C. § 1983 against DPS and Director Smith in his official capacity for negligent supervision/training due to their immunity against suit under the Eleventh Amendment (ECF No. 122) and dismissed the § 1983 claim for deliberate indifference against Rice (ECF No. 118). The court also granted summary judgment as to Plaintiff's § 1983 negligent supervision/training claim against Director Smith in his individual capacity, along with any *Monell* claims against DPS and Director Smith, to the extent they were brought. (ECF No. 126.)

## I.     BACKGROUND AND ANALYSIS

### A.   ADA Claims

Pursuant to Title II of the ADA, "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "A 'qualified individual with a disability' is broadly defined as any person who 'meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.' 42 U.S.C. § 12131(2). The term 'public entity' is defined to be 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.' 42 U.S.C. § 12131(1)." *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998). The Fourth Circuit has concluded that Title II applies to police investigations,

---

[1] In response to the DPS Defendants' Motion for Summary Judgment, Plaintiff acknowledges that he failed to raise this claim in the pleadings, but argues it was an oversight. (ECF No. 94 at 27 n.7.) Because Defendants were on notice of a potential negligence claim arising from the same facts that support Plaintiff's federal § 1983 claim for deliberate indifference against Rice, the court will consider the SCTCA negligence claim against DPS in this order.

*Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 338 (4th Cir. 2012), and an ADA claim may exist where "police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees." *Waller v. Danville*, 556 F.3d 171, 174 (4th Cir. 2009).

Plaintiff alleges that DPS "intentionally discriminated against Mr. Tarashuk" when its employee Patrolman Rice failed to transport him "to a hospital for a mental health examination," (ECF No. 1-5 at 64 ¶ 334), and "failed to make any reasonable accommodation for Mr. Tarashuk's mental disability" (*id*. at ¶ 337).  A claimant must show the following elements to establish a Title II ADA claim: "(1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability.  *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016) (citing *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)).

Courts have concluded that where an arrestee's  "disability 'played a role in the . . . [official] decision-making process and . . . had a determinative effect on the outcome of that process[,]'" *i.e.*, if the arrestee's disability was a 'but for' cause of the deprivation or harm he suffered," then the [requirement that the claimant has been excluded from a service, program, or activity or discriminated against by reason of his disability] has been met." *Haberle v. Troxell*, 885 F.3d 170, 179 (3d Cir. 2018) (citing *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 n.11 (3d Cir. 2013); *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir. 2007)). Here, Tarashuk's disability could have prevented him from communicating with responding officers and constituted a but-for cause of their failure to transport him to the hospital for further treatment.

3

Still, the obligation to provide reasonable accommodations applies only where public entities were aware of the individual's "known physical and mental limitation" and the need for accommodations was clear. 42 U.S.C. § 12112(b)(5)(A). Defendants argue that in this case, "law enforcement officers were [not] in a position to have actual knowledge of Mr. Tarashuk's mental health history nor his needs" and could not have gauged "what specific accommodations, if any, might have been reasonable under the circumstances." (ECF No. 80-1 at 22-23 (citing *Gray v. Cummings*, 917 F.3d 1, 18 (1st Cir. 2019)).) But at the summary judgment stage, the court need not decide what effectively amounts to a factual dispute between the parties.

Plaintiff has demonstrated that there is a genuine question of material fact as to whether Patrolman Rice, as an employee of DPS, was or should have been aware of Tarashuk's mental disability, which would, in turn, trigger his obligation to provide reasonable ADA accommodations. Rice testified that he did not know "whether [Tarashuk was] on some type of medication, . . . on a drug, or [he had] a mental illness." (ECF No. 94 at 13 (citing ECF No. 94-7 at 24:50-25:49 (SLED interview of Rice)).) But Rice recognized that Tarashuk could not be left alone, recounting the following conversation with Deputy Doroski during the SLED interview:

> ". . . I told the deputy straight out, I said, 'If you leave him here, here's what's going to happen. I'm going to take him to jail for being a pedestrian on an interstate or take him to the hospital to hopefully get an assessment on him, or possibly both. If I take him to the hospital, and they can't do anything with him, then I will escort him to the jail. At least he'll get inside, he'll be fingerprinted until we can determine who he is and where he came from.'"

(ECF No. 94 at 13 (citing ECF No. 94-7 at 24:50-25:49 (SLED interview of Rice)).) Video and testimonial evidence from the scene support's Rice's subsequent testimony – he appeared to understand that Tarashuk could not be left by the side of the highway.

Plaintiff has also presented substantial evidence that DPS had a detailed policy relating to interactions with mentally ill subjects. (ECF No. 94-15 at 1-5 (setting forth DPS Policy 300.22 to

4

establish guidelines for DPS officers "in the event they become involved in unusual occurrences as a first responder or when called as backup" and "efficiently managing individuals having a mental illness").) Policy 300.22 was specifically informed by the requirements of the ADA, explaining that the ADA "entitles persons with a mental illness or disabilities to the same services and protections that law enforcement agencies provide to anyone else" such that "[t]hey should not be excluded from services or otherwise be provided with lesser services or protection than are provided to others." (ECF No. 94-15 at 3.) It also defined mental illness and described possible symptoms and required all officers to be trained on the policy at least every three years. (*Id*. at 5.)

It is evident from video and testimonial evidence that Tarashuk was confused, disorganized, and nonverbal before and during his encounter with Rice. It is certainly possible that his symptoms were caused by an ADA-qualifying disability. 42 U.S.C. § 12210(a). Given the circumstances surrounding the initial 911 call and Tarashuk's inability to answer any questions he was asked, it is also possible that Tarashuk's behavior could have been triggered by circumstances which are explicitly outside the purview of the ADA, such as the illegal use of drugs. *See* 42 U.S.C. § 12210(a) ("The ADA does not reach individuals who are "currently engaging in the illegal use of drugs.") Here, Plaintiff has identified sufficient facts under which Rice could properly have concluded that Tarashuk was a "mentally ill subject" under Policy 300.22. Such facts are persuasive especially in light of Rice's own testimony that he called his supervisor during the incident and discussed Policy 300.22, explaining that "the local agency and EMS would need to come in – step in, and possibly do an evaluation or secure [Tarashuk] in some shape or form." (ECF No. 94-10 at 26.) Defendants' attempt to narrow the knowledge requirement to their knowledge of Tarashuk's specific mental health diagnosis of schizoaffective disorder is unavailing. *See Smith v. City of Greensboro*, No. 1:19-cv-386, 2020 WL 1452114, at *13

(M.D.N.C. Mar. 25, 2020), *reconsideration denied*, No. 1:19-cv-386, 2021 WL 5771544 (M.D.N.C. Dec. 6, 2021) (concluding that the allegations in the complaint made it "at least plausible that the Officers recognized Smith as mentally disabled, even if the precise nature of his disability was uncertain."). Individuals suffering from acute mental crises as a result of documented disabilities cannot, by definition, communicate their diagnoses or request accommodations. Instead, where the circumstances indicate that an individual has an obvious need for accommodations, the ADA shifts the burden of compliance on public bodies and their employees.

However, Plaintiff has not produced evidence demonstrating Rice's actions during the incident amounted to a failure to accommodate Tarashuk's mental disability. Under Policy 300.22, "officers should only transport a suspected mentally ill person as a last resort. A request to the local law enforcement agency to transport should be made when possible or a request for emergency medical services." (ECF No. 94-15.) This is precisely what Rice did. He called for backup a the outset, requesting the dispatcher contact a closer agency that "could possibly detain [Tarashuk] or at least get there and keep him from getting in the roadway or causing further harm to himself or to any others." (ECF No. 94-4 3:45-4:22.) Later, he insisted Sheriff's Deputy Doroski return to the scene. (ECF No. ECF No. 94-9 at 36:14.) He let Doroski know empathically that Tarashuk could not be left on the roadside.[2] After Rice raised these concerns with Doroski,

---

[2] (*See* ECF No. 94 at 13 (citing ECF No. 94-7 at 24:50-25:49).) Rice testified to SLED investigators that when he found out Doroski indicated they might leave Tarashuk, he "stopped [Doroski] and [] said, 'No. No. No. No. He will not get left here. . . . If y'all leave him there, I'm not going to leave him on the side of the road like this . . . You know good and well we cannot leave anyone on the side of the interstate, especially on the interstate . . . to start with, you got a guy here who have not positively identified, [and] he is basically shutting down on us.'" While the content of this conversation is established by Rice's testimony after the fact, Plaintiff has not disputed the content of this conversation, and, in fact, cites it in his own briefing. (ECF No. 94 at 13.)

Rice remained on the scene and attempted to conduct further investigation. (ECF No. 94-11 at 6:40-8:32.) Eventually, EMS was called, and Tarashuk was seated in Doroski's patrol car as the officers waited for the ambulance to arrive. (*Id*. at 9:46-11:13.) Rice remained at the scene until EMS arrived and did not depart until he witnessed Tarashuk enter the ambulance. (ECF No. 94 at 15.) When Rice left, two Sheriff's deputies were still present on the scene. Rice witnessed Doroski remove Tarashuk from the back of his patrol vehicle, walk him to the ambulance, and remain in the ambulance while paramedics evaluated Tarashuk. (ECF No. 94-10 at 26-27.)

These facts do not demonstrate that Rice's conduct violated the ADA. At the time Rice left, Tarashuk was under the care of two licensed paramedics and multiple deputies who remained with him. Rice was entitled to assume that they would provide Tarashuk with appropriate care. Policy 300.22 discouraged Rice from transporting a potentially mentally ill subject himself (referring to this option as a "last resort") and urged him to call either EMS or a local agency. (ECF No. 94-15 at 5.) With the arrival of EMS, Rice appropriately believed they would examine Tarashuk and transport him "to a mental health service or medical treatment facility." (*Id*.) The ADA does not require more of Rice. Regardless of any initial failure to recognize Tarashuk's disability, Rice nonetheless left him in what he believed to be the capable hands of medical professionals who were there for the presumptive purpose of taking him to the hospital. Accordingly, the court must grant summary judgment as to Plaintiff's ADA claim against DPS.

### B. SCTCA Negligence Claim

Plaintiff also insists he raised a SCTCA claim for negligence against DPS based on Patrolman Rice's conduct at the scene, pursuant to the same facts supporting Plaintiff's deliberate indifference claim under § 1983. (ECF No. 94 at 27 n.7.) In a prior order, the court determined Rice's conduct did not create an inference that he may have been deliberately indifferent to

Tarashuk's medical needs. (ECF No. 118.) These facts also do not support a finding of negligence here, because there is no indication that Rice breached any duties to Tarashuk while he investigated the incident and waited until he witnessed Tarashuk enter the EMS ambulance before departing the scene.

As discussed in depth in the context of Plaintiff's ADA claim, Rice followed DPS policy by waiting until Tarashuk entered the ambulance and was surrendered to the care of trained medical professionals. Plaintiff's argument that Rice "had a heightened duty to make sure that [Tarashuk] was transported to a hospital" is unavailing here. (ECF No. 94 at 24.) Rice was entitled to assume the paramedics would transport a disoriented and nonverbal individual to the hospital, especially because multiple law enforcement officials who were familiar with Tarashuk's dangerous conduct prior to the 911 call were present and could convey these facts to the paramedics. No policy gave Rice the duty to supervise the paramedic's medical assessments or follow the ambulance to ensure Tarashuk was indeed taken to the hospital. Plaintiff's claim that Rice knew Doroski was upset or that Doroski would not take Tarashuk to jail belies the record. Rice specifically attested to telling Doroski that Tarashuk could not be left alone on the highway. (*See* ECF No. 94 at 13 (citing ECF No. 94-7 at 24:50-25:49).) Moreover, Rice testified he did not know that Doroski would not take Tarashuk to jail (ECF No. 94-10 at 49-50, 58), and mentioned to Tarashuk multiple times that he would indeed "be booked into jail as a John Doe" if the officers could not figure out who he was (ECF No. 94-9 at 54:40-58:00). These statements support the inference that Rice believed, especially after his empathic conversation with Doroski, that Tarashuk would be taken either to jail or to the hospital. Plaintiff has presented no facts to the contrary. To the extent Plaintiff argues Rice should have had a more forceful conversation with Doroski, such a claim still does not support a cause of action for negligence.

Finally, the record does not support an inference that Rice's actions breached any DPS policy. On the contrary, Rice contacted his supervisor, specifically discussed the applicable department policy regarding mentally ill individuals and waited until he personally witnessed Tarashuk enter the ambulance. Finding that no theory of negligence is supported by this record, the court dismisses any negligence-based claim against DPS under the SCTCA.

## II.     CONCLUSION

The court **GRANTS IN PART** DPS Defendants' Motion for Summary Judgment. (ECF No. 80.) Specifically, the court grants summary judgment as to the Americans with Disabilities Act claim under 42 U.S.C. § 12101 against DPS, as outlined in the eighth cause of action within the Complaint. (*See* ECF No. 1-5 at 61-64.) The court similarly grants summary judgment as to any negligence claim under the South Carolina Tort Claims Act against DPS, to the extent it has been brought.

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

March 22, 2022
Columbia, South Carolina