**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ORANGEBURG DIVISION**

| | | |
|---|---|---|
| Paul Tarashuk, *Personal Representative* *of the Estate of Paul David Tarashuk*, | ) ) ) | Civil Action No.: 5:19-cv-02495-JMC |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| Orangeburg County, Orangeburg County Emergency Medical Services, Danny Rivers, *Individually and in his Official Capacity as the Director of Orangeburg County Emergency Medical Services*, Orangeburg County Sheriff's Office, Leroy Ravenell, *Individually and in his Official Capacity as the Sheriff of the Orangeburg County Sheriff's Office*, South Carolina Department of Public Safety, Leroy Smith, *Individually and in his Official Capacity as the Agency Director of the South Carolina Dept. of Public Safety*, Town of Santee, Joseph Serrano, *Individually and in his Official Capacity as the Chief of Police of the Town of Santee*, Jamie D. Givens, Alison K.B. Harmon, Clifford A. Doroski, Buist M. Smith, and Keith A. Cline, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **ORDER AND OPINION** |
| Defendants. | ) ) | |

Before the court is the Motion for Summary Judgment filed by Defendants Orangeburg County EMS ("OCEMS"), Orangeburg County, Danny Rivers, and Jamie D. Givens (ECF No. 79), which seek, *inter alia*, summary judgment on Plaintiff's 42 U.S.C. § 1983 claims against Orangeburg County, OCEMS, and Rivers in his individual capacity for failure to supervise and train Defendants Harmon and Givens, failure to screen Defendant Harmons's background prior to hiring (ECF No. 1-5 at 66-67), against Orangeburg County, OCEMS, and Rivers in his official capacity for inadequate screening practices pursuant to *Monell v. Dep't of Soc. Serv's*, 436 U.S.

658 (1978), against Orangeburg County and OCEMS for violations of the Americans with Disabilities Act ("ADA") (ECF No. 1-5 at 63-66), and South Carolina Tort Claims Act ("SCTCA") (ECF No. 1-5 at 38-41).

After careful consideration, the court **GRANTS IN PART** Defendants' Motion for Summary Judgment as to the failure to supervise/train and failure to screen claims (ECF No. 79 at 12-15) and **DENIES IN PART** Defendants' Motion for Summary Judgment as to the ADA claims (*id*. at 15-18) and state law claims (*id*. at 18-19.)

In particular, the court **GRANTS** summary judgment as to Plaintiff's *Monell* claims for failure to supervise/train and failure to screen against Orangeburg County, OCEMS and Danny Rivers, in his official capacity as Director of OCEMS, and Plaintiff's § 1983 claims for failure to supervise/train and failure to screen against Orangeburg County, OCEMS and Danny Rivers, in his individual capacity, as per Plaintiff's ninth cause of action (ECF No. 1-5 at 66), and **DENIES** summary judgment as to Plaintiff's Americans with Disabilities Act claims against Orangeburg County and OCEMS, as per Plaintiff's eighth cause of action (ECF No. 1-5 at 63), and Plaintiff's negligence and gross negligence claims under the South Carolina Tort Claims Act against Orangeburg County and OCEMS, as per Plaintiff's second cause of action (ECF No. 1-5 at 36).

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Paramedic Harmon's career spiraled out of control after she became addicted to prescription drugs. (*See generally*, ECF No. 91 at 15-19 (citing substantial evidence from

---

[1] These allegations are taken from the Complaint and Plaintiff's Response to this Motion for Summary Judgment (ECF No. 91) which references facts from deposition testimony and documents produced in discovery. To the extent the court references these facts, they are unchallenged. At any rate, the court must accept Plaintiff's version of the facts at the summary judgment stage unless "blatantly contradicted by the record" or an unchallenged videotape. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

discovery regarding Harmon's employment history)). Her record is replete with coworkers and employers complaining she treated and drove patients while under the influence of narcotics.[2] These documents reflect a common concern: it was only a matter of time before someone would get hurt. Sure enough, Harmon drove her ambulance off the road on one occasion and injured another EMT. (ECF No. 91-42 at 28-31 (Harmon's deposition testimony regarding the accident).) The accident was severe: a tree limb smashed through the ambulance windshield and into the EMT compartment. (ECF No. 91-45 at 2 (interrogatory response of Casey Chavez, who witnessed the accident while supervising Harmon at TrustUs).) The police report of the incident stated Harmon was "not acting right" and charged her with driving too fast for the conditions on the road. (ECF No. 91-39 at 1 (summarizing from Harmon's DHEC interview).) Harmon admitted she was under the influence of Soma that day. (*Id*.) On another occasion, while headed to the burn unit in Augusta, Georgia, Harmon fell asleep at the wheel as a passenger screamed at her to wake up. (*Id*.) In light of these and other incidents related to her abuse of prescription drugs, she was fired by AMS, TrustUs, Edgefield County EMS, SouthStar, and Sumter County EMS. (ECF No. 91-46 at 87 (questioning the OCEMS 30(b)(6) representative regarding Harmon's employment history).)

The Department of Health and Environmental Control ("DHEC") conducted a detailed investigation into Harmon's employment starting in early 2016, confronting her with numerous reports alleging she had worked under the influence of narcotics and noting slurred speech,

---

[2] (*See, e.g.*, ECF Nos. 91-33 (listing numerous complaints from Harmon's time at Sumter County EMS); 91-34 (summary of SouthStar Corrective Action Meeting addressing Harmon working under the influence of medication); 91-35 (TrustUs investigation of Harmon's impairment on the job, including an employee complaint that Harmon was "unable to complete her thoughts when speaking" and "almost became unresponsive," expressing concern about Harmon's wellbeing "and the welfare of any patients that she should be required to care for that night," and attesting this was not the first time that she had come into work in this condition"); 91-36 (email from Harmon's coworker at Edgefield County EMS describing a lethargic Harmon driving dangerously while slurring her words).)

sluggish behavior, and slowed response times. (ECF No. 91-32 (DHEC Interview of Harmon). DHEC remarked Harmon had failed to complete three treatment programs. (ECF No. 91-31 (DHEC's second interview of Harmon, at 19:18).) Harmon admitted her past problems with addiction but insisted she had overcome them. (*Id.*) Yet, by September of the same year, she was fired by another EMS employer for the same behavior. (ECF No. 91-39 at 2.) Finally, an October 18, 2016, DHEC Administrative Order suspended Harmon's paramedic certificate, declaring she had "committed misconduct . . . as evidence[d] by her drug use to such a degree as to render her unfit to perform as Paramedic." (ECF No. 91 at 17 (citing ECF No. 91-41 at 14).) DHEC concluded Harmon "suffers from drug addiction which renders her a danger to patients under her care." (*Id.*) Under the terms of a Consent Order executed on December 29, 2016, Harmon agreed to the suspension of her paramedic certificate until March 30, 2018, but acknowledged she could apply for reinstatement upon successfully completing an outpatient treatment program for drug addiction. (ECF No. 91-47 at 3.) Still, Harmon continued to work as a paramedic despite her suspension. (ECF No. 91-39 at 3 (citing ECF No. 91-42 at 14 (indicating Harmon worked for the South Carolina Department of Corrections ("SCDC") while her license was suspended)).)

Harmon applied to OCEMS in November 2017. (ECF No. 91-40 at 2.) Her application and new hire documentation were full of misrepresentations. She falsely attested that she had never been addicted to drugs, narcotics, or alcohol. (ECF No. 91-43.) She failed to mention her reckless driving charge from the ambulance accident. (ECF No. 91-46 (indicating Harmon falsely answered "no" to question asking whether she has more than three moving traffic citations in the last three years).) And tellingly, she specifically requested that OCEMS not contact any of her former EMS employers, because she "was scared they [would] tell [OCEMS] about [her] addiction." (ECF No. 91-40 at 5-6; ECF No. 91-42 at 44.)

4

At the time Harmon applied to OCEMS, Danny Rivers served as its Director and hiring manager. (ECF No. 91-41 at 2.) He testified that when he questioned Harmon about her license suspension, she reassured him – explaining she was suspended because she "wasn't taking [her medication] correctly" and "had more [] in her system than she should have." (*Id*. at 2-3.) She attributed her answer of "no" to any contact with her former employers to a mere mistake. (ECF No. 91-41 at 7-8.) Rivers largely took her at her word, but did call DHEC, which confirmed Harmon's explanation regarding the medication issue. (*Id*. at 13-14.) Rivers did not inquire further. He did not ask which drugs Harmon had used. (*Id*. at 14-17.) He did not question whether her condition had affected her work performance or the safety of her patients. (*Id*. at 13-14.) He did not ask why she did not want OCEMS to contact her prior employers. (ECF No. 91-42 at 44.) He followed up with a single employer, Lexington County EMS, which Harmon had left in 2013. (ECF No. 91-41 at 7.) After Lexington County confirmed that Harmon had been a "competent" paramedic, Rivers did not contact any other employers, including SCDC, where Harmon worked when her license was suspended. (*Id*. at 5.) As to the medication issue, Rivers simply stated that "the reinstatement by DHEC was good enough for us ."[3] (ECF No. 91-41 at 6.) OCEMS hired Harmon on January 8, 2018. (ECF No. 91-39 at 3.)

Nine months later, a vehicle hit and killed Paul David Tarashuk while he was walking on I-95. (ECF No. 1-5 at 29 ¶¶ 152-53.) The night before, near 11:00 p.m., a truck driver called 911 to report that a man, later identified as Tarashuk, had climbed naked onto the trucker's tractor trailer at an on-ramp; rode on the catwalk while the truck traveled on I-95; detached "air lines" to

---

[3] An OCEMS 30(b)(6) designee could not explain OCEMS policy for validating employment history and conducting background checks on applicants but indicated that it would be concerning if an applicant had been fired from multiple jobs and misrepresented her history of addiction on an application form. (ECF No. 91-46 at 77-78, 87-88.)

the truck's brakes, forcing the truck to stop; and repeatedly attempted to enter the cab while the truck sat parked on the highway's shoulder.[4]  (*See* ECF Nos. 80-1 at 2-3; 94 at 3-4; 94-6 at 1-3.) Officers from three law enforcement agencies eventually responded, questioned Tarashuk, and received incoherent, bizarre, and/or inconsistent responses.[5]  (ECF No. 81-2 at 2.)  EMS was eventually requested, and Paramedics Harmon and Givens arrived at the scene in response to a call for "altered mental status" and began evaluating Tarashuk. (ECF Nos. 1-5 at 13 ¶ 65, 15 ¶ 76, 22 ¶ 119; 105-4 at 71:9-11; 91-7 at 15:1-2.)  Defendant Clifford A. Doroski, an Orangeburg County Sheriff's Office ("OCSO") Deputy informed Harmon and Givens that Tarashuk was not talking and had been found riding naked on a tractor.  The paramedics then took Tarashuk to their ambulance for examination, and Doroski's body camera recorded the rest of the interaction.  (ECF No. 91 at 6.)  Tarashuk initially sat in the back of the ambulance with his head down, unresponsive to questions, and Harmon eventually pushed an ammonia inhalant up his nose as a stimulant.[6] (ECF No. 105-4 at 90:7-9.)  While questioning him, the paramedics checked Tarashuk's vitals multiple times and found them to be normal.[7]  (*Id.* at 25 ¶ 133, 26 ¶ 138.)

---

[4] The Complaint alleges Plaintiff was suffering from a schizophrenic event while traveling down I-95 and was run off the road between 9:00 p.m. and 11:00 p.m.  (ECF No. 1-5 at 10 ¶ 44-47.)

[5] Law enforcement and OCEMS were unaware of Plaintiff's identity throughout their interactions as he refused or was unable to state his full name and carried no identification.

[6] Before inserting the stimulant into Tarashuk's nose—an act Harmon timidly concedes "may not have been sanctioned by OCEMS policy" (ECF No. 82-1 at 9)—it appears Givens asked Harmon if Harmon wanted "to have the pleasure" of administering the stimulant (ECF No. 91-15 (Doroski body camera at time mark 1:55-2:00)).  And while apparently administering the stimulant below Tarashuk's nose, Harmon told Tarashuk "talk to me, talk to me, you don't want it up your nose then talk to me, stop acting stupid you're a grown man[.]"  (*Id.* (Doroski body camera at time mark 2:20-2:35).)

[7] The Complaint refers to Tarashuk's vitals as normal (ECF No. 1-5 at 25 ¶ 133); Plaintiff's response to the instant Motion asserts the South Carolina Department of Health and Environmental Control ("DHEC") pointed out that Tarashuk's blood pressure of 160/82 and pulse of 124 were

Harmon later testified she did not believe Tarashuk posed a threat to himself or others during the interaction and did not believe he had a serious medical need. But body camera footage of the encounter captures no instance in which Tarashuk offered a verbal response to the paramedics' questioning throughout the nearly twelve-minute encounter. (*See* ECF No. 91-15 (Doroski body camera).) Tarashuk also did not react to an attempt to communicate with him through writing. (ECF No. 79-2 at 12:4-10.) After the OCEMS team repeatedly checked his vitals and unsuccessfully questioned Tarashuk, the other OCSO deputy in the ambulance exclaimed to Tarashuk, "what are you looking at me for? You're full of shit bro," to which Harmon responded, "yeah, he is." (ECF No. 91-15 (Doroski body camera at time mark 10:20-10:30).) Givens and Harmon then again offered Tarashuk the choice of either going to jail or going to the hospital. (ECF Nos. 105-4 at 96:13-17; 79-2 at 12:13-18.) When Tarashuk shook his head "no" to those options, Deputy Doroski remarked: "Then come on. I'm gonna give you a ride. You don't want to go to the hospital, either, so let's go." (ECF No. 91-15 (Doroski body camera at time mark 10:53-11:00).) Givens testified she believed Doroski was taking Tarashuk to jail, and Harmon believed Doroski was taking Tarashuk either to jail or a hospital. (ECF Nos. 79-3 at 10:1-3; 79-2 at 13:4-9.) Yet outside near the rear of the ambulance, as the OCSO deputies and Tarashuk were walking away, Doroski told Tarashuk: "You are not under arrest. I'm gonna give you a ride . . . . You're not going to jail, you're not under arrest, I'm going to give you a ride . . . . I'll figure out where you live. I'll give you a ride to a safe environment. That's all I want." (ECF No. 91-15 (Doroski body camera at time mark 11:00-11:37).) Doroski then told the other on-scene OCSO deputy that he was taking Tarashuk to Santee and ultimately dropped Tarashuk off at a closed gas station. (*Id.*

not within normal limits during their post-incident interview with Defendant Harmon (ECF No. 91 at 7).

(Doroski body camera at time mark 11:50-11:54); ECF No. 1-5 at 28-29 ¶¶ 150-52.)  Tarashuk eventually wandered back to I-95 and was struck by oncoming traffic and killed a few hours later. (ECF No. 1-5 at 29 ¶¶ 152-53.)

Plaintiff Paul Tarashuk, the personal representative of the Estate of Paul David Tarashuk, filed suit against the above-captioned Defendants.  (*See* ECF No. 1-5.)  In a previous order (ECF No. 119), the court concluded that Tarashuk had a serious medical need and denied Harmon and Givens' Motions for Summary Judgment on the basis of qualified immunity.  The court explained that in light of the facts presented, a jury could reasonably find that Harmon and Givens were deliberately indifferent to Tarashuk's serious medical needs.  The court highlighted that there was a factual dispute between the parties as to whether Harmon and Givens actually believed Doroski intended to take Tarashuk to a hospital or prison facility (where he could have received medical care) and whether a reasonable basis existed for that belief.  (*Id*. at 17-18.)

The court now considers Defendants Orangeburg County, OCEMS, and Rivers' Motion for Summary Judgment (ECF No. 79) on Plaintiff's failure to train/supervise, failure to screen, ADA, and SCTCA claims.  Plaintiff filed a Response in Opposition (ECF No. 91), to which Defendants Orangeburg County, OCEMS, and Rivers replied (ECF No. 106).  At issue are Plaintiff's claims under § 1983 for failure to supervise and/or train and failure to screen against Rivers in his individual capacity, OCEMS, and Orangeburg County, as well as *Monell* claims for inadequate screening practices against Rivers in his official capacity, OCEMS, and Orangeburg County.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

When considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In qualified immunity cases, this usually means accepting the plaintiff's version of the facts unless "blatantly contradicted by the record" or an unchallenged videotape. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). However, "[o]nly disputes over facts that might affect the outcome of the suit under governable law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Further, to show that a genuine issue of material fact exists, the non-moving party must set forth facts beyond "[t]he mere existence of a scintilla of evidence." *Id.* at 252. The non-moving party must present evidence sufficient to demonstrate that a reasonable jury could return a verdict for the non-moving party in order to avoid summary judgment. *See id.* at 248.

## III.    ANALYSIS

### A.  **Failure to Supervise and/or Train and Failure to Screen**

At the outset, the court notes Plaintiff has retracted his failure to train claim, conceding that "discovery has revealed that OCEMS did provide some level of training related to patients with

psychological impairment . . . even if that training was ineffective." (ECF No. 91 at 30.) Plaintiff devotes the remainder of his response to arguing that the court should deny summary judgment on the § 1983 failure to screen claim against Orangeburg County, Orangeburg EMS, and Rivers in his individual capacity.[8] (*Id.* at 30-32.) While Plaintiff's failure to screen claim was not specifically discussed in the Complaint under its own cause of action, the Complaint refers to various alleged shortcomings in the OCEMS hiring process. Moreover, substantial discovery was conducted on Harmon's employment history and OCEMS hiring practices that failed to detect misrepresentations on her application. (See, e.g., ECF No. 91-41 at 2-17 (Rivers' testimony regarding hiring Harmon).) In light of these facts, the court assumes Plaintiff's § 1983 claim for failure to screen and *Monell* claims for inadequate screening practices were adequately pleaded. Still, the evidence presented does not reach the virtually insurmountable bar for § 1983 plaintiffs alleging hiring deficiencies against municipalities, established by *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397 (1997) ("*Bryan County*").

The Supreme Court has articulated that mere indifference to an employee's background in layman's terms is insufficient to establish municipal liability under § 1983. *Id.* at 411. Instead,

> "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a *violation of a particular constitutional or statutory right will follow the decision.* Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'"

---

[8] Plaintiff characterizes this as a "negligent hiring" claim under § 1983. The court treats these names interchangeably for the purposes of this order. The *Monell* claims allege that the municipal entities adopted unconstitutionally inadequate screening policies, while the § 1983 claims allege failure to supervise/train and failure to screen based on a single incident – namely Harmon and Givens' interactions with Tarashuk and OCEMS' decision to hire Harmon.

10

*Id.* (emphasis added). Though the Court did not rule out that municipal liability could be premised on a single hiring decision, it expressed concern over the "particular danger that a municipality will be held liable for an injury not directly caused by a deliberate action attributable to the municipality itself." *Id.* at 410. Because *respondeat superior* is not a basis for municipal liability in this context, the Court concluded a plaintiff must put forth more than a "generalized showing of risk." *Id.*; *see also Monell*, 436 U.S. at 691, (1978) ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor . . . a municipality cannot be held liable under Section 1983 on a *respondeat superior* theory.") In failure to screen cases, therefore, "[t]he connection between the background of the particular applicant and the specific constitutional violation alleged must be strong." *Id.* at 412. The United States Court of Appeals for the Fourth Circuit has affirmed that a single hiring decision can establish municipal liability, but only if the plaintiff can demonstrate that the municipal actor "was 'deliberately indifferent' towards how its hiring decision could lead to a deprivation of federal rights." *Jones v. Mullins Police Dep't*, 355 F. App'x 742, 747 (4th Cir. 2009). "The standard is a high one." *Id.*

In a practical sense, this standard evokes two analytical steps: First, Plaintiff must demonstrate that the failure to screen a particular candidate would plainly result in improper conduct on the job. Second, Plaintiff must connect the potentially improper conduct to the "particular injury suffered" by his decedent. *Bryan County*, 520 U.S. at 412. In hindsight, it is clear that Rivers made a poor decision in hiring Harmon. But Plaintiff cannot demonstrate that Rivers' conduct amounts to "deliberate indifference" to Harmon's background. The mere presence of red flags on an application is not enough to impute deliberate indifference on a municipality. *See, e.g., Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 367 (5th Cir. 2020) (explaining that despite certain "red flags" on the applicant's record, the fact that two of three references responded

positively and that his criminal record did not provide insight into the conduct which precipitated an old arrest was not sufficient to establish deliberate indifference in the hiring process). *Bryan County* itself involved a sheriff who admittedly conducted almost no due diligence before hiring the applicant. *Bryan County*, 520 U.S. at 415-16. The deliberate indifference bar, therefore, requires more than a mere failure to follow every potential discrepancy on an application. Section 1983 cannot be deployed to put routine hiring decisions by official actors under a constitutional microscope.

Here, Plaintiff concedes Rivers contacted Harmon's longest-term employer who affirmed her competence as a paramedic. Rivers knew of Harmon's license suspension and contacted DHEC, the regulatory body in charge of her reinstatement, to ensure she had complied with its requirements. While certain red flags on Harmon's application, such as her relatively short tenure with subsequent employers and publicly available facts regarding her license suspension due to opioid addiction may have warranted further scrutiny, Rivers' failure to follow each thread in his investigation constitutes negligence at best. And in this context, negligence-based *respondeat superior* liability does not reach the substantial "deliberate indifference" threshold.[9]

Moreover, the court finds Plaintiff has not connected Harmon's past addiction to the *particular* constitutional injury asserted here. Plaintiff argues that "the inadequate screening of

---

[9] Other circuits have been reluctant to impose liability even when the hiring process was objectively flawed. In *Young*, the court noted that "a background check was performed, the background investigator spoke to two of Solitro's supervisors at the juvenile facility and received good reviews, and the Small incident came to light and was discussed at Solitro's oral interview before the hiring board. That procedures were flawed does not make Providence deliberately indifferent to the risk that Solitro would use excessive force." *Young*, 404 F.3d at 31. The hiring officers had conducted some level of investigation with an opportunity for the applicant to explain certain incidents on his record. The mere fact that the applicant's record was imperfect could not categorically preclude him from being hired.

Harmon's background demonstrates a deliberate indifference" to the possibility that she could some day harm a patient on the job. (ECF No. 91 at 30.) In support, Plaintiff cites Harmon's lengthy history of narcotics use in the workplace. He argues that the risk she would continue to work under the influence of narcotics as a paramedic for OCEMS was "plainly obvious," especially in light of her unwillingness to be honest about her past addiction. (*Id*.) By failing to follow up on obvious red flags on Harmon's application and by trusting her word in spite of apparent inconsistencies, Plaintiff contends Rivers' due diligence fell short of the constitutional mark and demonstrated "no regard for the effect of hiring someone with Harmon's background on OCEMS patients." (*Id*. at 31.)

Plaintiff attempts to connect the dots between Harmon's past addiction and the present incident through the testimony of a witness who worked with Harmon under multiple employers, and who insists the behavior exhibited by Harmon in Deputy Doroski's body camera footage, including her slurred speech, tired appearance, and constant references to sleepiness, coincide with her behavior the night she crashed the TrustUs ambulance after falling asleep at the wheel. (*Id*. at 32.) The evidence presented is compelling. But even if the court assumes Harmon was indeed under the influence of narcotics when she permitted Doroski to take Tarashuk away, these facts establish only a "generalized showing of risk" that *Bryan County* explicitly rejects. *Bryan County*, 520 U.S. at 410. Thus, Plaintiff must demonstrate that even if the municipality "had performed a full review of [Harmon's] record, the particular constitutional violation committed by the hired officer [must] have been a 'plainly obvious consequence' of the hiring decision." *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 30 (1st Cir. 2005). But Plaintiff does not explain how past problems with addiction led Harmon to violate Tarashuk's constitutional rights the night he died. Assuming that Harmon and Givens' decision to permit Doroski to take Tarashuk away

constituted deliberate indifference to his serious medical needs, Harmon's possible drug intoxication does not neatly fit into the chain of causation leading to Tarashuk's tragic death. It is certainly possible that Harmon, lethargic from the use of narcotics on the job, hoped to pass Tarashuk off to someone else and failed to oppose Doroski when he indicated he would take Tarashuk to an unspecified location. But this is far from a forgone conclusion. The body camera video demonstrates both paramedics in the ambulance displayed hostility and impatience towards Tarashuk. None recognized he needed medical care. That Harmon's actions that night were not only a direct result of drug intoxication, but also plainly obvious from past incidents in her employment record is, at best, a dubious conclusion.

Plaintiff attempts to bypass the causation requirement by defining the specific constitutional violation at issue in broad terms, citing the risk that "Harmon's condition would cause her to be indifferent to the medical needs of her patients." (ECF No. 91 at 32.) But this broad conception could encompass every error made by Harmon in the course of her duties, which nearly always involved patient interactions. It therefore cannot meet the particularity requirement of *Bryan County*. Following *Bryan County*, courts have generally found that a past history of violent acts, even criminal convictions, does not definitively indicate that an officer would violate someone's constitutional rights through the use of force. *See, e.g., Bryan County,* 520 U.S. 397 at 415-16 (officer accused of excessive force had a criminal record that included convictions for assault and battery and arrests for several driving infractions, resisting arrest, and public intoxication); *Aguillard v. McGowen*, 207 F.3d 226, 230 (5th Cir. 2000) (officer accused of deadly force had numerous violent acts on his record, including pistol-whipping a teenage boy, but this did not "reveal him to be likely to use excessive force in general or possess a trigger-happy nature in particular"); *Morris v. Crawford Cty.*, 299 F.3d 919, 924 (8th Cir. 2002) ("Municipalities are

14

not necessarily liable even when an applicant's background contains complaints of physical violence, including acts of aggression and assault").[10]  In many cases, courts require plaintiffs to identify "nearly identical" conduct on the officer's record to conclude a municipality was sufficiently on notice.[11]  *See, e.g., Morris*, 299 F.3d at 923 (8th Cir. 2002) (explaining that "prior

---

[10] Cases involving sexual assault tend to fare similarly.  *See, e.g., Riddick v. Sch. Bd. of the City of Portsmouth,* 238 F.3d 518 (4th Cir. 2000) (concluding it was not obvious that a coach who had previously been investigated for openly filming fully-clothed female students would secretly videotape nude students three years later); *Gros v. Grand Prairie*, 209 F.3d at 431 (5th Cir. 2000) (rejecting inadequate screening claim where chief of police had hired officer whose record indicated he had been overbearing and abusive during a previous traffic stop and was subsequently accused of sexually assaulting two women and using excessive force in another traffic stop); *Wilson v. Cook County*, 742 F.3d. 775, 781-84 (7th Cir. 2014) (finding employee's background, which evidenced track record of abusing power to coerce female probationers under his supervision to engage in sexual activity did not put the municipality on notice that he would later "abuse an [invented] position of power that would allow him to violate the bodily integrity" of another woman.)

[11] Such showings are exceedingly rare.  Two relatively recent circuit court decisions upheld municipal liability on the basis of failure to screen.  In *Parker v. Blackwell*, 23 F.4th 517, 524 (5th Cir. 2022), the Fifth Circuit explained that "one's rights can be infringed when an official is deliberately indifferent to a specific risk of harm posed by a hiring decision, such as a risk of sexual assault."  When a correctional officer was rehired "at the very same jail" from which he had been terminated for sexually abusing detainees, the court determined that a "reasonable supervisor [could] conclude that the plainly obvious consequences of the decision to rehire [the officer] would be that he would abuse inmates again."  *Id.*

Similarly, the Eleventh Circuit upheld a municipal failure to screen claim when the City of Opa-Locka hired a City Manager despite being "inundated with articles, faxes, and mail, warning of [the applicant's] problems with sexual harassment and dealings with women."  *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1314 (11th Cir. 2001).  Citizens even attempted to raise these concerns at a City Commission meeting, but all warnings, including those indicating the applicant had continued to harass women in the period between his appointment as acting City Manager and his final confirmation, were completely disregarded.  *Id.*  The City contacted no former employers and did not attempt to conduct any form of background investigation.  *Id.*  The court concluded "that the evidence supports the conclusion that the City ignored a known or obvious risk that Neal was highly likely to engage in sexual harassment if hired as the City's permanent City Manager."  *Id.*  These cases demonstrate how closely prior conduct and the asserted constitutional violations must align.

complaints in an applicant's background must be nearly identical to the type of officer misconduct that caused the constitutional deprivation allegedly suffered by a plaintiff. Courts routinely reject attempts to satisfy *Bryan County*'s causal connection requirement where none of the prior complaints in an applicant's background were of the same or similar type of officer misconduct that caused the plaintiff's injury.")  Plaintiff cannot point to "nearly identical" events where Harmon failed to provide medical care to patients who could not refuse it or impermissibly released a patient despite his or her serious medical need.  Past instances of Harmon falling asleep while driving or administering care to patients fail to highlight a strong causal connection between Harmon's addiction and the specific constitutional violation at hand.  *See Riddick v. Sch. Bd. of the City of Portsmouth,* 238 F.3d 518 (4th Cir.2000).  For this reason, Plaintiff cannot carry the heavy burden of demonstrating that Rivers' actions in hiring Harmon rose to the level of deliberate indifference to constitutional rights.

To the extent Plaintiff brings forth a *Monell*-based claim alleging that OCEMS screening procedures were generally deficient, a deliberate indifference finding is still precluded.  Pattern-based failure to screen cases tend to be even more difficult to prove, and "[a] pattern of previous bad hiring decisions leading to constitutional violations (perhaps of the same type as the one at issue) would likely be necessary to get one outside the "single incident" analysis in [*Bryan County*]. *See Young*, 404 F.3d at 31 (citing *Bryan County,* 520 U.S. at 409–11); *see also Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir.1998) (where the Fifth Circuit found no pattern of bad hiring decisions had been sufficiently demonstrated and analyzed the failure to screen claim as a single incident despite allegations that the hiring policy itself was deficient.)  Plaintiff has shown that apparently, OCEMS had no written policy for screening applicants and gave discretion to the OCEMS director to vet paramedic applications, and the HR director to vet criminal and driving

records.  (ECF No. 91 at 31.)  Evidently, there was no further oversight over how these background

checks were conducted.  (*Id*.)  These allegations are serious and demonstrate a jarring lack of hiring

responsibility for a job where human lives are regularly at stake.  But they cannot rise to the level

of deliberateness required to establish municipal liability under § 1983, because Plaintiff has not

identified a *pattern* of hiring decisions that implicated similar constitutional violations.  The court

therefore grants summary judgment in favor of Rivers, in his official capacity, OCEMS, and

Orangeburg County for any *Monell*-based failure to screen and failure to train/supervise claims,

and in favor of Rivers in his individual capacity, OCEMS, and Orangeburg County, for any § 1983

claims for failure to train/supervise and failure to screen.

### B.  ADA Claims

Pursuant to Title II of the ADA, "[N]o qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42

U.S.C. § 12132.  "A 'qualified individual with a disability' is broadly defined as any person who

'meets the essential eligibility requirements for the receipt of services or the participation in

programs or activities provided by a public entity.' 42 U.S.C. § 12131(2). The term 'public entity'

is defined to be 'any department, agency, special purpose district, or other instrumentality of a

State or States or local government.' 42 U.S.C. § 12131(1)."  *Gorman v. Bartch*, 152 F.3d 907,

912 (8th Cir. 1998).  The Fourth Circuit has concluded that Title II applies to police investigations,

*Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 338 (4th Cir. 2012), and an ADA

claim may exist where "police properly arrest a suspect but fail to reasonably accommodate his

disability during the investigation or arrest, causing him to suffer greater injury or indignity than

other arrestees."  *Waller v. Danville*, 556 F.3d 171, 174 (4th Cir. 2009).

17

Plaintiff alleges that various institutional defendants, including Orangeburg County and OCEMS "intentionally discriminated against Mr. Tarashuk" when their employees failed to transport him "to a hospital for a mental health examination," (ECF No. 1-5 at 64 ¶ 334), and "failed to make any reasonable accommodation for Mr. Tarashuk's mental disability" (*id*. at ¶ 337). A claimant must show the following elements to establish a Title II ADA claim: "(1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability. *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016) (citing *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)).

Courts have concluded that where an arrestee's "disability 'played a role in the . . . [official] decision-making process and . . . had a determinative effect on the outcome of that process[,]'" *i.e.*, if the arrestee's disability was a 'but for' cause of the deprivation or harm he suffered," then the [requirement that the claimant has been excluded from a service, program, or activity or discriminated against by reason of his disability] has been met." *Haberle v. Troxell*, 885 F.3d 170, 179 (3d Cir. 2018) (citing *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 n.11 (3d Cir. 2013); *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir. 2007)). Here, Tarashuk's disability could have prevented him from communicating with Harmon and Givens and constituted a but-for cause of their failure to transport him to the hospital for further treatment.

Still, the obligation to provide reasonable accommodations applies only where public entities were aware of a "known physical and mental limitation" and that the need for accommodations is clear. 42 U.S.C. § 12112(b)(5)(A). Defendants counter that in this case, the

"need to treat Tarashuk differently than a nondisabled person" was far from plain.  (ECF No. 79-1 at 17.)  But at the summary judgment stage, the court need not decide what effectively amounts to a factual dispute between the parties.

Plaintiff has demonstrated that there is a genuine question of material fact as to whether Harmon and Givens, as employees of Orangeburg County and OCEMS, were aware of Tarashuk's mental disability, which would, in turn, trigger their obligation to provide reasonable ADA accommodations.  It is evident from video and testimonial evidence that Tarashuk was confused, disorganized, and nonverbal throughout his encounter with police officers and EMS.  It is certainly possible that his symptoms were caused by an ADA-qualifying disability.  42 U.S.C. § 12210(a).  Given the circumstances surrounding the initial 911 call and Tarashuk's inability to answer any questions he was asked, it is also possible that Tarashuk's behavior could have been triggered by circumstances which are explicitly outside the purview of the ADA, such as the illegal use of drugs.  *See* 42 U.S.C. § 12210(a) (The ADA does not reach individuals who are "currently engaging in the illegal use of drugs.")  But Plaintiff has identified sufficient facts under which Harmon and Givens, especially in light of their medical training, could properly have concluded that Tarashuk "was in the midst of an acute psychotic break."  (ECF No. 91 at 34.)  Defendants' attempt to narrow the knowledge requirement to their knowledge of Tarashuk's specific mental health diagnosis of schizoaffective disorder is unavailing.  *See Smith v. City of Greensboro*, No. 1:19-cv-386, 2020 WL 1452114, at *13 (M.D.N.C. Mar. 25, 2020), *reconsideration denied*, No. 1:19-cv-386, 2021 WL 5771544 (M.D.N.C. Dec. 6, 2021) (concluding that the allegations in the complaint made it "at least plausible that the Officers recognized Smith as mentally disabled, even if the precise nature of his disability was uncertain.").  Individuals suffering from acute mental crises as a result of documented disabilities cannot, by definition, communicate their diagnoses or

19

request accommodations. Instead, where the circumstances indicate that an individual has an obvious need for accommodations, the ADA shifts the burden of compliance on public bodies and their employees.

Further, the actual accommodations required in this case are relatively obvious. Plaintiff alleges that Harmon and Givens should have simply "followed OCEMS protocols and transported Paul [Tarashuk] to the hospital" for medical evaluation and treatment. (ECF No. 91 at 35.) Unlike other cases where responding police officers "had no way of gauging what specific accommodation, if any, might have been reasonable under the circumstances," here, the answer was found in OCEMS' own protocols. *Gray v. Cummings*, 917 F.3d 1, 18 (1st Cir. 2019). Plaintiff has alleged sufficient facts to indicate that two trained paramedics should have been able to gauge the specific accommodation required here and taken Tarashuk to the hospital. Ultimately, whether the circumstances alleged here are such that responding paramedics knew or should have known Tarashuk was obviously disabled presents a genuine question of material fact and precludes summary judgment.

### C. <u>South Carolina Tort Claims Act</u>

In his second cause of action, Plaintiff alleges that Defendants Orangeburg County and OCEMS were negligent and/or grossly negligent or reckless in violating their duties of care to Tarashuk. Plaintiff cites a number of acts and omissions which could support a finding of negligence, gross negligence or recklessness by Harmon and Givens, and their employers, OCEMS and Orangeburg County.[12] (ECF No. 1-5 at 36-37 ¶ 183). Defendants urge these claims should

---

[12] For instance, Plaintiff argues that Orangeburg County and OCEMS were negligent in failing "to ensure the safety of [] their patient," "adher[ing] to proper emergency medical service procedures," "using ammonia inhalant on a patient who was conscious and alert," "failing to recognize that Mr. Tarashuk's mental state was such that he was a danger to himself and others, and therefore should be transported to the hospital," "failing to follow OCEMS Standing Orders and Protocols," and hiring

be dismissed under the framework of *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966) because they constitute supplementary state law claims remaining only after all federal claims have been eliminated on summary judgment. But here, the court declined to grant summary judgment as to Defendants Orangeburg County and OCEMS for Plaintiff's federal ADA claims, and therefore it may continue "to exercise jurisdiction over the remaining state-law claims" without conducting the factor-by-factor pendent jurisdiction analysis set forth in *Gibbs*, 383 U.S. 715. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

The court finds Plaintiff's state tort claims survive summary judgment, because he has alleged sufficient facts to create a genuine dispute of material fact under multiple theories of negligence which may be attributed to these defendants.

For instance, Plaintiff's argument that Orangeburg County and OCEMS negligently hired Harmon finds substantial factual support on the record to overcome a dispositive motion. South Carolina courts accept that "[i]n circumstances where an employer knew of or should have known that its employment of a specific person created an undue risk of harm to the public, a plaintiff may claim that the employer was itself negligent in hiring . . . the employee. . . ." *Kase v. Ebert*, 707 S.E.2d 456, 459 (S.C. Ct. App. 2011) (citing *James v. Kelly Trucking Co.,* 661 S.E.2d 329, 330 (S.C. 2008)). Plaintiff has established that Harmon had a lengthy record of dismissals, suspensions, and complaints regarding her use of narcotics while working as a paramedic, and a cursory review of various red flags on her application would have revealed this to Danny Rivers, the OCEMS Director who screened her application. That hiring Harmon could "create an undue

---

paramedic Harmon despite her lengthy history of working under the influence of narcotics," among other theories. (ECF No. 1-5 at 36-38.) This list includes claims grounded in *respondeat superior* liability as well as Defendants' own negligent acts, such as failure to screen Harmon's record properly before she was hired.

risk of harm to the public" warrants no detailed explanation.  Plaintiff has put forth sufficient facts

to support "two fundamental elements" essential to a negligent hiring cause of action: "knowledge

of the employer and foreseeability of harm to third parties."  *Kase*, 707 S.E. at 459 (citing *Doe v.*

*ATC,* 624 S.E.2d 447, 450 (S.C. Ct. App. 2005); *Di Cosala v. Kay,* 450 A.2d 508, 516 (N.J. 1982)).

Foreseeability is generally an issue of fact, and here, a reasonable jury could find "the risk

foreseeable or the employer's conduct to have fallen below the acceptable standard." *Kase*, 707

S.E. at 459.  Moreover, a jury could find that Harmon's alleged use of narcotics at the time of her

encounter with Tarashuk proximately caused his death by rendering her incapable of recognizing

that Tarashuk could not refuse transport and should be taken to the hospital or jail, where he could

receive further medical care.

Other theories of negligence also find substantial support in the record.  For instance, it is

undisputed that Harmon and Givens failed to follow OCEMS protocols, which state that a patient

"shall be considered incapable of making medical decisions regarding care and/or transport and

should be transported to the closest appropriate medical facility under implied consent" when they

demonstrate "altered mental status" or are "unable to verbalize an understanding of the illness

and/or risks of refusing care despite the risks."  (ECF No. 105-18 at 5.)  Video evidence

demonstrates Tarashuk was nonverbal for the duration of his interaction with OCEMS.  (*See* ECF

No. 91-15 (Doroski body camera); ECF No. 79-2 at 12:4-10 (demonstrating no reaction to an

attempt to communicate with him in writing).)  Yet, Harmon and Givens allowed Deputy Doroski

to take him away. Under these facts, Plaintiff has plausibly alleged that Harmon and Givens

exhibited conduct that fell below the standard of care, as clarified, in part, by OCEMS' own

protocols.  Moreover, Plaintiff has presented expert testimony from Joe Lord, a paramedic since

1980, who determined that Harmon and Givens must have known Tarashuk was in an altered

mental state because, despite not knowing the full factual background of Tarashuk's behavior that night, they "knew that being naked on the interstate, either walking along the road or on top of the cab of a tractor, or riding naked on a tractor, was abnormal and bizarre behavior indicative of an altered mental state and/or behavioral emergency." (ECF No. 91-48 at 16.)  His testimony further supports an inference that Givens and Harmon acted at least negligently in permitting Deputy Doroski to take Tarashuk away, which a jury could determine proximately caused Tarashuk's death on I-95 several hours later.

Further, as the court explained in its prior order, a genuine dispute exists whether Harmon and Givens believed Doroski was transporting Tarashuk to a prison facility or hospital where his medical needs could be addressed, based on Doroski's statements and behavior throughout the encounter and while exiting the ambulance. (ECF No. 119 at 14.)  Thus, a jury could credibly find Tarashuk's medical issues were "so obvious that the fact-finder could conclude that [Harmon and Givens] did know of [them] because [they] could not have failed to know of [them]," and their response was "so patently inadequate as to justify an inference that [they] actually recognized that [their] response to the risk was inappropriate." *Brice*, 58 F.3d at 105; (*see also id*.)  Just as their alleged state of mind could support an inference of deliberate indifference under § 1983, it can also support a cause of action for negligence or gross negligence under the SCTCA.  At bottom, it is clear that Plaintiff has alleged substantial facts which create genuine questions as to numerous theories of negligence asserted against OCEMS and Orangeburg County under the SCTCA.  Thus, the court declines to grant summary judgment as to these claims.

## IV.    CONCLUSION

The court **GRANTS IN PART** and **DENIES IN PART** the Motion for Summary Judgment filed by Defendants OCEMS, Orangeburg County, Danny Rivers, and Jamie D. Givens

(ECF No. 79). In particular, the court **GRANTS** summary judgment as to Plaintiff's *Monell* claims for failure to supervise/train and failure to screen against Orangeburg County, OCEMS and Danny Rivers, in his official capacity as Director of OCEMS, and Plaintiff's § 1983 claims for failure to supervise/train and failure to screen against Orangeburg County, OCEMS and Danny Rivers, in his individual capacity, as per Plaintiff's ninth cause of action (ECF No. 1-5 at 66), and **DENIES** summary judgment as to Plaintiff's Americans with Disabilities Act claims against Orangeburg County and OCEMS, as per Plaintiff's eighth cause of action (ECF No. 1-5 at 63), and Plaintiff's negligence and gross negligence claims under the South Carolina Tort Claims Act against Orangeburg County and OCEMS, as per Plaintiff's second cause of action (ECF No. 1-5 at 36).

**IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

March 23, 2022
Columbia, South Carolina