**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION**

| | | |
|---|---|---|
| Paul Tarashuk, *Personal Representative of the Estate of Paul David Tarashuk*, | ) ) ) | Civil Action No.: 5:19-cv-02495-JMC |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| Orangeburg County, Orangeburg County Emergency Medical Services, Danny Rivers, *Individually and in his Official Capacity as the Director of Orangeburg County Emergency Medical Services*, Orangeburg County Sheriff's Office, Leroy Ravenell, *Individually and in his Official Capacity as the Sheriff of the Orangeburg County Sheriff's Office*, South Carolina Department of Public Safety, Leroy Smith, *Individually and in his Official Capacity as the Agency Director of the South Carolina Dept. of Public Safety*, Town of Santee, Joseph Serrano, *Individually and in his Official Capacity as the Chief of Police of the Town of Santee*, Jamie D. Givens, Alison K.B. Harmon, Clifford A. Doroski, Buist M. Smith, and Keith A. Cline, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **ORDER AND OPINION** |
| Defendants. | ) ) | |

Before the court is a combined Motion to Dismiss and Motion for Summary Judgment filed

by Defendants Town of Santee ("Santee"), Officer Buist Smith, Officer Keith Cline, and Santee's

Chief of Police, Joseph Serrano, individually and in his official capacity (collectively, "Santee

Defendants") (ECF No. 81), which seek, *inter alia*, summary judgment on Plaintiff's 42 U.S.C. §

1983 claims for deliberate indifference against Officers Smith and Cline (ECF No. 1-5 at 61-63),

Plaintiff's § 1983 claim for bystander liability against Officer Smith[1], Plaintiff's 42 U.S.C. § 1983 claims against Serrano in his individual capacity for failure to supervise and train Officers Smith and Cline, (*id.* at 70-72), against Santee and Serrano in his official capacity for failure to supervise and train in accordance with *Monell v. Dep't of Soc. Serv's*, 436 U.S. 658 (1978) (*id.* at 70-72), and Plaintiff's Americans with Disabilities Act ("ADA") claims against Santee (*id.* at 63-66).

After careful consideration, the court **GRANTS** the Santee Defendants' Motion for Summary Judgment. (ECF No. 81.) Specifically, the court grants summary judgment as to the Americans with Disabilities Act claim under 42 U.S.C. § 12101 against Santee (eighth cause of action), the § 1983 claims for deliberate indifference against Officers Smith and Cline, and for bystander liability against Officer Smith (seventh cause of action), the § 1983 claim for failure to supervise/train against Santee and Chief Serrano (twelfth cause of action), and any *Monell* claims against Santee and Chief Serrano in his official capacity. Defendants' Motion to Dismiss (ECF No. 81) is therefore **MOOT**.

---

[1] Plaintiff did not allege a specific claim for bystander liability against Officer Smith in the Complaint. However, the claim arises from the same facts as Plaintiff's § 1983 claim for deliberate indifference against Officer Smith, was addressed in briefing and in the summary judgment hearing held before this court. (*See* ECF No. 143.) Moreover, the Fourth Circuit has held that parties are "not required to use any precise or magical words in their pleading," *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 418 (4th Cir. 2014), as long as the complaint gives "fair notice" to the defendants. *Id.* (*citing E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 447-48 (4th Cir. 2011); *Labram v. Havel,* 43 F.3d 918, 920-21 (4th Cir. 1995) ("Legal labels characterizing a claim cannot, standing alone, determine whether it fails to meet [the standard for notice pleading pursuant to Federal Rule of Civil Procedure 8(a)(2)].")). Here, the court finds Plaintiff sufficiently set forth the facts underlying his bystander liability claim against Officer Smith such that Defendants had fair notice.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

A little before 6:00 a.m. on September 10, 2018, a vehicle hit and killed Paul David Tarashuk ("Tarashuk") as he was running down I-95.  (ECF No. 1-5 at 29 ¶¶ 152-53.)  The night before, near 11:00 p.m., a truck driver called 911 to report that a man, later identified as Tarashuk, had climbed naked onto the trucker's tractor trailer at an on-ramp; rode on the catwalk while the truck traveled on I-95; detached "air lines" to the truck's brakes, forcing the truck to stop; and repeatedly attempted to enter the cab while the truck sat parked on the highway's shoulder.[3]  (*See* ECF Nos. 80-1 at 2-3; 94 at 3-4; 94-6 at 1-3.)    Officers from three law enforcement agencies, including Trooper Rice from the Highway Patrol and Officers Smith and Cline from the Santee Police Department, began arriving around 11:23 pm.  (ECF No. 104-15 (Orangeburg County Dispatch Record at 11:23.))  Officers Smith and Cline arrived first on the scene, finding Tarashuk naked on top of the tractor trailer.  After attempting to talk to Tarashuk, who appeared dazed and told the officers he was "from the sky" and "Charles China Town," they recognized he was incoherent and likely mentally ill.  (ECF No. 104-16 (Smith body camera at timestamp 0:01-2:16).)  Officer Cline placed Tarashuk in handcuffs to prevent him from wandering away.  (ECF No. 104-11 (Cline body camera at timestamp 11:41-13:25).)  When Trooper Rice arrived shortly thereafter, Officers Smith and Cline briefed him on Tarashuk's condition, telling Rice he was "incoherent" and "definitely a mental subject of some sort."  (ECF No. 110-3 (Cline body camera at timestamp

---

[2] These allegations are taken from the Complaint and Plaintiff's Response to this Motion for Summary Judgment (ECF No. 104) which references facts from deposition testimony and documents produced in discovery.  To the extent the court references these facts, they are unchallenged.  At any rate, the court must accept Plaintiff's version of the facts at the summary judgment stage unless "blatantly contradicted by the record" or an unchallenged videotape. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

31:52-32:10).)  Deputy Doroski, a Sheriff's deputy with the Orangeburg County Sheriff's Office ("OCSO") arrived at the scene around 11:41 pm, in response to a request for an "agency assist" by Highway Patrol Trooper Rice.  (ECF No. 104-18 (OCSO Dispatch Record at 11:41 p.m).)  Cline explained the situation to Doroski and mentioned Tarashuk's nonsensical responses.  (ECF No. 110-3 (Cline body camera at timestamp 31:52-32:10).)  Smith also conveyed his impressions of Tarashuk to other officers on the scene, noting that Tarashuk appeared "like a zombie, about zoned out, zombie land."  (ECF No. 110-5 (Smith body camera at timestamp 20:30-23:04).)  He explained that Tarashuk was "lucky he didn't get run over."  (*Id*. at 41:14.)

By this time, Doroski had left with Deputy Howell, another OCSO Sheriff's deputy on the scene.  (ECF No. 104-20 (Doroski body camera at timestamp 17:59-18:10).)  Officer Smith and Trooper Rice attempted to call Doroski back over dispatch to see if the OSCO would be willing to handle the situation.  They believed OCSO may have had jurisdiction over the matter because it "happened in the County." (ECF No. 110-5 (Smith body camera at timestamp 36:23-36:41).)  Doroski asked Officer Smith to call him on his personal cell phone instead.  On that call, Doroski called the situation "stupid" and later testified that, at that time, he saw no need to participate in the investigation.  (ECF Nos. 104-16 (Smith body camera at timestamp 45:00-48:20); 104-23 at 38).)  Doroski also advised Smith that the officers should detain [Tarashuk] and advise him he's going to be under arrest for disorderly conduct."  (ECF No. 110-5 (Smith body camera at timestamp 36:42-39:15).)  Once Smith ended the call with Doroski, he let Cline and Rice know that the OCSO was "trying to figure out what we're going to do with [Tarashuk]," and determine whether Tarashuk's vehicle, clothes and identification could be found. (ECF No. 110-5 (Smith body camera at timestamp 49:30-49:52).)  When Doroski returned, he appeared visibly irritated about having "to clean this mess up."  (ECF No. 104-12 (Doroski body camera at timestamp 1:17-

4

1:32); ECF No. 104-28 at 41.)  Observing Doroski's demeanor, Cline remarked "I don't think he's

happy."  (ECF No. 110-3 (Cline body camera at timestamp 53:00-53:14).)  Doroski briefly

conferred with the other officers.  Though this conversation was not recorded, Trooper Rice later

testified that Doroski suggested leaving Tarashuk by the roadside.  (ECF No. 94 at 13 (citing ECF

No. 94-7 at 24:50-25:49 (SLED interview of Rice)).)  He recounted that he had "stopped Doroski,"

exclaiming:

> **'No. No. No. No. He will not get left here. . . I said, 'If y'all leave him there,
> I'm not going to leave him on the side of the road like this**.  You know good
> and well we cannot leave anyone on the side of the interstate, especially on the
> interstate.'  In South Carolina, it's against the law to be on the side on an interstate
> . . . I said, 'To start with, you got a guy here who we have not positively identified,
> he is basically shutting down on us.  I don't know whether he's on some type of
> medication, whether he's on a drug, or does he have a mental illness.'  I don't
> know.  But **I told the deputy straight out, I said, 'If you leave him here, here's
> what's going to happen.  I'm going to take him to jail for being a pedestrian
> on an interstate or take him to the hospital to hopefully get an assessment on
> him, or possibly both**.  If I take him to the hospital, and they can't do anything
> with him, then I will escort him to the jail.  At least he'll get inside, he'll be
> fingerprinted until we can determine who he is and where he came from.'

(*Id*. (emphasis added).)

The officers turned to Tarashuk, who at this point, was silent in response to attempts to

communicate and appeared to have shut down completely.  (ECF No. 104-11 (Cline body camera

at timestamp 54:48-57:57).)  Smith finally suggested calling EMS, more than an hour after officers

first responded to the scene.  Describing Tarashuk's current state to the operator, Smith remarked

Tarashuk was not communicating, and when asked a question, he would just give "a blank stare."

(ECF No. 104-30 at 50.)  Doroski, agreeing that EMS should be called, asked that Tarashuk's

handcuffs be removed, and led him to the back of his patrol car.  (ECF No. 104-12 (Doroski body

camera at timestamp 9:45-9:52).)  As the officers waited for EMS, Doroski leaned into Smith's

patrol car and had the following conversation with Smith and Cline:

| Doroski: | "Last I checked, this is called the 'highway.' Am I wrong?" |
| Cline: | "Right." |
| Doroski: | "OK. I don't know why highway patrolmen can't do his job or her job on the highway. Call me silly." |
| Cline: | "I mean we came out as an agency assist till they're available. . . But we weren't gonna run it till, once they showed up that should be theirs." |
| Doroski: | "Oh, I know whose it should be. I'm getting passed this thing down. He ain't going to jail, I promise you that. He ain't my fish. I ain't cleaning it. I get him some medical help. All I'm doing. That's not acceptable." |

(ECF No. 110-3 (Cline body camera at timestamp 1:04:12ff).) Smith later recounted that he took Doroski's comment to mean he would have Tarashuk transported to the hospital with EMS. (ECF No. 110-9 at 52.) It took forty minutes for EMS to arrive. (ECF Nos. 1-5 at 24 ¶ 128.) During that time, Tarashuk remained in Doroski's cruiser. Smith and Cline left before the ambulance arrived.

When Orangeburg County EMS ("OCEMS") reached the scene, Doroski informed paramedics Harmon and Givens that Tarashuk was not talking and had been found riding naked on a tractor. (ECF No. 83-3 at 2.) The paramedics took Tarashuk to their ambulance for examination, and Doroski's body camera recorded the rest of the interaction. (ECF No. 91 at 6.) Body camera footage of the nearly twelve-minute encounter captures no instance in which Tarashuk offered a verbal response to the paramedics' questioning. (*See* ECF No. 91-15 (Doroski body camera).) Tarashuk also did not respond to the paramedics' attempt to communicate with him through writing. (ECF No. 79-2 at 12:4-10.) Givens and Harmon again offered Tarashuk the choice of either going to jail or going to the hospital. (ECF Nos. 105-4 at 96:13-17; 79-2 at 12:13-18.) When Tarashuk shook his head "no" to those options, Doroski remarked: "Then come on. I'm gonna give you a ride. You don't want to go to the hospital, either, so let's go." (ECF No. 91-15 (Doroski body camera at timestamp 10:53-11:00).) The paramedics never told Doroski that

they would not transport Tarashuk to the hospital. By Doroski's own admission, he was the one who affirmatively decided to take Tarashuk off the ambulance and ordered him to go with him in his patrol car. (ECF No. 104-29 (SLED Interview of Doroski at timestamp 15:33-16:50).) Doroski took Tarashuk to Santee and ultimately dropped him off at a closed gas station at 1:56 am—alone, unclothed, and with no one around who could help. (*Id.* (Doroski body camera at time mark 11:50-11:54); ECF No. 1-5 at 28-29 ¶¶ 150-52.) Tarashuk eventually wandered back to I-95 and was struck by oncoming traffic and killed a few hours later. (ECF No. 1-5 at 29 ¶¶ 152-53.)

While he performed property checks in Santee, Officer Smith apparently heard over the radio that Doroski was dropping Tarashuk off "at the CVS."[3] Smith testified later that he knew Doroski was not transporting Tarashuk to the hospital, (ECF No. 110-9 at 81), and admitted that although he "could have" easily called Doroski to make sure Tarashuk was taken to the hospital (*id.* at 79-80), or just stepped in to "handle it" himself, he did not do so that night. (*Id.* at 79-81.)

In later testimony, nearly every officer on the scene, including Smith and Cline, testified there were only two options as to where Tarashuk could have been taken the night of the incident: jail or the hospital.[4] Smith repeatedly affirmed he "felt at the time that [Tarashuk] just needed to

---

[3] In fact, Doroski dropped Tarashuk off at an empty gas station across the street from the CVS. When Smith later responded to Tarashuk's death on the highway, he told the EMS crew Doroski "took [Tarashuk] and brought him here, dropped him off in Santee. . . right there at the CVS." (ECF No. 110-10 (Smith body camera at timestamp 6:30-7:37).) Plaintiff argues he heard this over the dispatch radio, when Doroski told Orangeburg County dispatch: "10-23 [arrived] at the Horizon at 6 and 15, Santee, . . . letting off my passenger." (ECF No. 110-11 (Orangeburg County dispatch record 2018-09-10_01.54.57).)

[4] (*See* ECF Nos. 104-30 at 52 (Officer Smith—admitting it was "obvious" Tarashuk needed to be hospitalized); 104-40 at 39 (Officer Cline—jail or Emergency Protective Custody); 104-32 at 46 (Trooper Rice— "at a minimum, the hospital"); 104-22 (Trooper Richardson—arrest or hospital); 104-41 (30(b)(6) Representative Chief Serrano—jail or emergency protective custody).)

go to the hospital" because "it was obvious," and acknowledged that if he "had custody of [Tarashuk]," he "should have" taken him to the hospital.  (*Id*. at 82-85.)

Shortly after Tarashuk's death, Officer Cline expressed deep regret during a phone conversation with New Jersey Police Officer Fichi, a relative of the Tarashuk family.  (ECF No. 110-13 (Phone call from Fichi to Cline).)  Cline blamed Doroski and the systemic "laziness" of the Sheriff's Department, as Tarashuk "should never have been released without knowing who he was and what his problem was."  (*Id*. at 6:15.)  Cline mused he would probably have taken Tarashuk to jail for disorderly conduct.  (*Id*. at 11:45.)  He characterized Tarashuk's death as a "senseless, needless, [sheer] and total loss of life for no reason."  (*Id*. at 16:12.)

Plaintiff now alleges that the Santee Police Department had no policy or practices for its officers in dealing with mentally ill individuals.  (ECF No. 110-16 at 8-9.)  In support, Plaintiff cites testimony from Santee Police Chief Serrano that the department had "no policy" and "no practices" for "interacting with mentally ill subjects, and "no procedures other than what the [South Carolina Criminal Justice Academy] has taught."  (*Id*.)  Officer Smith recalled viewing a training video from the Academy on the topic of mental illness, but acknowledged there were no departmental written policies or other directives on this topic.  (ECF No. 110-9 at 66-69.)  When asked about Santee's policies on this subject, Officer Cline stated the following: "I just know that when we come across a situation where there's a questionable issue with someone who's mental[ly ill], we contact EMS. And then we -- we make that call. We let EMS handle that."  (ECF No. 110-7 at 51.)

Subsequently, Tarashuk's Estate filed suit against the above-captioned Defendants.  (*See* ECF No. 1-5.)  Defendants removed the matter to federal court in September 2019.  (*See* ECF No. 1.)  The court now considers Defendant Officers Smith and Cline, Chief Serrano, and Santee's

Motion to Dismiss and Motion for Summary Judgment (ECF No. 81). Plaintiff filed a Response in Opposition (ECF No. 110), to which Defendants replied (ECF No. 112).

## I.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

When considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In qualified immunity cases, this usually means accepting the plaintiff's version of the facts unless "blatantly contradicted by the record" or an unchallenged videotape. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). However, "[o]nly disputes over facts that might affect the outcome of the suit under governable law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Further, to show that a genuine issue of material fact exists, the non-moving party must set forth facts beyond "[t]he mere existence of a scintilla of evidence." *Id.* at 252. The non-moving party must present evidence sufficient to demonstrate that a reasonable jury could return a verdict for the non-moving party in order to avoid summary judgment. *See id.* at 248.

## II.     ANALYSIS

### A.  Deliberate Indifference

Although individuals do not generally have a "right to protection" by the state, the Supreme Court has recognized that an affirmative duty to protect its citizens may be imputed on the government in two contexts.  *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989).  The first involves "a special relationship" between the individual and the state: when the state "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs . . . it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause."  *Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995) (quoting *DeShaney,* 489 U.S. at 200).[5]   In this context, the United States Court of Appeals for the Fourth Circuit generally requires some form of custody—the "confinement of the injured party[—]to trigger the affirmative duty."  *Id*. at 1175.  Therefore, when the existence of such a special relationship is properly alleged, deliberate indifference to the plaintiff's serious medical needs violates the Constitution.[6]  *Estelle v. Gamble*, 429 U.S. 97 (1976); *see also Krell v. Braightmeyer*, 828 F. App'x 155, 158-59 (4th Cir. 2020) (citations omitted); *Young v. City of Mount Ranier*, 238 F.3d 567, 575 (4th Cir. 2001).

---

[5] The second exception involves "state-created dangers," which Plaintiff has not alleged against Officers Smith and Cline.

[6] Though *Estelle* discussed deliberate indifference in the context of the Eighth Amendment's prohibition against cruel and unusual punishment, courts have routinely found that pretrial detainees bringing suit under the Fourteenth Amendment's Due Process Clause are, at a minimum, entitled to the same constitutional protections as prisoners. *See, e.g.*, *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209 n.5 (4th Cir. 2017) (quoting *Bell v. McAdory*, 820 F.3d 880, 882 (7th Cir. 2016) (highlighting that government officials "must treat detainees at least as well as prisoners, and often they must treat detainees better—precisely because detainees (whether civil or pretrial criminal) have *not* been convicted and therefore must not be punished.")).

To prove a medical deliberate indifference claim, a plaintiff must establish two elements: First, he must show "he had a serious medical condition—i.e., a condition that 'has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Krell*, 828 F. App'x at 158-59 (quoting *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (internal quotation marks omitted)). This element requires an *objective* showing. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ("[T]he deprivation alleged must be, objectively, 'sufficiently serious'") (internal citations omitted). "Second, the plaintiff must establish that the defendants acted with deliberate indifference—i.e., that they 'had actual knowledge of the plaintiff's serious medical needs and the related risks, but nevertheless disregarded them.'" *Id.* at 357 (brackets and internal quotation marks omitted). The second factor therefore looks to the defendant's *subjectively* "culpable state of mind," *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 834), regarding both the seriousness of the medical condition and the "excessive risks posed by the official's action or inaction," *id*. at 226 (quoting *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

This sets a high standard. Plaintiff must demonstrate that Officers Smith and Cline's behavior "was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Dean for & on behalf of Harkness v. McKinney*, 976 F.3d 407, 413 (4th Cir. 2020), *cert. denied sub nom. McKinney v. Dean on Behalf of Harkness*, 141 S. Ct. 2800, 210 L. Ed. 2d 930 (2021) (citing *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005); *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

Such indifference can be manifested by officers in their response to a subject's needs or by intentionally denying or delaying access to medical care. *See Estelle*, 429 U.S. at 104. The Fourth Circuit has noted "it is not enough that the officers *should have* recognized [the risk]; they

actually must have perceived the risk." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (emphasis in original) (citing *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)). Additionally, officials "actually *must have* recognized that [their] actions were insufficient" in light of the circumstances. *Id.* (emphasis in original). Knowledge of these elements can be inferred from circumstantial evidence—if the risk of injury or the medical need is so obvious that the officer "could not have failed to know of it." *Id.* (quoting *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995)). Similarly, officials' response can be "so patently inadequate as to justify an inference that the official actually recognized that [their] response to the risk was inappropriate." *Id.*

Plaintiff alleges that Officers Cline and Smith acted with deliberate indifference to Tarashuk's serious medical needs because they knew Deputy Doroski would not take Tarashuk to jail or to the hospital but failed to intervene. (ECF No. 1-5 at 62.) Assuming Tarashuk was indeed detained, the court finds that the record does not support a deliberate indifference claim against these defendants.

As an initial matter, the court previously concluded that Plaintiff has put forth sufficient evidence to demonstrate Tarashuk suffered from an objectively serious medical condition such that "even a lay person would easily recognize the necessity for a doctor's attention." (ECF No. 119 at 11 (quoting *Gordon*, 937 F.3d at 356).) Plaintiff offered expert testimony of Richard L. Frierson, M.D., D.F.A.P.A., who concludes "[t]here is abundant evidence from police cam videos that [Tarashuk] was in the midst of an acute psychotic break at the time of his death." (ECF No. 91-1 at 9.) It does not take medical training to recognize that someone riding on top of a tractor trailer on the interstate and running between cars in the nude may need medical attention. This is precisely the kind of medical distress that even a lay person could easily recognize. Hours of

video footage demonstrate that Tarashuk was catatonic or "blank," disoriented, and nonsensical or nonverbal when responding to questioning, all of which a layperson could easily associate with mental distress or agitation. The evidence supports an inference that Tarashuk's medical need was objectively serious. Therefore, Plaintiff has satisfied the first prong of the deliberate indifference inquiry.

Turning to the subjective prong of the deliberate indifference inquiry, the court notes that Smith and Cline readily admit that they subjectively recognized that Tarashuk needed medical help. In fact, Cline apparently recognized him as "incoherent" and a "mental subject of some sort." (ECF No. 110-4 (Cline body camera at timestamp 31:52-32:10).) Smith described Tarashuk as "a zombie, about zoned out." (ECF No. 110-5 (Smith body camera at timestamp 20:30-23:04).) Both acknowledged that Tarashuk was lucky he had not been "run over" or "hit." (ECF No. 110-5 (Smith body camera at timestamp 41:14).) ECF No. 110-3 (Cline body camera at timestamp 48:15-48:31).) Both unequivocally testified that they believed Tarashuk needed to go to jail or the hospital. (ECF No. 110-9 at 52-53 (Smith acknowledging "it was obvious"); 110-7 at 39 (Cline stating that from his perspective, the options were to "take [Tarashuk] to jail or to EPC him" (referring to Emergency Protective Custody)).) Smith and Cline's recorded statements therefore support the inference that like any reasonable person, both were subjectively aware that Tarashuk's situation was serious enough to require a "doctor's attention." *Gordon*, 937 F.3d at 356.

Yet, even recognizing that Tarashuk's medical need was objectively serious, and that Smith and Cline subjectively understood this fact, Plaintiff has not demonstrated that the officers disregarded this risk or responded inappropriately while they were on the scene. At the outset, the court notes that Smith and Cline were called to the scene as an "agency assist." (ECF No. 143

at 48.)  Twelve miles outside of their jurisdiction, they were not responsible for leading the investigation.  (ECF No. 110-7 at 29-30.)  Still, the evidence demonstrates that they remained on the scene for approximately fifty minutes, conducting a preliminary investigation of the situation and conveying their impressions of Tarashuk to officers from OCSO and the Highway Patrol, who had jurisdiction over the incident.  Eventually, Smith called EMS after conferring with Doroski, and with Tarashuk safely in Doroski's patrol car and the ambulance on the way, Smith and Cline cleared the scene.  (ECF No. 110-5 (Smith body camera at timestamp 57:57-1:06:00).)  Plaintiff's argument that Smith and Cline are somehow liable because "the 'communication' of [Tarashuk's] condition by these two officers to Trooper Rice and/or to Deputy Doroski was not at all clear," is unavailing.  (ECF No. 110 at 23.)  The record demonstrates that Smith and Cline repeatedly mentioned the fact that Tarashuk may be experiencing a mental crisis to the other defendants and were instrumental in calling EMS.  Even if Doroski and Rice failed to verbally acknowledge Smith and Cline's comments regarding Tarashuk's condition, this does not indicate they did not hear them.  And regardless, at the time Smith and Cline cleared the scene, it appeared Tarashuk was in good hands: two OSCO deputies and two Highway Patrol troopers with proper jurisdiction remained on the scene, a decision regarding what to do with Tarashuk had been reached, and an ambulance was *en route* to transport him to a hospital where he could get a mental evaluation and further medical care.  *See, e.g., Robinson v. U.S. Bureau of Prisons*, 244 F. Supp. 2d 57, 63 (N.D.N.Y. 2003) ("Because [the defendant officer] immediately summoned help for [the plaintiff], and such help, including an EMT and other corrections officers, arrived quickly and began performing first aid on [the plaintiff], it cannot be said that [the defendant officer] acted with deliberate indifference to [the plaintiff's] serious medical condition."); *Marshall v. Russell*, 391 F. Supp. 3d 672, 690 (S.D. Tex. 2018) ("[A]n officer's obligation to provide medical care is ordinarily

satisfied by calling an ambulance or permitting EMS access to the injured individual.").  A reasonable person in Smith and Cline's position would be within his rights to assume that at that point, the situation was effectively resolved: all the remaining officers had to do was ensure Tarashuk safely boarded the ambulance and was properly handed off to the EMS personnel.

The fact that Cline had Tarashuk in his custody for a substantial portion of the initial encounter before EMS was called does not change the court's analysis.  When Smith and Cline departed, Doroski had effectively taken custody of Tarashuk by removing his handcuffs and putting Tarashuk in his patrol car.  (ECF No. 104-12 (Doroski body camera at timestamp 9:45-9:52).)  Smith and Cline had no actual or constructive control of Tarashuk by that time.  Nor did they have any supervisory relationship to Doroski, and could not, as Plaintiff alleges, force him to take any particular action with respect to Tarashuk.  They were reasonably entitled to assume Doroski would handle the situation properly, especially because EMS was already on the way. *See, e.g., Jackson v. Wilkins*, 517 F. App'x 311, 319 (6th Cir. 2013) (concluding that officer was not deliberately indifferent because after "returning to the accident scene, [he] helped search the area for 15 minutes or so[, and] then returned to his patrol, leaving [the decedent] in [two other officers'] hands.")

This reasoning stands even if Smith and Cline may have known Doroski was upset and did not want to deal with this incident.  While it is true that Doroski indicated to them that he would not take Tarashuk to jail, he also affirmed that he would get Tarashuk "medical help."  (ECF No. 110-11 (Cline body camera at timestamp 1:04:00-1:06:00).)  With EMS already alerted and an ambulance on the way, Smith and Cline could reasonably assume that "medical help" in this context meant simply transferring Tarashuk to the ambulance and allowing trained emergency personnel to evaluate and transport him to receive further medical care.  When Smith was asked

about his interpretation of Doroski's statement that he would get Tarashuk "medical help," Smith explained that he took it to mean "[t]hat EMS, upon their arrival, would have transported [Tarashuk] to the hospital to be evaluated by a certified physician or a specialist." (ECF No. 110-9 at 52.) Similarly, Cline testified that he did not know what Doroski meant, but indicated that the only two options in this situation were arresting Tarashuk (which he understood Doroski was not willing to do), and placing him into emergency protective custody. (ECF No. 110-7 at 38-39.)

Finally, the fact that Smith found out over the dispatch radio that Doroski was dropping Tarashuk off in Santee does not render his conduct conscience shocking pursuant to the deliberate indifference standard. By that time, Smith had returned to his patrol and was conducting property checks in Santee. Tarashuk was in Doroski's custody, not Smith's, and nothing on the record indicates that Smith had the authority to prevent Doroski from leaving Tarashuk at the gas station. Smith did not supervise Doroski—they did not even work for the same agency—and Smith's retrospective admission that he could have called Doroski and urged him to transport Tarashuk to the hospital, (ECF No. 110-9 at 79-82), does not create the inference that Smith violated Tarashuk's constitutional rights. The proximate link between Smith's failure to call Doroski and Tarashuk's death several hours later is attenuated, because it is not at all clear from the record that Doroski would have waited or done anything differently in light of Smith's call. If anything, the record indicates that Doroski had made up his mind and had no intention of taking Tarashuk for further medical care. And at any rate, Smith's failure to intervene amounts to negligence at most, which cannot, by itself, support a constitutional due process claim. *See County of Sacramento v. Lewis*, 523 U.S. 833, 848-49 (1998) (explaining that the Supreme Court has routinely "rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking

16

conduct" and emphasizing that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process").

Even in the light most favorable to Plaintiff, Smith and Cline's departure—after the officers called an ambulance to have Tarashuk evaluated by OCEMS paramedics and while OCSO deputies remained on the scene—simply does not "shock the conscience" or otherwise demonstrate deliberate indifference. Smith and Cline were not responsible for the actions of Doroski or the paramedics after they left the scene. Given these circumstances, the court cannot determine that their actions amounted to deliberate indifference of any serious medical need afflicting Tarashuk. *See also Grayson*, 195 F.3d at 696 (affirming dismissal of a section 1983 claim for deliberate indifference against an off-duty police officer who chose to transport the plaintiff to a prison— which had only a trained "nurse and . . . licensed correctional health assistant" on duty—rather than a hospital, despite the officer observing the plaintiff "acting irrationally and slurring his speech"). Accordingly, the court grants Smith and Cline's Motion for Summary Judgment as to Plaintiff's § 1983 claim for deliberate indifference to Tarashuk's serious medical need.[7]

### B. **Bystander Liability**

"As a general matter, a law officer may incur § 1983 liability only through affirmative misconduct." *Randall v. Prince George's Cty.*, 302 F.3d 188, 202 (4th Cir. 2002). However, the Fourth Circuit has recognized liability when a plaintiff demonstrates that a "bystanding officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Id*. at 204 (footnote omitted). The Fourth Circuit requires "specific knowledge" of the constitutional violation to

---

[7] Because the court finds no constitutional violation, it need not apply the second prong of the qualified immunity analysis to determine whether the law was clearly established at the time of the incident.

satisfy the first element, *id*. at n. 24, and "a realistic opportunity to intervene to prevent the harm from occurring," *id*. at 204.

Plaintiff asserts that Officer Smith knew Tarashuk needed to go to the hospital and heard over the dispatch radio that Doroski was taking him back to Santee to drop him off at the "CVS" across the street from the gas station where Doroski ultimately left him. (ECF No. 110 at 19.)  In support, Plaintiff cites Smith's deposition testimony admitting he actually knew Doroski was leaving Tarashuk in Santee. (ECF No. 110-9 at 79-82.)  At his deposition, Smith admitted that he "could have called Doroski," urged him to "take [Tarashuk] to the hospital" or asked him to "wait till [Smith] g[ot] to wherever [Doroski was] going" and "handle[d] it" himself. (*Id*. at 82.)  Yet, these retrospective allegations as to what Smith could have done with the benefit of hindsight are not sufficient to render Smith liable as a bystander.

First, the court notes Smith did not find out that Doroski was leaving Tarashuk in Santee until nearly an hour and a half after Smith had cleared the scene of the original investigation and left Tarashuk in what he reasonably believed to be the capable hands of fellow law enforcement officers and EMS. (ECF No. 143 at 60:21-62:14.)  As discussed *supra*, in connection with Plaintiff's deliberate indifference claim, the evidence shows that Smith acted reasonably in participating in the initial investigation and the decision-making process with the other officers on the scene.  He ensured that officers with jurisdiction had control over Tarashuk and left as an ambulance headed their way.  Smith could not have known, at that point, that Doroski would incomprehensibly take Tarashuk off the ambulance and drop him off in Santee.  By the time he heard that fact on the radio, he was miles from the scene and from Doroski's patrol car.  He had moved on to respond to other obligations in Santee.  Accordingly, he could no longer be considered a "bystander" in any reasonable sense.

The second element of a bystander liability claim requires Plaintiff to demonstrate that Smith had a "reasonable opportunity to prevent the harm."  Recognizing that hindsight will always afford clarity as to what "could have" been done, the court finds Plaintiff has not made such a showing here.  "The purpose of bystander liability is to extend the radius of culpability to those police officers who fail to act in the presence of another officer's unconstitutional behavior." *Compton v. O'Bryan*, No. 2:16-CV-09298, 2018 WL 813443, at *6 (S.D.W. Va. Feb. 9, 2018). But this radius is not indefinite—some degree of proximity is naturally required for an officer to have a "reasonable opportunity to prevent the harm."  *Id*.  In this vein, "most litigation [focuses] on officers simply at the scene or outskirts of an incident."  *Id*. (citing *Gunsay v. Mozayeni*, 695 F. App'x 696, 702-03 (4th Cir. 2017) (discussing the bystander liability claims against two officers who "were in the immediate vicinity" and "also were present during" alleged deprivations of the plaintiff's constitutional rights by other officers); *Thomas*, 533. App'x at 221-23 (discussing the bystander liability claims against officers who were generally at the scene but had no contact with the plaintiff); *Dunn v. Nicholas Cty.*, 2:14-cv-25532, 2015 WL 6964693, at *5-6 (S.D. W. Va. Nov. 10, 2015) (analyzing the bystander liability claim against an officer who was outside the house in which alleged constitutional violations were perpetrated).  The court is unaware of any case within this circuit which imposed bystander liability when the officer was neither in the vicinity of the alleged deprivation, nor a participant in the incident at the time the deprivation occurred.

Here, the evidence demonstrates that Smith was spatially removed from Doroski, and no longer a participant in Doroski's detention of Tarashuk.  Nor did Smith have any supervisory authority over Doroski—an officer belonging to an entirely separate jurisdiction.  Thus, the court finds it is not at all clear that Doroski would have obliged Smith's request to take Tarashuk to the

hospital. Smith's explanation as to why he did not take the steps put forth by Plaintiff appears to acknowledge his lack of authority over the situation: when asked if he "should have" intervened, he simply said "if I had custody of [Tarashuk], then, yes." (ECF No. 110-9 at 83.) And even if Smith abandoned his patrol to look for Tarashuk near the gas station, it is not clear that he could have averted the harm, especially since the gas station, too, was adjacent to a road and close to the highway. Moreover, it is not clear that Smith truly "failed to act," because he provided some testimony that he looked for Tarashuk as he conducted his property checks, which even Plaintiff concedes. (*Id*. at 36-37 (testifying he was "looking to see if anybody [was] walking on the road or in a parking lot [or] standing," and "if [he] saw [Tarashuk] anywhere," and explaining that if he had "seen him, [he] would have called for EMS"); ECF No. 110 at 19 (alleging Smith "was concerned enough to look for [Tarashuk] *after* he finished his property checks" (emphasis in original).) At bottom, the court finds that the connection between Doroski's decision to remove Tarashuk from the ambulance and leave him in Santee, and Smith's alleged failure to intervene directly is simply too attenuated here. Imposing liability on an officer who acted properly, left an individual under the care of law enforcement and medical personnel who had superior jurisdiction, and returned to his duties stretches the concept of bystander liability beyond its contemplated scope.

At any rate, even if the court found that Smith may have violated Tarashuk's constitutional rights, he would still be entitled to qualified immunity. Qualified immunity protects state actors from liability unless their acts violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court requires a plaintiff to demonstrate (1) that the defendant's conduct violated a constitutional right, and (2) that the right was clearly established at the time of the alleged

misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Pinder*, 54 F.3d at 1181. In conducting this inquiry, the court must "ask whether, when the defendants violated the right, there existed either controlling authority (such as a published opinion of [the Fourth Circuit]) or a robust consensus of persuasive authority that would have given the defendants fair warning that their conduct, under the circumstances, was wrongful." *Williams v. Strickland*, 917 F.3d 763, 769 (4th Cir. 2019) (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017); *Williamson v. Stirling*, 912 F.3d 154, 187 (4th Cir. 2018)) (internal quotation marks omitted).

How the bystander liability doctrine applies to officers who are not near the vicinity of the deprivation, nor have any obvious involvement in the incident at the time the constitutional deprivation occurs, has not been directly addressed by the Fourth Circuit. As explained above, the court is unaware of district courts in this circuit addressing analogous facts. The Fifth Circuit, however, has affirmatively declared that "liability will not attach where an officer is not present at the scene of the constitutional violation." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (citing *Snyder v. Trepagnier*, 142 F.3d 791, 801 n. 11 (5th Cir. 1998); *Gilbert v. French*, 364 F. App'x 76, 83 (5th Cir. 2010) (per curiam) (unpublished); *Ibarra v. Harris Cty. Tex.*, 243 F. App'x 830, 835 & n. 8 (5th Cir. 2007)). The court finds that as applied to Smith, the bystander liability doctrine was sufficiently unsettled such that any rule requiring his intervention could not have been clearly established. Therefore, the court finds Smith is entitled to qualified immunity as to the bystander liability claim.

C. **Supervisory Liability**

Supervisory liability under § 1983 and municipal liability under *Monell* require a finding that a municipal employee violated the plaintiff's constitutional rights. *See Spell v. McDaniel*, 824 F.2d 1380, 1388 (4th Cir. 1987) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985)) ("Proof merely that such a policy or custom was 'likely' to cause a particular violation is not sufficient; there must be proven at least an 'affirmative link' between policy or custom and violation; in tort principle terms, the causal connection must be 'proximate,' not merely 'but-for' causation-in-fact."). Upon review, the court has concluded *supra* that Plaintiff's § 1983 against Officers Smith and Cline must be dismissed. Therefore, Plaintiff cannot sustain his failure to supervise/train and *Monell*-based policy and custom claims in the absence of unconstitutional conduct by municipal employees. *Id.*

Plaintiff's § 1983 supervisory liability claims against Chief Serrano personally fail for similar reasons. The Fourth Circuit has "set forth three elements necessary to establish supervisory liability under § 1983: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Any constitutional injury suffered by Tarashuk was not caused by the conduct of Officers Smith and Cline. Therefore, Defendants' Motion for Summary Judgment is granted with respect to any § 1983 and/or *Monell* claims against Santee and Chief Serrano in his individual and official capacity.

### D. __ADA__

Pursuant to Title II of the ADA, "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  "A 'qualified individual with a disability' is broadly defined as any person who 'meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.' 42 U.S.C. § 12131(2). The term 'public entity' is defined to be 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.' 42 U.S.C. § 12131(1)." *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998).  The Fourth Circuit has concluded that Title II applies to police investigations, *Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 338 (4th Cir. 2012), and an ADA claim may exist where "police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees." *Waller v. Danville*, 556 F.3d 171, 174 (4th Cir. 2009).

Plaintiff alleges that Santee "intentionally discriminated against Mr. Tarashuk" when its employees Officers Smith and Cline failed to transport him "to a hospital for a mental health examination," (ECF No. 1-5 at 64 ¶ 336), and "failed to make any reasonable accommodation for Mr. Tarashuk's mental disability" (*id*. at ¶ 337).  A claimant must show the following elements to establish a Title II ADA claim: "(1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability.  *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016) (citing *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)).

The obligation to provide reasonable accommodations applies only where public entities are aware of the individual's "known physical and mental limitation" and the need for accommodations is clear. 42 U.S.C. § 12112(b)(5)(A). Defendants argue that in this case, "Plaintiff has no evidence of . . . discriminatory treatment" cannot demonstrate that the Santee officers failed "to make accommodations to the known mental limitations of Tarashuk." (ECF No. 81-1 at 23.) But at the summary judgment stage, the court need not decide what effectively amounts to a factual dispute between the parties.

The court finds the ADA claim against Santee fails because Plaintiff has not produced evidence demonstrating Smith and Cline's actions during the incident amounted to a failure to accommodate Tarashuk's mental disability. Smith and Cline responded to an out-of-jurisdiction call to assist other agencies. The evidence shows that they secured the scene, attempted to speak to Tarashuk and to the witness trucker, and conveyed their impressions to Doroski, Rice, and other officers with superior jurisdiction. Later, Smith contacted Doroski and asked him to return to the scene. Both Smith and Cline remained on the scene as the officers attempted to conduct further investigation and decided what to do with Tarashuk. (ECF No. 94-11 at 6:40-8:32.) Eventually, Smith called EMS, and explained Tarashuk's condition. Smith and Cline left once Tarashuk was seated in Doroski's patrol car as the officers waited for the ambulance to arrive. (*Id*. at 9:46-11:13.) At the time of their departure, two Sheriff's deputies and Highway Patrol troopers were still present on the scene, and the ambulance was on its way. These facts do not demonstrate that Smith and Cline's conduct violated the ADA. They were entitled to assume that law enforcement officers and paramedics who took over the incident would provide Tarashuk with appropriate care. Accordingly, the court must grant summary judgment as to Plaintiff's ADA claim against Santee.

### III.    CONCLUSION

The court **GRANTS** the Santee Defendants' Motion for Summary Judgment.  (ECF No. 81.)  Specifically, the court grants summary judgment as to Plaintiff's Americans with Disabilities Act claim under 42 U.S.C. § 12101 against Santee (eighth cause of action), the § 1983 claims for deliberate indifference against Officers Smith and Cline, and for bystander liability against Officer Smith (seventh cause of action), the § 1983 claim for failure to supervise/train against Santee and Chief Serrano, in his individual and official capacity (twelfth cause of action), and any *Monell* claims against Santee and Chief Serrano in his official capacity.  Defendants' Motion to Dismiss (ECF No. 81) is therefore **MOOT**.

**IT IS SO ORDERED.**

J. Michelle Childs

United States District Judge

March 30, 2022
Columbia, South Carolina