## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## ORANGEBURG DIVISION

| | | |
|---|---|---|
| Paul Tarashuk, *Personal Representative* | ) | |
| *of the Estate of Paul David Tarashuk,* | ) | Civil Action No.: 5:19-cv-02495-JMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Orangeburg County, Orangeburg County | ) | |
| Emergency Medical Services, Danny | ) | |
| Rivers, *Individually and in his Official* | ) | |
| *Capacity as the Director of Orangeburg* | ) | |
| *County Emergency Medical Services,* | ) | |
| Orangeburg County Sheriff's Office, | ) | **ORDER AND OPINION** |
| Leroy Ravenell, *Individually and in his* | ) | |
| *Official Capacity as the Sheriff of the* | ) | |
| *Orangeburg County Sheriff's Office,* | ) | |
| South Carolina Department of Public | ) | |
| Safety, Leroy Smith, *Individually and in* | ) | |
| *his Official Capacity as the Agency* | ) | |
| *Director of the South Carolina Dept.* | ) | |
| *of Public Safety,* Town of Santee, Joseph | ) | |
| Serrano, *Individually and in his Official* | ) | |
| *Capacity as the Chief of Police of the* | ) | |
| *Town of Santee,* Jamie D. Givens, Alison | ) | |
| K.B. Harmon, Clifford A. Doroski, Buist | ) | |
| M. Smith, and Keith A. Cline, | ) | |
| | ) | |
| Defendants. | ) | |

Before the court is the Motion for Summary Judgment filed by Defendants Orangeburg

County Sheriff's Office ("OSCO"), Deputy Clifford Doroski, and Sheriff Leroy Ravenell (ECF

No. 83), who seek, *inter alia*, summary judgment on Plaintiff's various claims pursuant to 42

U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and the South Carolina Tort Claims

Act ("SCTCA").

After careful consideration, the court **GRANTS IN PART** and **DENIES IN PART**

Defendants' Motion for Summary Judgment (ECF No. 83).  In particular, the court **GRANTS**

summary judgment as to Plaintiff's § 1983 claim for state-created danger against Doroski (third cause of action), and **DENIES** summary judgment as to Plaintiff's § 1983 claim for deliberate indifference against Doroski (fourth cause of action), the Americans with Disabilities Act claims against OCSO (eighth cause of action), and the negligence and gross negligence claims under the South Carolina Tort Claims Act against OCSO (first cause of action).

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

A little before 6:00 a.m. on September 10, 2018, a vehicle hit and killed Paul David Tarashuk ("Tarashuk") while he was running down I-95.  (ECF No. 1-5 at 29 ¶¶ 152-53.)  The night before, near 11:00 p.m., a truck driver called 911 to report that a man, later identified as Tarashuk, had climbed naked onto the trucker's tractor trailer at an on-ramp; rode on the catwalk while the truck traveled on I-95; detached "air lines" to the truck's brakes, forcing the truck to stop; and repeatedly attempted to enter the cab while the truck sat parked on the highway's shoulder.  (*See* ECF Nos. 80-1 at 2-3; 94 at 3-4; 94-6 at 1-3.)   Officers from three law enforcement agencies, including Trooper Rice from the Highway Patrol and Officers Smith and Cline from the Santee Police Department began arriving around 11:23 pm.  (ECF No. 104-15 (Orangeburg County Dispatch Record at 11:23.))  Officers Smith and Cline arrived first on the scene, finding Tarashuk naked on top of the tractor trailer.  After attempting to talk to Tarashuk, who appeared dazed and told the officers he was "from the sky" and "Charles China Town," they recognized he was incoherent and likely mentally ill.  (ECF No. 104-16 (Smith body camera at timestamp 0:01-2:16).)

---

[1] These allegations are taken from the Complaint and Plaintiff's Response to this Motion for Summary Judgment (ECF No. 104) which references facts from deposition testimony and documents produced in discovery.  To the extent the court references these facts, they are unchallenged.  At any rate, the court must accept Plaintiff's version of the facts at the summary judgment stage unless "blatantly contradicted by the record" or an unchallenged videotape. *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

Officer Cline placed Tarashuk in handcuffs to prevent him from wandering away. (ECF No. 104-11 (Cline body camera at timestamp 11:41-13:25).) When Trooper Rice arrived shortly thereafter, Officers Smith and Cline briefed him on Tarashuk's condition, telling Rice he was "incoherent" and "definitely a mental subject of some sort." (ECF No. 110-3 (Cline body camera at timestamp 31:52-32:10).)

Deputy Doroski, a Sheriff's deputy with the OCSO, arrived at the scene around 11:41 pm, in response to a request for an "agency assist" by Highway Patrol Trooper Rice. (ECF No. 104-18 (OCSO Dispatch Record at 11:41 pm).) Around that time, some of the officers were still unsuccessfully attempting to speak with Tarashuk, who gave incoherent, bizarre, and/or inconsistent responses to their questions. (ECF No. 81-2 at 2; ECF No. 104-20 (Doroski body camera at timestamp 0:01-2:53).) Doroski observed Tarashuk's responses and told Deputy Howell, another OCSO Sheriff's deputy on the scene, that it might be "time to ask for a [Drug Recognition Expert]" to evaluate Tarashuk. (*Id.* at timestamp 2:54).) As the other officers continued to question Tarashuk to figure out who he was and how he got there, Doroski laughed at Tarashuk's confused and disoriented answers, asking Deputy Howell, in a side conversation, when Tarashuk would "start running." (*Id.* at timestamp 3:14-4:08)). At some point, Tarashuk laid down on the grass. Seemingly exasperated, Doroski reiterated again that it was "time to call a [Drug Recognition Expert] on that boy. That's what you call under the influence." (*Id.* at timestamp 5:34-5:41)).

Doroski's demeanor made it clear he did not want to deal with this incident or with Tarashuk, and he made no effort to hide his feelings, stating candidly that if Tarashuk ran into traffic, "I ain't part of it" (*id.* at timestamp 5:42-6:02). As the other officers searched the cabin of the truck Tarashuk had allegedly been riding and spoke with its driver, Doroski commented to

3

Deputy Howell that it might be time to "disappear." (*Id*. at timestamp 16:42.) Doroski then left

the scene with Howell. (*Id*. at timestamp 17:59-18:10.) Shortly thereafter however, he was asked

to return. Though Officer Smith and Trooper Rice attempted to call Doroski back over dispatch,

Doroski asked Officer Smith to call him on his personal cell phone instead. On that call, Doroski

referred to the situation as "stupid" and later testified that, at that time, he saw no need to participate

in the investigation. (ECF Nos. 104-16 (Smith body camera at timestamp 45:00-48:20); 104-23 at

38).) Still, Doroski returned, visibly irritated about having "to clean this mess up." (ECF No. 104-

12 (Doroski body camera at timestamp 1:17-1:32); ECF No. 104-28 at 41.) Upon arriving, he

briefly conferred with the other officers. Though this conversation was not recorded, Trooper Rice

later testified that Doroski suggested leaving Tarashuk by the roadside. (ECF No. 94 at 13 (citing

ECF No. 94-7 at 24:50-25:49 (SLED interview of Rice)).) He recounted that he had "stopped

Doroski," exclaiming:

> **'No. No. No. No.  He will not get left here. . . I said, 'If y'all leave him there,
> I'm not going to leave him on the side of the road like this**. You know good
> and well we cannot leave anyone on the side of the interstate, especially on the
> interstate.' In South Carolina, it's against the law to be on the side on an interstate.
> . . I said, 'To start with, you got a guy here who we have not positively identified,
> he is basically shutting down on us. I don't know whether he's on some type of
> medication, whether he's on a drug, or does he have a mental illness.' I don't
> know. But **I told the deputy straight out, I said, 'If you leave him here, here's
> what's going to happen.  I'm going to take him to jail for being a pedestrian
> on an interstate or take him to the hospital to hopefully get an assessment on
> him, or possibly both**. If I take him to the hospital, and they can't do anything
> with him, then I will escort him to the jail. At least he'll get inside, he'll be
> fingerprinted until we can determine who he is and where he came from.'

(*Id*. (emphasis added).)

The officers turned to Tarashuk, who at this point, was silent in response to attempts to

communicate and appeared to have shut down completely. (ECF No. 104-11 (Cline body camera

at timestamp 54:48-57:57).) Doroski, already aware of Tarashuk's troubling conduct before he

arrived at the scene, witnessed this behavior, and did nothing. (ECF No. 104-12 (Doroski body camera at timestamp 1:38-6:21 interrogating the trucker about Tarashuk's behavior on the truck).) In fact, it was Officer Smith who finally suggested calling EMS, around an hour after officers first responded to the scene. (ECF No. 110-5 (Smith body camera at timestamp 59:57-59:59).) Describing Tarashuk's current state to the operator, Smith remarked Tarashuk was not communicating, and when asked a question, he would just give "a blank stare." (ECF No. 104-30 at 50.) Doroski, agreeing that EMS should be called, asked that Tarashuk's handcuffs be removed, and led him to the back of his patrol car. (ECF No. 104-12 (Doroski body camera at timestamp 9:45-9:52).) It took forty minutes for EMS to arrive. (ECF Nos. 1-5 at 24 ¶ 128.) During that time Tarashuk remained in Doroski's cruiser.

When Orangeburg County EMS ("OCEMS") reached the scene, Doroski informed paramedics Harmon and Givens that Tarashuk was not talking and had been found riding naked on a tractor-trailer. (ECF No. 83-3 at 2.) The paramedics took Tarashuk to their ambulance for examination, and Doroski's body camera recorded the rest of the interaction. (ECF No. 91 at 6.) Tarashuk initially sat in the back of the ambulance with his head down, unresponsive to questions, and Harmon pushed an ammonia stimulant, up his nose. (ECF No. 105-4 at 90:7-9.) While questioning him, the paramedics checked Tarashuk's vital signs multiple times and found them to be normal.[2] (*Id.* at 25 ¶ 133, 26 ¶ 138.) Doroski commented that he believed Tarashuk was high on some kind of drug, telling Tarashuk that if that was the case, "we gonna get treatment for it

---

[2] The Complaint refers to Tarashuk's vitals as normal (ECF No. 1-5 at 25 ¶ 133); Plaintiff's response to the instant Motion asserts the South Carolina Department of Health and Environmental Control ("DHEC") pointed out that Tarashuk's blood pressure of 160/82 and pulse of 124 were not within normal limits during their post-incident interview with Defendant Harmon (ECF No. 91 at 7).

[*sic*]."  (ECF No. 104-39 (Doroski body camera at timestamp 6:04).)  As the paramedics unsuccessfully attempted to communicate with Tarashuk, Doroski became increasingly impatient.

Harmon later testified she did not believe Tarashuk posed a threat to himself or others during the interaction and that she did not believe he had a serious medical need.  (ECF No. 79-3 at 10.)  But body camera footage of the nearly twelve-minute encounter captures no instance in which Tarashuk offered a verbal response to the paramedics' questioning.  (*See* ECF No. 91-15 (Doroski body camera).)  Tarashuk also did not respond to the paramedics' attempt to communicate with him through writing.  (ECF No. 79-2 at 12:4-10.)  After the OCEMS team repeatedly checked his vital signs, the other OCSO deputy in the ambulance exclaimed to Tarashuk, "what are you looking at me for?  You're full of shit bro," to which Harmon responded, "yeah, he is."  (ECF No. 91-15 (Doroski body camera at timestamp 10:20-10:30).)  Givens and Harmon again offered Tarashuk the choice of either going to jail or going to the hospital.  (ECF Nos. 105-4 at 96:13-17; 79-2 at 12:13-18.)  When Tarashuk shook his head "no" to those options, Doroski remarked: "Then come on.  I'm gonna give you a ride.  You don't want to go to the hospital, either, so let's go."  (ECF No. 91-15 (Doroski body camera at timestamp 10:53-11:00).)  The paramedics never told Doroski that they would not transport Tarashuk to the hospital.  By Doroski's own admission, he was the one who affirmatively decided to take Tarashuk off the ambulance and ordered him to go with him in his patrol car.  (ECF No. 104-29 (SLED Interview of Doroski at timestamp 15:33-16:50).)

As Doroski led Tarashuk away, Givens testified she believed he was taking Tarashuk to jail, and Harmon testified she believed he was taking Tarashuk either to jail or a hospital.  (ECF Nos. 79-3 at 10:1-3; 79-2 at 13:4-9.)  Yet, as the pair exited the ambulance, Doroski told Tarashuk: "You are not under arrest.  I'm gonna give you a ride . . . .  You're not going to jail, you're not

under arrest, I'm going to give you a ride . . . . I'll figure out where you live.  I'll give you a ride to a safe environment.  That's all I want."  (ECF No. 91-15 (Doroski body camera at timestamp 11:00-11:37).)  But instead, Doroski took Tarashuk to Santee, a nearby town, and ultimately dropped him off at a closed gas station at 1:56 am—alone, unclothed, and with no one around who could help.  (*Id*. (Doroski body camera at timestamp 11:50-11:54); ECF No. 1-5 at 28-29 ¶¶ 150-52.)  Tarashuk eventually wandered back to I-95 and was struck by oncoming traffic and killed a few hours later.  (ECF No. 1-5 at 29 ¶¶ 152-53.)

In later testimony, every other officer on the scene acknowledged there were only two options as to where Tarashuk have been taken that night: jail or the hospital.[3]  After viewing video of Tarashuk's initial interactions with law enforcement officers, even Doroski admitted he was a candidate for Emergency Protective Custody.  (ECF No. 104-23 at 182-83.)  But he decided against that option that night.

Plaintiff Paul Tarashuk, the personal representative of the Estate of Paul David Tarashuk, filed suit against the above-captioned Defendants.  (*See* ECF No. 1-5.)  In a previous order filed July 21, 2021, the court concluded that Tarashuk had a serious medical need and denied Defendants Harmon and Givens' Motions for Summary Judgment as to Plaintiff's § 1983 claims for deliberate indifference on the basis of qualified immunity. (ECF No. 119 at 11, 17.)  The court explained that in light of the facts presented, a jury could reasonably find that Harmon and Givens were deliberately indifferent to Tarashuk's serious medical needs.  (*Id.* at 16.)  The court highlighted that there was a factual dispute between the parties as to whether Harmon and Givens

---

[3] (*See* ECF Nos. 104-30 at 52 (Officer Smith: admitting it was "obvious" Tarashuk needed to be hospitalized); 104-40 at 39 (Officer Cline: jail or Emergency Protective Custody); 104-32 at 46 (Trooper Rice: "at a minimum, the hospital"); 104-22 (Trooper Richardson: arrest or hospital); 104-41 (30(b)(6) Representative Chief Serrano: jail or emergency protective custody).)

actually believed Doroski intended to take Tarashuk to a hospital or prison facility (where he could have received medical care), and whether a reasonable basis existed for that belief. (*Id*. at 17-18.) In subsequent orders, the court also dismissed Plaintiff's § 1983 claims for negligent supervision/training against OCSO and Sheriff Ravenell in his official capacity on state sovereign immunity grounds (ECF No. 122), dismissed all *Monell* claims against OCSO and Sheriff Ravenell in his official capacity, (ECF No. 127), and dismissed Plaintiff's § 1983 negligent supervision/training claims against Sheriff Ravenell in his individual capacity (*id*.).

The court now considers Defendants Doroski, OCSO, and Sheriff Ravenell's Motion for Summary Judgment (ECF No. 83) on the remaining claims, including Plaintiff's § 1983 claims for deliberate indifference and state-created danger against Doroski, as per the third and fourth causes of action (ECF No. 1-5 at 41-52), Plaintiff's negligence-based SCTCA claim against OCSO as per the first cause of action, (*id*. at 37-38), and Plaintiff's ADA claim against OCSO, as per the eighth cause of action, (*id*. at 63-66). Plaintiff filed a Response in Opposition (ECF No. 104), to which Defendants replied (ECF No. 106).

## II.     LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

When considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party.

8

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  In qualified immunity cases, this usually means accepting the plaintiff's version of the facts unless "blatantly contradicted by the record" or an unchallenged videotape.  *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  However, "[o]nly disputes over facts that might affect the outcome of the suit under governable law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  Further, to show that a genuine issue of material fact exists, the non-moving party must set forth facts beyond "[t]he mere existence of a scintilla of evidence." *Id.* at 252.  The non-moving party must present evidence sufficient to demonstrate that a reasonable jury could return a verdict for the non-moving party in order to avoid summary judgment.  *See id.* at 248.

### III.    ANALYSIS

#### A.  <u>Deliberate Indifference</u>

Although individuals do not generally have a "right to protection" by the state, the Supreme Court has recognized that an affirmative duty to protect its citizens may be imputed on the government in two contexts.  *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989).  The first involves "a special relationship" between the individual and the state: when the state "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs . . .  it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause."  *Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995) (quoting *DeShaney*, 489 U.S. at 200).[4]  When the state has a special relationship with an individual, it may not be deliberately indifferent to his

---

[4] The second exception involves "state-created dangers," which are examined in the following section.

serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97 (1976) (establishing that deliberate indifference to a prisoner's serious medical needs violates the Constitution); *see also Waybright v. Frederick Cty., Md.*, 528 F.3d 199, 207 (4th Cir. 2008) (citing *Patten v. Nichols*, 274 F.3d 829, 836-37 (4th Cir. 2001)) ("[W]here the state is in a special relationship to a private individual, it acquires a duty to act on that individual's behalf and its failures to act are measured on a deliberate indifference standard; that is why a conscious disregard of the rights of prisoners, pretrial detainees, and committed mental patients have traditionally been examined for deliberate indifference.").[5]  In this context, the Fourth Circuit generally requires some form of custody— the "confinement of the injured party[—] to trigger the affirmative duty." *Pinder*, 54 F.3d at 1175.

The question of custody turns on whether Tarashuk was rendered incapable of caring for himself. *See Deshaney*, 489 U.S. at 200.  The mere fact that Tarashuk was not in police custody at the precise time he was struck and killed on I-95 is a formalistic distinction that improperly narrows the scope of this inquiry.  Though *Pinder* rejected the existence of a special relationship where the plaintiff "was never incarcerated, arrested, or otherwise restricted in any way," Tarashuk was in a markedly different situation, because he was detained by officers for an extended time, thereby limiting his freedom. *Pinder*, 54 F.3d at 1175.  Plaintiff put forth evidence that Tarashuk spent *over an hour* in handcuffs during the initial investigation, and, throughout

---

[5] Though *Estelle* discussed deliberate indifference in the context of the Eighth Amendment's prohibition against cruel and unusual punishment, courts have routinely found that pretrial detainees bringing suit under the Fourteenth Amendment's Due Process Clause are, at a minimum, entitled to the same constitutional protections as prisoners. *See, e.g.*, *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209 n.5 (4th Cir. 2017) (quoting *Bell v. McAdory*, 820 F.3d 880, 882 (7th Cir. 2016) (highlighting that government officials "must treat detainees at least as well as prisoners, and often they must treat detainees better—precisely because detainees (whether civil or pretrial criminal) have *not* been convicted and therefore must not be punished.")).

10

that time, multiple officers told Tarashuk he was detained or under arrest.  At all times, he was guided by the officers: first to Doroski's patrol car, then to the ambulance, and then back into Doroski's vehicle.  In *Young v. City of Mount Ranier*, 238 F.3d 567, 575 n.5 (4th Cir. 2001), the Fourth Circuit recognized that the plaintiff, handcuffed and transported by officers for an emergency psychiatric evaluation, "was not a typical pretrial detainee given that there is no indication that he was under arrest or would later have been arrested."  Still, the officers were deemed to "owe[] him the same duties owed to a more typical pretrial detainee" because they had taken him into custody involuntarily.[6]  *Id.*  Here too, Tarashuk was held without consent by various agencies and handcuffed for at least part of his interactions with their officers.  The court therefore finds there is at least an issue of fact as to whether Tarashuk was in the custody of officers at various points during the alleged incidents leading to this lawsuit.

Next, the court turns to Plaintiff's allegation that Doroski violated Tarashuk's rights under the Fourteenth Amendment through deliberate indifference to his serious medical needs, by deciding to take Tarashuk off the ambulance and failing to transport him to a safe location for

---

[6] *See also Buffington v. Baltimore Cty., Md.*, 913 F.2d 113, 119 (4th Cir. 1990) (explaining that custody in this context can take many forms, including "incident to enforcement of [] criminal laws," and "civil, regulatory purposes."); *Higgins v. Borough of Taylor*, 551 F. Supp. 2d 370, 376 (M.D. Pa. 2008) (holding that a plaintiff who fell from a porch and injured his head while an officer was leading him to his apartment after releasing him from jail had plausibly alleged that he was in custody at the time of his injury.  The court found that the facts did not indicate "plaintiff could have left the station of his own free will," or that he "voluntarily agreed to be transported home from the police station."  Therefore, it was plausible that the plaintiff was still in "the exclusive custody and control" of the police defendants at the time of his injury.)  Tarashuk's demeanor and evident lack of comprehension throughout the encounter leaves doubt as to whether he had the ability to make decisions, let alone understand whether he was free to leave.  Even Doroski refrains from asserting that Tarashuk was definitively *not* in his custody during the encounter with EMS. (ECF No. 83-1 at 11 (stating the existence of custody is "doubtful" at that stage).)  A reasonable jury could therefore conclude that Tarashuk was in custody at the time Doroski decided to lead him off the ambulance, into his patrol car, and to the gas station parking lot where he was ultimately abandoned.

11

evaluation and treatment. A government official who is deliberately indifferent to a plaintiff's serious medical needs violates the due process clause of the Fourteenth Amendment. *See Krell v. Braightmeyer*, 828 F. App'x 155, 158-59 (4th Cir. 2020) (citations omitted); *Young*, 238 F.3d 567, 575 (4th Cir. 2001). To establish a medical deliberate indifference claim, a plaintiff must prove two elements: First, he must show "he had a serious medical condition—i.e., a condition that 'has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Krell*, 828 F. App'x at 158-59 (quoting *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (internal quotation marks omitted)). This element requires an *objective* showing. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) ("[T]he deprivation alleged must be, objectively, 'sufficiently serious'") (internal citations omitted). "Second, the plaintiff must establish that the defendants acted with deliberate indifference—i.e., that they 'had actual knowledge of the plaintiff's serious medical needs and the related risks, but nevertheless disregarded them.'" *Id.* at 357 (brackets and internal quotation marks omitted). The second factor therefore looks to the defendant's *subjectively* "culpable state of mind," *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 834), regarding both the seriousness of the medical condition and the "excessive risks posed by the official's action or inaction," *id*. at 226 (quoting *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

This sets a high standard. Plaintiff must demonstrate that Doroski's behavior "was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Dean for & on behalf of Harkness v. McKinney*, 976 F.3d 407, 413 (4th Cir. 2020), *cert. denied sub nom. McKinney v. Dean on Behalf of Harkness*, 141 S. Ct. 2800 (2021) (citing *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005); *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

Whether conduct truly "shocks the conscience" must be evaluated in light of the circumstances confronting the official at the time the official acted. The Supreme Court envisioned a "culpability spectrum" to illustrate the subjective prong of the substantive due process claim. *McKinney*, 976 F.3d at 414 (quoting *Lewis*, 523 U.S. at 848-849). On one end of this spectrum lies "liability for negligently inflicted harm," which always falls beneath the constitutional threshold. *Id.* (quoting *Lewis*, 523 U.S. at 848-849). At the other end lies the "sort of official action [] most likely to rise to the conscience-shocking level," "conduct intended to injure" that is "unjustifiable by any government interest." *Id.* (quoting *Lewis*, 523 U.S. at 849). Deliberate indifference, lies somewhere in between: "'an intermediate level of culpability' that can, if proven, also establish a due process violation." *Id.* at 415 (quoting *Lewis*, 523 U.S. at 848-849). Courts recognize that different situations allow for different levels of deliberation. In emergencies where officers must "act decisively and [] show restraint at the same moment, [where] their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance," *id.* (quoting *Terrell v. Larson*, 396 F.3d 975 (8th Cir. 2005), the Supreme Court has applied the higher standard of "intent to harm." *Lewis*, 523 U.S. at 854 (applying the intent standard in the context of a high-speed chase). Such situations plainly "preclude the luxury of calm and reflective deliberation." *McKinney*, 976 F.3d at 414 (quoting *Terrell*, 396 F.3d. at 978). But where "actual deliberation is practical" and the officer has adequate time to reflect consciously and arrive at an unhurried decision, the lesser "deliberate indifference standard must apply." *Id.* at 415 (quoting *Lewis*, 523 U.S. at 851).

Indifference can be manifested by officers in their response to a subject's needs or by intentionally denying or delaying access to medical care. *See Estelle*, 429 U.S. at 104. The Fourth Circuit has noted "it is not enough that the officers *should have* recognized [the risk]; they

actually must have perceived the risk." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (emphasis in original) (citing *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)). Additionally, officials "actually *must have* recognized that [their] actions were insufficient" in light of the circumstances. *Id.* (emphasis in original). Knowledge of these elements can be inferred from circumstantial evidence—if the risk of injury or the medical need is so obvious that the officer "could not have failed to know of it." *Id.* (quoting *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995)). Similarly, officials' response can be "so patently inadequate as to justify an inference that the official actually recognized that [their] response to the risk was inappropriate." *Id.*

As an initial matter, the two and a half-hours in which Tarashuk was in the officers' care allowed plenty of time for "calm and reflective deliberation," *McKinney*, 976 F.3d at 414 (quoting *Terrell*, 396 F.3d. at 978). Therefore, Doroski's culpability must be assessed under the lesser standard of deliberate indifference rather than the standard of willful or intentional action, which applies to emergencies where rapid, decisive action is required. *Lewis*, 523 U.S. at 854.

Assuming Tarashuk was indeed detained, the court finds that sufficient disputes of fact preclude summary judgment as to Plaintiff's deliberate indifference claim. Turning to the objective question of whether Tarashuk's medical need was sufficiently serious, the court previously concluded that Plaintiff put forth sufficient evidence to support an inference that "even a lay person would easily recognize the necessity for a doctor's attention" in this case. (ECF No. 119 at 11 (quoting *Gordon*, 937 F.3d at 356).) Plaintiff offered expert testimony from Richard L. Frierson, M.D., D.F.A.P.A., who concludes "[t]here is abundant evidence from police cam videos that [Tarashuk] was in the midst of an acute psychotic break at the time of his death." (ECF No. 91-1 at 9.) It does not take medical training to recognize that someone riding on top of a

14

tractor trailer on the interstate and running between cars in the nude may need medical attention. This is precisely the kind of medical distress that even a lay person could easily recognize. Hours of video footage demonstrate that Tarashuk was catatonic or "blank," disoriented, and nonsensical or nonverbal when responding to questioning, all of which a layperson could easily associate with mental distress or agitation. The evidence supports an inference that Tarashuk's medical need was objectively serious. Therefore, Plaintiff has satisfied the first prong of the deliberate indifference inquiry.

As to the second prong, Doroski cannot seriously assert subjective ignorance of Tarashuk's condition. He was dispatched to investigate "a naked man on the roof of a tractor trailer," (ECF No. 104-20 (Doroski body camera at timestamp 0:01-0:05)), a fact he confirmed with the trucker and communicated to paramedics himself. Doroski observed Tarashuk's unintelligible responses when other officers attempted to question him. (ECF No. 104 at 8-9 (citing ECF No. 104-20 (Doroski body camera at timestamp 0:01-2:53)).) He remarked that it was "time to call a [drug recognition expert]" on multiple occasions. (ECF No. 104-20 (Doroski body camera at timestamps 2:51-2:54 and 5:34-5:41).) He told other officers and paramedics that Tarashuk was on drugs. (ECF No. 104-39 (Doroski body camera at timestamp 6:04).) He overtly stated that Tarashuk was "not making any sense when he talks . . . He is under the influence of something." (ECF No. 104-20 (Doroski body camera at timestamps at 11:09-11:13).) He ridiculed Tarashuk's behavior. (*See, e.g.,* ECF No. 104-20 (Doroski body camera at timestamps 4:07-4:08; 17:59-18:02).) Doroski's own recorded statements support the inference that like any reasonable person, he was subjectively aware that Tarashuk's condition was serious enough to require a "doctor's attention." *Gordon*, 937 F.3d at 356.

The court further concludes that under these facts, a reasonable jury could find that

Doroski's conduct was sufficiently culpable to demonstrate subjective awareness of the risk of denying Tarashuk medical care, and to satisfy the subjective element of the deliberate indifference analysis. Doroski argues that because EMS found Tarashuk's vitals normal and did not explicitly state Tarashuk needed additional evaluation or care, he could not have been subjectively aware of "a substantial risk of action or inaction." *Scinto*, 841 F.3d at 226; (ECF No. 83-1 at 16-17.) The record belies this contention. Doroski interacted with Tarashuk over the course of nearly two and a half hours. In that time, Doroski observed nothing indicating that the mental state of the man riding tractor trailers on the interstate had improved. Similarly, Tarashuk's encounter with EMS lasted mere minutes, and at no point did the paramedics administer any sort of treatment to Tarashuk or "clear" him in any manner. Instead, Doroski watched as Tarashuk remained disoriented and nonverbal in response to any attempt to talk to him and failed to react to an ammonia stick in his nose. And in a mental health emergency, normal vital signs do not obviate the need for treatment.[7] Under these facts, a jury could conclude that Doroski knew Tarashuk was experiencing a mental crisis and needed further medical care.

Plaintiff has adduced sufficient facts to support a finding that Doroski "knew of a substantial risk" in not letting EMS take Tarashuk to the hospital and not getting him any medical help, "from the very fact that the risk was obvious." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842). Indeed, Doroski expressly mentioned the risk

---

[7] Doroski's final argument that he "responded appropriately to [Tarashuk's] need by contacting EMS and ensuring Tarashuk was evaluated prior to taking him to Santee" is disingenuous at best. (ECF No. 83-1 at 17.) It was Doroski who decided Tarashuk needed to be taken off the ambulance, and Doroski who decided to leave him in a parking lot with no further medical care. The record therefore supports an inference that Doroski interfered with the EMS evaluation and, despite the lack of any indication that Tarashuk had been stabilized and no longer needed medical care, decided to abandon him in an unsafe location, alone, and without any chance of obtaining treatment.

16

Tarashuk might run into traffic multiple times. Despite his assessment, he took Tarashuk away from law enforcement officers and paramedics who could have taken him to a hospital or jail. That risk materialized hours later, when Tarashuk died in the same manner Doroski had foreseen from the start.

### 1. Qualified Immunity

Qualified immunity protects state actors from liability unless their acts violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome qualified immunity, a plaintiff must show that (1) the defendant's conduct violated a constitutional right, and (2) the right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Although the question of qualified immunity is resolved at the summary judgment stage whenever possible, when a dispute of material fact "precludes a conclusive ruling on qualified immunity . . . the [court] should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury." *Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005).

The court concludes that a reasonable jury could find Doroski's deliberate indifference to Tarashuk's medical needs violated Tarashuk's Fourteenth Amendment rights. An underlying material dispute of fact exists regarding whether Doroski subjectively believed that Tarashuk needed no further medical attention, that there was no risk in releasing him alone at a gas station parking lot in the middle of the night, and, crucially for qualified immunity, whether a reasonable basis existed for that belief. Though a jury may ultimately conclude Doroski reasonably held these beliefs, at this stage of litigation, the court is barred from resolving such disputes of material fact. Thus, the court cannot decide whether Doroski is entitled to qualified immunity because

issues of material fact preclude a finding as to the first element—whether Doroski violated the Constitution. This issue must be decided by a jury. *See Scinto*, 841 F.3d at 235.

Second, the court must consider whether this right was clearly established at the time of the alleged misconduct. *See Pearson*, 555 U.S. at 232. The second prong is a purely legal question and "is always capable of decision at the summary judgment stage." *Willingham*, 412 F.3d at 559 (quoting *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992)). The asserted right must be defined with particularity and not in a general sense. *Williams v. Ozmint*, 716 F.3d 801, 806 (4th Cir. 2013) (citing *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)). In this case, Tarashuk alleges his substantive due process rights under the Fourteenth Amendment were violated because Doroski was deliberately indifferent to his serious medical needs by failing to transport him to a location where he could obtain medical care. (ECF No. 1-5 at 47-50.)

As discussed *supra*, the Supreme Court has held that "a pretrial detainee has a right to be free from any form of punishment under the Due Process Clause of the Fourteenth Amendment." *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990) (citing *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)). This right "requires that government officials not be deliberately indifferent to any serious medical needs of the detainee." *Id.* (citing *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988)). Therefore, it is beyond debate that deliberate indifference toward the serious medical needs of prisoners constitutes a violation of the Eighth Amendment and pretrial detainees are entitled to "at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment." *See Estelle*, 429 U.S. at 104; *Young*, 238 F.3d at 575. The Fourth Circuit explained that "[a] prisoner's right to adequate medical care and freedom from deliberate indifference to their medical needs has been clearly established by the Supreme Court and this Circuit since at least 1976." *Scinto*, 841

F.3d at 236. In doing so, the Fourth Circuit rejected the invitation to narrow "the right to adequate medical care" by requiring "that the [defendant official's] 'very action in question must have previously been held unlawful' for a reasonable official to have notice that his conduct violated that right." *Id.* This court, too, must conclude that Tarashuk's right to adequate medical care was clearly established at the time of this incident. *See Knouse v. Primecare Medical of West Virginia*, 333 F. Supp. 3d 584, 590 (S.D.W. Va. 2018). At this stage, the court finds Doroski is not entitled to summary judgment as to Plaintiff's deliberate indifference claim on the basis of qualified immunity. *See Willingham*, 412 F.3d at 560.

## B. State-Created Danger

The second exception[8] to *DeShaney's* broad rule rejecting citizens' right to protection from the state arises "[w]hen the state itself creates the dangerous situation that resulted in a victim's injury." *Pinder*, 54 F.3d at 1177 (citing *DeShaney*, 489 U.S. at 201); *see also Doe v. Rosa*, 795 F.3d 429, 438 (4th Cir. 2015). The Fourth Circuit recognized in these cases, that when "the state is not merely accused of a failure to act . . . it becomes much more akin to an actor itself directly causing harm to the injured party." *Pinder*, 54 F.3d at 1177.

*Pinder* unequivocally limited the scope of the exception by recognizing that inherently, all actions occur "[a]t some point on the spectrum between action and inaction." 54 F.3d at 1175. At some point on that spectrum, the state's conduct may implicate it in the harm caused." *Id*. But the

---

[8] This doctrine presents an "alternate framework" of establishing § 1983 liability. *Rosa*, 795 F.3d at 438 n. 6. Though it is "commonly referred to as a second 'exception' to *DeShaney's* general rule, [the Fourth Circuit] noted that this terminology 'is not strictly accurate.'" *Id*. (citing *Pinder*, 54 F.3d at 1176 n. *. Because the court already determined that Plaintiff has "a substantive due process claim against [Doroski] based upon the [special relationship] exception," it need not analyze whether a secondary avenue for § 1983 liability has been properly alleged under the state-created danger doctrine. *See Robinson v. Lioi*, 536 F. App'x 340, 343 n. 1 (4th Cir. 2013). Nonetheless, the court addresses this claim for completeness.

state does not "'commit[] an affirmative act' or 'create[] a danger' every time it does anything that makes injury at the hands of a third party more likely." *Id*. In other words, "[l]iability does not arise when the state stands by and does nothing in the face of danger." *Stevenson ex rel. Stevenson v. Martin Cty. Bd. of Educ.*, 3 F. App'x 25, 31 (4th Cir. 2001) (citing *DeShaney*, 489 U.S. at 201). The state-created danger doctrine is therefore limited to cases involving a "state actor [who] created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission." *Rosa*, 795 F.3d at 439.

*Graves v. Lioi,* 930 F.3d 307, 316 (4th Cir. 2019), examined the contours of the state-created danger doctrine. *Graves* involved tragic facts: a domestic violence victim was murdered by her husband after police officers withheld a warrant for his arrest and sent letters and text messages to the victim's husband to help him avoid capture. *Id*. at 311, 320. The victim's family alleged the officer had violated her civil rights by preventing the warrant from being served and enabling the victim's husband "to remain free at the time he killed his wife." *Robinson v. Lioi*, 536 F. App'x 340, 342 (4th Cir. 2013) (examining the same facts in an earlier opinion). To establish the existence of a state-created danger, the Fourth Circuit required the plaintiff to demonstrate (1) that the conduct at issue could be characterized "as legally cognizable affirmative acts, [not] nonactionable inactions and omissions," *Graves*, 930 F.3d at 320, and point to (2) a "requisite causal link between the officers' purported 'affirmative acts' and the harm that befell [the plaintiff]," *id.* at 321.

The court concluded "[a]t its core, [the plaintiff's] claim suffers the same fundamental problem identified in *Town of Castle Rock*, *DeShaney*, *Pinder*, and *[Rosa]*—an attempt to turn inactions and omissions into affirmative acts." (citing *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005); *DeShaney*, 489 U.S. 189; *Pinder*, 54 F.3d at 1169; *Rosa*, 795 F.3d 429) (referencing

20

seminal cases in the Supreme Court and Fourth Circuit's state-created danger jurisprudence which consistently found that the failure of state actors to prevent harms to plaintiffs in the hands of third parties did not rise to the level of affirmative acts required for liability).  In *Graves*, the threat to the victim existed before and independent of communications between the defendant officers and the perpetrator, and nothing on the record demonstrated that the perpetrator "used them to avoid arrest."  *Id.* at 323.  Moreover, any challenges to the defendant officers' decision-making and exercises of discretion did not amount to affirmative acts—the affirmative act that caused the victim's death was her husband's "decision to stab her."  *Id.* at 329.  "[N]o amount of semantics [could] disguise that fact."[9]  *Id.* (citing *Pinder*, 54 F. 3d at 1175).  The Fourth Circuit further emphasized the narrowly drawn nature of the state-created danger doctrine in a second opinion issued on the same day, explaining that it has "never issued a published opinion recognizing a successful state-created danger claim."  *Turner v. Thomas*, 930 F.3d 640, 646 (4th Cir. 2019).

Whether Doroski's conduct in removing Tarashuk from the ambulance and leaving him in an abandoned parking lot amounts to an "affirmative act" must be decided against this legal backdrop.  Though Defendants frame Doroski's conduct as a failure to obtain medical care, Plaintiff has put forth some facts to demonstrate that it was Doroski's affirmative decisions which led to Tarashuk's death.  As discussed *supra*, Doroski commanded Tarashuk off the ambulance and removed him from a relatively safe location from which he could have been transported to a hospital only to abandon him in an empty parking lot a mile from the same highway where he had

---

[9] The *Graves* court reversed its stance on the state-created danger issue from an earlier unpublished order in the same case, *Robinson*, 536 F. App'x 340, where it had initially allowed the victim's § 1983 claim to proceed because she had raised triable issues of fact as to whether the officer's "conduct 'affirmatively placed [her] in a position of danger.'"  *Id.* at 589-90.  The *Graves* dissent rejected the majority's apparent dismissal of "the law of [the] case" by characterizing the defendant officers' conduct as "nothing more than a failure to act."  *Graves*, 930 F.3d at 334 (Gregory, C.J., dissenting).

been found naked, running in and out of traffic.  (ECF No. 91-15 (Doroski body camera at time mark 10:53-11:00).)

In the light most favorable to Plaintiff, Doroski's conduct could be viewed as more "affirmative" and decisive than the official actions at issue in *DeShaney*, *Pinder*, *Doe*, and *Graves*, where the decision to harm the victim was made by third parties acting with intent, not the officials themselves.  *See DeShaney*, 489 U.S. 189 (child who was not removed from father's custody was severely beaten); *Pinder*, 54 F.3d 1169 (former boyfriend who was not arrested after domestic violence complaint returned to kill victim's children); *Rosa*, 795 F.3d 429 (summer campers were molested by counselor after president of college concealed prior accusations against the same counselor); *Graves*, 930 F.3d 307 (see above).

Similarly, under the second factor articulated in *Graves*, the chain of causation between Doroski's act and Tarashuk's death on the highway is less attenuated because it did not involve an intentional decision by a third party to harm Tarashuk directly.  In fact, it is almost inevitable that a pedestrian running on a highway could be struck by passing cars.  Doroski's act could be deemed more akin to "throw[ing] [Tarashuk] to the lions" rather than failing to protect him "from lions at large."  *Rosa*, 795 F.3d at 439 (quoting *Pinder*, 54 F.3d at 1177).

Had Doroski simply failed to act, he would have left Tarashuk in the ambulance or left the scene altogether.  The court cannot speculate as to how EMS or other officers would have reacted in this alternate reality.  But Plaintiff has put forth testimony from at least some of the officers indicating they would have transported Tarashuk to jail, where he could have received medical care or a mental evaluation.  (*See, e.g.,* ECF No. 94 at 13 (citing ECF No. 94-7 at 24:50-25:49 (SLED interview of Trooper Rice acknowledging that if Doroski left Tarashuk by the roadside, he would "take him to jail for being a pedestrian on an interstate or take him to the hospital to

hopefully get an assessment on him, or possibly both.")).)  Similarly, both paramedics attested that they believed Doroski was taking Tarashuk to jail or to a hospital.  (ECF Nos. 79-3 at 10:1-3; 79-2 at 13:4-9.)  Doroski argues that he could not have "increased the risk of private danger" by giving Tarashuk a "ride to a gas station."  (ECF No. 83-1 at 13.)  But even if the court did conclude that Doroski's actions violated Tarashuk's constitutional right to be free from state-created danger, the second prong of the qualified immunity analysis prevents this claim from advancing past summary judgment.

*1. Qualified Immunity*

As discussed *supra*, the Supreme Court requires a plaintiff to demonstrate (1) that the defendant's conduct violated a constitutional right, and (2) that the right was clearly established at the time of the alleged misconduct.  *Pearson*, 555 U.S. at 232.  Even if the court assumes issues of fact exist as to the first element under the state-created danger doctrine, such a right was not "clearly established" in this circuit in 2018.

"A right is clearly established when the contours of the right are sufficiently clear that a reasonable officer would understand that what he is doing violates that right."  *Pinder*, 54 F.3d at 1181.  In conducting this inquiry, the court must "ask whether, when the defendants violated the right, there existed either controlling authority (such as a published opinion of [the Fourth Circuit]) or a 'robust consensus of persuasive authority' that would have given the defendants 'fair warning that their conduct,' under the circumstances, 'was wrongful.'"  *Williams v. Strickland*, 917 F.3d 763, 769 (4th Cir. 2019) (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017); *Williamson v. Stirling*, 912 F.3d 154, 187 (4th Cir. 2018)).

In the "failure to protect" realm, the Fourth Circuit's acknowledgement of the state-created danger doctrine has largely been abstract: while it accepted the possibility of liability for

affirmative acts, it has never actually recognized "a successful state-created danger claim" in a published opinion. *Turner*, 930 F.3d at 646. Without such a case, it is hard to articulate that a reasonable official could have "fair warning" as to which types of acts would fall below the constitutional threshold. Because the distinction between action and inaction turns into a line-drawing problem, examples of "state-created dangers" from precedential cases are crucial to understanding what affirmative acts may generate § 1983 liability. *See Robinson*, 536 F. App'x at 345-46 (deciding that the alleged actions of the defendant officers fell at "that 'point on the spectrum between action and inaction' such that [they] created 'the dangerous situation that resulted in [the victim's] injury.'") (quoting *Pinder*, 54 F.3d at 1175).

The state-created danger doctrine remains unsettled in this circuit. District courts have reached contradictory findings on this issue and struggled to define "affirmative acts" in this context.[10] One must look no further than the Fourth Circuit's reversal of its own earlier holding

---

[10] *See, e.g., Pullium v. Ceresini*, 221 F. Supp. 2d 600, 605 (D. Md. 2002) ("While the Fourth Circuit may be reluctant to impose liability on police officers whose *omissions* create increased dangers from third parties, there is no indication that the court would have the same reluctance where it is an officer's affirmative conduct that creates the danger.") (citing *Stevenson v. Martin County Board of Educ.*, 3 Fed. App'x. 25 (4th Cir. 2001), *cert. denied*, 534 U.S. 821 (2001); *Wood v. Ostrander*, 879 F.2d 583 (1989); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982)) (emphasis added); *see also H.B. v. State Bd. of Educ.*, No. 4:14-cv-204-BO, 2015 WL 2193778, at *5 (E.D.N.C. May 11, 2015) (concluding that school officials could be deemed to have "created the danger" to the plaintiff because they knew he had been attacked by a classmate in the past, yet still assigned both students to the same dormitory. The court stated that the plaintiff had plausibly alleged that the "State, either intentionally or with reckless indifference, placed plaintiff in a situation in which it knew that danger could and most likely would arise. Where the State's behavior surpasses a passive failure to act, it may properly be considered to have 'directly enabled' the dangerous situation which resulted in injury to the victim.").

*But see Shelley v. Blackwelder*, No. 3:15-cv-04989-JFA (D.S.C. Jan. 17, 2017), cited by Defendants in support of their argument as to the "special relationship" exception. That case involved a police officer who assisted a motorist and his girlfriend after their car broke down on an interstate highway. *Id*. at 1-3. Although the motorist presented some signs of intoxication, he denied that he was under the influence and passed a sobriety test. *Id*. at 3. The officer instructed the motorist to call his mother for gasoline and spoke to the motorist's girlfriend to confirm their

that the plaintiff in *Graves* had sufficiently alleged affirmative acts by the defendant officers. *Robinson*, 536 F. App'x at 344-45. In a later published opinion in the same case, the Fourth Circuit reframed the defendants' same actions as omissions or failures to act. *Graves*, 930 F.3d at 340 (Gregory, C.J., dissenting ("The majority now does an about-face, finding that *Town of Castle Rock* is in fact controlling and that [the plaintiff's] evidence amounts to nothing more than omissions by [the defendant officers]"). At a minimum, *Graves* demonstrates that there was disagreement among reasonable jurists in this unsettled area of circuit law. The court finds Tarashuk's constitutional right to be free from state-created danger in this factual context was not clearly established, and therefore, Doroski is entitled to qualified immunity on this claim.

**C. ADA Claim**

Pursuant to Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "A 'qualified individual with a disability' is broadly defined as any person who 'meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.'" 42 U.S.C. § 12131(2). "The term 'public

---

location on the highway. He then departed the scene to respond to another accident. *Id*. Forty minutes later, the motorist walked into the road, where he was struck and killed by oncoming traffic. *Id*. The court determined that the state-created danger doctrine did not apply to these facts, because the officer merely assisted a stranded motorist, diagnosed his mechanical issues, and moved his car to a safer position on the roadside. *Id*. at 9. The court concluded that the officer could not be held responsible "for a danger that already existed," and because "affirmative acts should not extend beyond the context of immediate interactions between the [state actor] and the plaintiff, he did not "create or increase any risk of private danger." *Id*. at 9-10 (citing *Rosa*, 795 F.3d at 437). Plaintiff's allegations in this case focus on Doroski's affirmative act of removing Tarashuk from the ambulance: by taking control of Tarashuk and leaving him alone and without a means to get help, Doroski created the danger that ultimately claimed Tarashuk's life. But *Shelley* fits neatly into the line of "failure to protect" cases where the defendant was not deemed to have taken any affirmative actions, which a reasonable officer could extend to the facts at issue here.

entity' is defined to be 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.' 42 U.S.C. § 12131(1)." *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998). The Fourth Circuit has concluded that Title II applies to police investigations, *Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 338 (4th Cir. 2012), and has held that an ADA claim may exist where "police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees." *Waller v. Danville*, 556 F.3d 171, 174 (4th Cir. 2009).

Plaintiff alleges that various institutional defendants, including OCSO, "intentionally discriminated against Mr. Tarashuk" when their employees failed to transport him "to a hospital for a mental health examination, or not obtaining a drug recognition examination," (ECF No. 1-5 at 64 ¶ 335), and "failed to make any reasonable accommodation for Mr. Tarashuk's mental disability" (*id*. at ¶ 337). A claimant must show the following elements to establish a Title II ADA claim: "(1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016) (citing *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005)).

Courts have concluded that where an arrestee's disability "'played a role in the . . . [official] decision-making process and . . . had a determinative effect on the outcome of that process[,]' *i.e.*, if the arrestee's disability was a 'but for' cause of the deprivation or harm he suffered," then the requirement that the claimant have been excluded from a service, program, or activity or discriminated against by reason of his disability has been met. *Haberle v. Troxell*, 885 F.3d 170,

179 (3d Cir. 2018) (citing *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 n.11 (3d Cir. 2013) (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 300 n.4 (3d Cir. 2007))).  Here, Tarashuk's disability could have prevented him from communicating with Doroski, Harmon, and Givens, and constituted a but-for cause of their failure to transport him to the hospital for further treatment.

Still, the obligation to provide reasonable accommodations applies only where public entities are aware of a "known physical and mental limitation" and that the need for accommodations is clear.  42 U.S.C. § 12112(b)(5)(A).  Defendants counter that, in this case, there was no evidence that Doroski knew Tarashuk "suffered from a mental limitation due to a disqualifying disability."  (ECF No. 83-1 at 18.)  But, at the summary judgment stage, the court need not decide what effectively amounts to a factual dispute between the parties.

Plaintiff argues there is a genuine question of material fact as to whether Doroski, as an employee of OCSO, was aware of Tarashuk's mental disability, which would, in turn, trigger his obligation to provide reasonable ADA accommodations.  It is evident from video and testimonial evidence that Tarashuk was confused, disorganized, and nonverbal throughout his encounter with police officers and EMS.  It is certainly possible that his symptoms were caused by an ADA-qualifying disability.  42 U.S.C. § 12210(a).  Given the circumstances surrounding the initial 911 call and Tarashuk's inability to answer any questions he was asked, it is also possible that Tarashuk's behavior could have been triggered by circumstances which are explicitly outside the purview of the ADA, such as the illegal use of drugs.  *See* 42 U.S.C. § 12210(a) (The ADA does not reach individuals who are "currently engaging in the illegal use of drugs.")  Here, the record supports the inference that Doroski suspected possible illegal drug use throughout his interactions with Tarashuk.  (*See, e.g.,* ECF Nos. 104-12 (Doroski body camera at timestamp 16:48-17:48,

asking Tarashuk if he had "taken anything . . . prescription medication or any drugs"); 104-39 (Doroski body camera at timestamp 6:04, noting he has seen "the same [behavior]" when [he sees] a variety of drugs being used" and telling Tarashuk he "ought to get treatment if [he has] taken anything").)

But viewing the record in the light most favorable to Plaintiff, a jury could reasonably conclude that Doroski believed Tarashuk "was in the midst of an acute psychotic break." (ECF No. 91 at 34.) Nothing on the scene confirmed Doroski's suspicions that Tarashuk's mental state was caused by drug intoxication. Further, Plaintiff argues Doroski's conduct demonstrated, above all, an unwillingness to deal with Tarashuk. Doroski's consistent reference to Tarashuk's potential drug use could simply be an attempt to minimize his medical need.

Further, Defendants' attempt to narrow the knowledge requirement to their knowledge of Tarashuk's specific mental health diagnosis of schizoaffective disorder is unavailing. *See Smith v. City of Greensboro*, No. 1:19-cv-386, 2020 WL 1452114, at *13 (M.D.N.C. Mar. 25, 2020), *reconsideration denied*, No. 1:19-cv-386, 2021 WL 5771544 (M.D.N.C. Dec. 6, 2021) (concluding that the allegations in the complaint made it "at least plausible that the Officers recognized Smith as mentally disabled, even if the precise nature of his disability was uncertain."). Individuals suffering from acute mental crises as a result of documented disabilities may not be able to communicate their diagnoses or request accommodations. Instead, where the circumstances indicate that an individual has an obvious need for accommodations, the ADA shifts the burden of compliance on public bodies and their employees.

Moreover, the actual accommodations required in this case are relatively obvious. Doroski could simply have allowed Harmon and Givens to "follow[] OCEMS protocols and transport[] Paul [Tarashuk] to the hospital" for medical evaluation and treatment, (ECF No. 91 at 35), instead

28

of intervening in their evaluation and commanding Tarashuk to get in his patrol car.  Unlike other cases where responding police officers "had no way of gauging what specific accommodation, if any, might have been reasonable under the circumstances," here, the answer was to simply let the paramedics do their job.  *Gray v. Cummings*, 917 F.3d 1, 18 (1st Cir. 2019).  Ultimately, whether the circumstances alleged here are such that Doroski knew Tarashuk was obviously disabled presents a genuine question of material fact and precludes summary judgment.

### D.  State Law Claims

Under the Eleventh Amendment, federal courts cannot hear claims against a state or its instrumentalities, unless the state has consented to suit.  *Fauconier v. Clarke*, 966 F.3d 265, 279 (4th Cir. 2020); *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997).  In South Carolina, the South Carolina Tort Claims Act, S.C. Code Ann. §§ 15-78-10 *et seq.* (West 2022), (the "SCTCA") creates a limited waiver of the state's sovereign immunity.  The SCTCA governs all tort claims against governmental entities and is the exclusive civil remedy available in an action against a governmental entity or its employees."  *Flateau v. Harrelson*, 584 S.E.2d 413, 416 (S.C. Ct. App. 2003); *see* S.C. Code Ann. § 15-78-20(b).

The State and its political subdivisions may be held liable under the SCTCA for their torts as a private individual would be liable, subject to the limitations and exemptions of the Act.  *Hawkins v. City of Greenville*, 594 S.E.2d 557, 563 (S.C. Ct. App. 2004) (citing S.C. Code Ann. §§ 15-78-30(d), 15-78-40).  The SCTCA provides "specific, enumerated exceptions limiting the liability of the [S]tate and its political subdivisions in certain circumstances."  *Wells v. City of Lynchburg*, 501 S.E.2d 746, 749 (S.C. Ct. App. 1998); *see* S.C. Code Ann. § 15-78-60 (listing forty enumerated exclusions from the State's waiver of immunity under the SCTCA).

In his first cause of action, Plaintiff alleges that OCSO was negligent and/or grossly negligent or reckless in violating its duties of care to Tarashuk.  (ECF No. 1-5 at 37-38.)  Plaintiff cites a number of acts and omissions which could support a finding of negligence, gross negligence, or recklessness by Doroski, and his employer, OCSO.[11]  (*Id.* at 38 ¶ 183).  Defendants urge these claims should be dismissed under SCTCA, because they are specifically excluded from the scope of the Act under two provisions: (1) S.C. Code Ann. § 15-78-60(6), disclaiming liability for "civil disobedience, riot, insurrection, or rebellion *or the failure to provide the method of providing police or fire protection*," and (2) S.C. Code Ann. § 15-78-60(4), disclaiming liability for the ". . . failure to adopt or enforce any law, whether valid or invalid, including, but not limited to, any charter, provision, ordinance, resolution, rule, regulation, or *written policies*."  (ECF No. 83-1 at 5-8 (emphasis added).)

The court agrees that any theories of negligence arising from the failure to implement or enforce written policies are categorically exempt from the SCTCA pursuant to S.C. Code. Ann. § 15-78-60(4).  *See Adkins v. Varn*, 312 S.C. 188, 192, 439 S.E.2d 822, 824 (1993) ("The provisions of Section 15-78-60(4) are clear and unambiguous on their face, and are not subject to judicial interpretation. The statute clearly exempts from liability any loss resulting from the failure to enforce an ordinance.")  Here, Plaintiff specifically challenges OCSO's failure to have proper

---

[11] For instance, Plaintiff argues that OCSO was negligent in failing "to ensure the safety of [Tarashuk]," "adher[ing] to proper law enforcement procedures," "failing to recognize that [Tarashuk's] mental state was such that he was a danger to himself and others," and therefore should be transported to the hospital, "transporting [Tarashuk] from mile marker 86 on I-95 to Santee, South Carolina, and by not dropping him off in a safe environment but rather at a closed gas station parking lot, knowing that he had an altered mental status, and was potentially suicidal," and "failing to have proper policies . . . for law enforcement officers to interact with citizens with altered mental states," among other theories.  (ECF No. 1-5 at 35-36.)  This list includes claims grounded in *respondeat superior* liability as well as OCSO's own negligent acts, such as the failure to train officers in issues concerning mental health.

policies for dealing with mental illness in place and its failure to enforce such policies by adequately training its officers. (ECF No. 1-5 at 38 ¶ 183(r)). The court finds this allegation falls squarely within the scope of the statutory exclusion under § 15-78-60(4), and therefore, OSCO is immune from liability on this ground.

In accordance with the SCTCA, Plaintiff's remaining theories assert liability against OSCO for Doroski's alleged negligence, in part because Doroski failed to obtain treatment for Tarashuk and "drop[ped] him off. . . at a closed gas station parking lot, knowing that he had an altered mental status." (ECF No. 1-5 at 37 ¶ 180(f), (a)-(j).) Defendants characterize these claims essentially as a "failure to protect," barred under S.C. Code Ann. § 15-78-60(6), which explicitly disclaims liability for the state's "failure to provide the method of providing police or fire protection." (ECF No. 83-1 at 5-7 (citing *Shelley v. S.C. Highway Patrol,* 852 S.E.2d 220 (S.C. Ct. App. 2020).[12]

In *Shelley*, 852 S.E.2d at 222, a South Carolina Court of Appeals found that the plaintiff's claims "collectively, essentially [are] a 'failure to protect' claim . . . [and] derivative of the notion that [the defendant trooper] should have protected [the decedent driver] from harm." The court notes again, however, that there are substantial factual differences between the facts of this case and *Shelley*. For instance, *Shelley* contained no allegation that the defendant officer removed the decedent from a place of relative safety and abandoned him in a more dangerous location. *Id*. at 225.

Further, South Carolina courts have recognized that police officers may owe a duty of care to intoxicated individuals. *See, e.g., Russell v. City of Columbia*, 406 S.E.2d 338, 339 (S.C. 1991); *Hill v. York Cty. Sheriff's Dep't*, 437 S.E.2d 179, 181 (S.C. Ct. App. 1993). In *Russell*, the South

---

[12] The court discussed the facts of *Shelley*, *supra*, at n. 10. The Plaintiff filed *Shelley v. Blackwelder*, No. 3:15-cv-04989-JFA (D.S.C. Jan. 17, 2017) in federal court, while *Shelley v. S.C. Highway Patrol,* 852 S.E.2d 220 (S.C. Ct. App. 2020) was subsequently brought in state court.

31

Carolina Supreme Court found that officers assumed a duty of care toward the decedent who died after the officers "asserted their authority," removed individuals trying to render him aid, and insisted the decedent leave the premises in his injured and intoxicated state.  406 S.E.2d at 90.  In *Hill*, 437 S.E.2d at 180, officers released an arrestee from jail and declined to transport him to his motel nearly thirteen miles away.  "At the time of his release, [the arrestee] was wearing only a pair of shorts, with no shoes or shirt, had only four dollars in cash and was extremely intoxicated. He was released into a high crime area and, within a short distance from the jail, [and] was shot in the abdomen."  *Id*. at 180-81.  The South Carolina Court of Appeals concluded that "there is a reasonable inference that law officers might foresee the injury that occurred to [plaintiff] as a result of such actions," and denied the officer's motion for summary judgment as to plaintiff's negligence claim.  *Id*. at 182.  Though these courts did not explicitly consider SCTCA immunities under § 15-78-60, these exclusions were included in the text of § 15-78-60 from its initial passage and were therefore effective at the time both *Hill* and *Russell* were decided.  *See* 1986 S.C. Acts 463 § 1. To the court's knowledge, *Russell* remains good law, and the South Carolina Supreme Court has not yet adopted the broad interpretation of the "failure to protect" exclusion of § 15-78-60(6) endorsed by *Shelley*, 852 S.E.2d 220.

Moreover, the SCTCA establishes that state entities are not liable for failures in the "supervision, protection, control, confinement, or custody of any student, patient, prisoner, inmate, or client of any governmental entity, *except when the responsibility or duty is exercised in a grossly negligent manner*."  S.C. Code Ann. § 15-78-60(25) (emphasis added).  Plaintiff has alleged that Doroski was "grossly negligent [or] reckless" in his interaction with Tarashuk, (ECF No. 1-5 at 37 ¶ 180), and asserts that Tarashuk was in custody when Doroski ordered him off the ambulance (*Id*. at 40 ¶ 183) (stating the paramedics allowed "Deputy Doroski to take custody and control of Mr.

Tarashuk"). The fact of custody distinguishes this case from *Shelley*, where the court primarily analyzed the "failure to protect" claim as applied to members of the general public who were not detained, arrested, or otherwise confined by the state. *See Shelley,* 852 S.E.2d at 221 (noting that the trial court found "the custodial immunity in subsection 15-78-60(25) of the Act—which includes a gross negligence exception—did not apply under the facts of this case."). And as discussed *supra*, triable issues of fact support a finding that Tarashuk was in custody when Doroski removed him from the ambulance and led him to his patrol car.

If Tarashuk was in fact detained, the court must apply the heightened gross negligence standard to determine whether the State's immunity is waived. S.C. Code Ann. § 15-78-60(25). "Gross negligence is a mixed question of law and fact and should be presented to the jury unless the evidence supports only one reasonable inference. *Taylor v. S.C. Dep't of Corr.*, No. 0:19-cv-02105-JFA, 2020 WL 1672780, at *10 (D.S.C. Apr. 6, 2020) (citing *Bass v. S.C. Dep't of Soc. Servs.*, 780 S.E.2d 252, 259 (S.C. 2015)). Pursuant to the same reasoning discussed above regarding Plaintiff's deliberate indifference claim, these facts permit an inference that Doroski acted with gross negligence or recklessness with regard to Tarashuk's wellbeing and safety, because deliberate indifference is, in effect, a recklessness standard. *McKinney*, 976 F.3d at 416 ("An officer's actions demonstrate deliberate indifference where the evidence shows that the officer subjectively recognized a substantial risk of harm and that his actions were inappropriate in light of the risk."). The court therefore finds Plaintiff's negligence based SCTCA claim survives summary judgment.

## E.  CONCLUSION

The court **GRANTS IN PART** and **DENIES IN PART** the Motion for Summary Judgment filed by Defendants OCSO, Doroski, and Sheriff Leroy Ravenell.  (ECF No. 83).

In particular, the court **GRANTS** summary judgment as to Plaintiff's § 1983 claim for state-created danger against Doroski (third cause of action), and **DENIES** summary judgment as to Plaintiff's § 1983 claim for deliberate indifference against Doroski (fourth cause of action), the Americans with Disabilities Act claims against OCSO (eighth cause of action), and the negligence and gross negligence claims under the South Carolina Tort Claims Act against OCSO (first cause of action).

**IT IS SO ORDERED.**

_J. Michelle Childs_

United States District Judge

March 30, 2022
Columbia, South Carolina

34